**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

BRISTOL COUNTY RETIREMENT SYSTEM,
Individually and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

QURATE RETAIL, INC., MICHAEL A. GEORGE, GREGORY B. MAFFEI,
DARRELL CAVENS AND THADDEUS JASTRZEBSKI,

      Defendants.

---

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL**
**SECURITIES LAWS AND JURY TRIAL DEMAND**

---

**INTRODUCTION**

Plaintiff Bristol County Retirement System ("Bristol County" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges the following based on personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based upon the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of press releases and other public statements issued by Qurate Retail, Inc. ("Qurate" or the "Company"), Qurate's filings with the U.S. Securities and Exchange Commission ("SEC"), and media and analyst reports about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth hereinafter a reasonable opportunity for discovery.

1

## SUMMARY OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Qurate securities between August 5, 2015 and September 7, 2016, inclusive (the "Class Period"). The action is brought against Qurate and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Qurate markets and sells various consumer products primarily through live merchandise-focused televised shopping programs, websites, and mobile applications. The Company was formerly known as "Liberty Interactive Corporation" and changed its name to Qurate Retail, Inc. on or about April 9, 2018. Qurate is comprised of eight leading retail brands – QVC, HSN, zulily, Ballard Designs, Frontgate, Garnet Hill, Grandin Road, and Improvements, all dedicated to providing a "third way to shop" that goes beyond transactional eCommerce and traditional stores. The Company is number one in video commerce, with a worldwide reach of nearly 360 million homes via 16 television channels and multiple media outlets.

3.      QVC, Inc. ("QVC") is Qurate's largest segment, accounting for roughly 85 percent of the Company's total revenue in 2016. In the U.S., QVC distributes its programming live 24 hours per day, 364 days per year and presents on average 800 products every week. Internationally, QVC distributes live programming 8 to 24 hours per day, depending on the market. QVC classifies its products into six groups: home, apparel, beauty, accessories, electronics, and jewelry.

4.      As a promotional tool used to spur sales, QVC offers a payment plan called Easy-Pay to its customers in the U.S., U.K., Germany and Italy (known as Q-Pay in Germany, and

Italy). Easy Pay allows QVC customers to pay for certain merchandise in two or more monthly installments. When Easy-Pay is elected by the QVC customer, the first installment is billed to the customer's credit card upon shipment and an Easy-Pay receivable is established to account for the collection of subsequent installments.

5.      Qurate is exposed to the credit risk on the Easy-Pay receivables. Specifically, if the QVC customer does not remit payment for the subsequent Easy-Pay installments, Qurate is required to record a loss and write off the Easy-Pay receivable. Under Generally Accepted Accounting Principles, the Company is required to establish adequate reserves for its Easy-Pay receivables.

6.      During the Class Period, Qurate repeatedly attributed its growth to broad-based marketing and higher personalized customer experience, which the Company claimed would spur continued revenue growth. However, Defendants' (as defined herein) Class Period statements pertaining to the Company's revenue growth were materially false and misleading because Defendants failed to disclose that: (1) the Company was aggressively loosening the credit standards of its Easy-Pay program to attract a large group of new customers; (2) the Company's strong sales growth was due to this loose credit policy; (3) accounts receivable associated with this new group of customers posed a high risk of write-off; and (4) as a result of the foregoing, the Company's positive statements about its business, operations, and prospects lacked a reasonable basis.

7.      The slowdown in QVC sales began to emerge on August 5, 2016, when the Company issued a press release announcing financial results for the second quarter ended June 30, 2016, in which the Company disclosed "significant headwinds" and sales declines as

compared to prior periods. Later that day, during the Company's Second Quarter 2016 Earnings Call with analysts and investors, the Company disclosed "higher than expected write-offs on Easy Pay purchases from October and November of last year" and announced increased reserves for prior period purchases. The Company also disclosed that "[g]iven heightened write-off risks, we choose to moderate our Easy Pay usage beginning in June, which puts some additional pressure on our sales." In an attempt to downplay Easy Pay issues and divert customers' attention away from the real situation, Company executives attributed its poor results to a variety of other factors, including "aggressive markdown activity" by department stores during clearance sales, a drop-off in sales for one of its largest brands, and even lowered QVC station viewership from "distractions" in the summer due to television coverage of certain world events and the 2016 U.S. presidential election.

8.      On news of Qurate's sales slowdown, the Company's stock price fell $5.69 per share, or 21.63 percent, to close on August 5, 2016 at $20.61 per share.

9.      Then, on September 8, 2016, during a Goldman Sachs Global Retailing Conference in New York City, the Company finally disclosed the true impact of the Easy Pay issues, revealing to investors that it expects to see "higher default rates" associated with these sales. Moreover, the Company warned that this negative trend, while improved, would still, continue to impact its business.

10.     On this news, the Company's stock fell price $1.87 per share, or 8.71 percent, to close on September 8, 2016 at $19.59 per share.

11.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Qurate is headquartered in Colorado and conducts business in this District. Many of the acts charged herein, including the preparation and/or dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.     Plaintiff Bristol County purchased Qurate securities during the Class Period, as set forth in the certification attached hereto, and was damaged as the result of Defendants' wrongdoing as alleged in this complaint.

16.     Defendant Qurate is a Delaware corporation with its principal executive offices located at 12300 Liberty Boulevard, Englewood, Colorado 80112. The Company's stock is listed on the NASDAQ under the ticker symbol "QRTEA."[1]

17.     Defendant Michael A. George ("George") is the President and Chief Executive Officer ("CEO") of Qurate and served as the CEO and President of QVC Inc. from April 2006 to March 2018, and November 2005 to March 2018, respectively.

18.     Defendant Gregory B. Maffei ("Maffei") was the CEO of Qurate from February 2006 to March 2018.

19.     Defendant Darrell Cavens ("Cavens") is the President of New Ventures at Qurate and served as the President and CEO of Zulily LLC from October 2009 to February 2018.

20.     Defendant Thaddeus "Ted" Jastrzebski ("Jastrzebski") served as CFO of Qurate subsidiary QVC, Inc. from July 2013 to May 17, 2018.

21.     Defendants George, Maffei, Cavens and Jastrzebski are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Qurate' reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been

---

[1] Qurate's Series B common stock trades on the NASDAQ under the ticker symbol "QRTEB."

disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

22.     Qurate and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Qurate markets and sells various consumer products primarily through live merchandise-focused televised shopping programs, website, and mobile applications. Of it's eight leading brands – QVC, HSN, zulily, Ballard Designs, Frontgate, Garnet Hill, Grandin Road, and Improvements, QVC is the Company's largest segment, accounting for roughly 85 percent of the Company's total revenue in 2016. In the United States alone, QVC distributes its programming live 24 hours per day, 364 days per year and presents on average 800 products every week. QVC also has a strong presence internationally.

24.     As a promotional tool used to spur sales, QVC offers a payment plan called Easy-Pay to its customers in the U.S., U.K., Germany and Italy (known as Q-Pay in Germany, and Italy). Easy Pay allows QVC customers to pay for certain merchandise in two or more monthly installments. When Easy-Pay is elected by the QVC customer, the first installment is billed to the customer's credit card upon shipment and an Easy-Pay receivable is established to account for the collection of subsequent installments.

25.     Qurate is exposed to the credit risk on the Easy-Pay receivables. Specifically, if the QVC customer does not remit payment for the subsequent Easy-Pay installments, Qurate is required to record a loss and write off the Easy-Pay receivable. Under Generally Accepted Accounting Principles, the Company is required to establish adequate reserves for its Easy-Pay receivables.

26.     The Company also acquired online retailer zulily, Inc. (now known as zulily, LLC), on October 1, 2015, as part of its strategy to boost sales growth and attract new customers. Based in Seattle, Washington, zulily offers merchandise and other products through flash sales on its website, which typically last for 72 hours.

### Materially False and Misleading Statements Issued During the Class Period

27.     The Class Period begins on August 5, 2015, when the Company held its Second Quarter 2015 Earnings Call with analysts and investors. During the call, Defendant George made several positive statements concerning the Company's growth, stating in part:

> We drove solid local currency revenue and adjusted OIBDA growth in every one of our consolidated markets. Our e-commerce growth accelerated significantly, with nearly half of our e-commerce orders coming from mobile devices. Our overall customer base and our new customer additions increased at some of the strongest rates we've seen in years.
>
> ***
>
> We believe these strong results in the quarter reflect our disciplined execution of strategies, aimed at extending our leading global video and e-commerce position.
>
> ***
>
> Our consolidated customer base increased 5% and new customers increased 9%. And in the U.S., total customer account increased 7% and new customers increased 12%, driven by strengths in product and programming, personalization initiatives, enhanced digital marketing, growing mobile penetration and the new S&H rates.

Defendant George also discussed the Company's use of Easy Pay as an important promotion tool, stating in part:

> I mean, we certainly use Easy Pay as an important promotional tool. As we've talked in the past, it's a relatively efficient vehicle for us. And so, we use it strategically when we need to and the offers and events are always changing at a fair amount. So, I don't know if that can give you any sort of additional quantification but it's definitely an important tool for us.

28.     On November 4, 2015, during the Company's Third Quarter 2015 Earnings Call with analysts and investors, Defendant George attributed the Company's stronger customer growth to its marketing strategies, stating in part:

> Now looking at some other highlights for the quarter, on a consolidated basis we grew our overall customer base 4%, and new customers 2%, and we improved retention rates across all customer segments – existing, new and reactivated. This **strong customer growth was fueled by engaging products and programming, the continued work on personalization initiatives, enhanced digital marketing and growing mobile penetration.**
>
> We saw especially strong growth in the U.S., with total customer count increasing 5%, and we continue to be encouraged by our new customer acquisition rates in Japan and Italy, which has been a focus for us.

Defendant Cavens added:

> As discussed on zulily's last earnings call, we've been most focused on two areas of the business that are critical to getting us back to stronger growth levels – marketing and customer experience.
>
> \*\*\*
>
> I think as we look at the back half of this year, we're really kind of anniversarying some very, very strong growth last year. And I think as we come out of that, we're just very, **very focused on kind of the higher-quality customer growth first**. And I think we're not giving kind of forward guidance here, but I would just say I think the back half of this year is really where we added a tremendous amount of buyers last year and I think once we get out of that I hope that we're going to see some growth beyond that.

29.     On November 12, 2015, during the Company's Investor Day call with analysts and investors, Defendant George again made positive statements concerning the Company's growth, stating in part:

> So we have very consistent and stable revenue growth, certainly ups and downs by quarter and across markets, but over any long period of time, our customer growth has been – our revenue growth has been stable.
>
> ***
>
> The core of the story are these extraordinarily advantaged profitability rates. We are simply more profitable than any other multi-category retailer – period – by a substantial margin. And not only are we highly profitable, we keep growing our profitability every year.
>
> ***
>
> We love our unique brand and the deep connections we've formed with our customers. We love our global diversity. We love our success across digital eCommerce and mobile platforms. We love this highly loyal and repeating customer base and growing customer base and we love these highly advantaged financials that are driven at the core of the model.

30.     On February 26, 2016, the Company issued a press release announcing financial results for the fourth quarter and year ended December 31, 2015. In the press release, Defendants Maffei and Cavens discussed the Company's solid revenue growth, stating in part:

> "QVC generated another quarter of solid revenue growth, particularly QVC US, which we view as very strong given the backdrop of a soft US retail environment. zulily ended the year with a strong fourth quarter, delivering solid revenue growth and significant adjusted OIBDA margin expansion, reinforcing our investment thesis," said Greg Maffei, Liberty Interactive president and CEO.
>
> ***
>
> "We ended 2015 with positive momentum and strong operational execution across the business," said zulily CEO Darrell Cavens. "We remain focused on delivering growth through improvements in marketing, the launch of new products and brands, compelling enhancements to our customer experience, and continuing our work to deliver significant improvements in our supply chain. Additionally, we remain very excited to work alongside QVC to take advantage of shared learnings that can help us grow faster together. We believe these areas of focus will provide a strong foundation for growth in 2016 and beyond."

31.     On that same day, during the Company's Fourth Quarter 2015 Earnings Call with analysts and investors, Defendant George again made positive statements concerning the Company's growth, stating in part:

> We experienced outstanding customer growth in 2015. On a trailing 12-month basis, total consolidated customer count increased 3% to 12.6 million customers, and in the U.S., customer count grew 4% to 8.3 million. Those are both records for total customers served.
>
> **We think these strong customer dynamics are the result of our focus on compelling merchandise and content and our increasing focus on personalizing our digital platforms.**

32.     On March 10, 2016, during the Company's UBS Global Consumer Conference call with analysts and investors, Defendant George again made positive statements concerning the Company's growth, stating in part:

> [A] pretty diverse set of customers and a pretty health and growing customer base. So we're excited that the customer base grows every year and grows in a health way.
>
> ***
>
> I think we saw pretty healthy new name growth over the last 12 months.  It's hard to prove cause and effect, but I think that healthy new name growth was bolstered by the new shipment and handling charges. And so we think that's kind of de-risked the business and it's probably a pretty sustainable place that we can grow from going forward.

33.     On May 9, 2016, the Company issued a press release announcing financial results for the first quarter ended March 31, 2016. In the press release, Defendants Maffei, George and Cavens discussed the Company's solid revenue growth, stating in part:

> "QVC generated another strong quarter of revenue growth, particularly in the US, and posted impressive increases in mobile penetration of orders in the US and on a consolidated basis. zulily started off strong in 2016 with accelerating revenue growth and a six-fold increase in adjusted OIBDA on strong operational execution," said Greg Maffei, Liberty Interactive President and CEO.

\*\*\*

"We generated very solid top-line growth, with local currency gains in nearly every market," said QVC President and CEO Mike George. "We continued to benefit from our strategies and investments to enhance and extend the reach of our commerce platforms. We delivered double-digit gains for both consolidated eCommerce revenue and mobile orders. Our top-line performance and the continued expansion of our commerce platforms demonstrate how strongly the QVC brand resonates with consumers."

\*\*\*

"Our first quarter performance came in strong and I'm pleased with our sales momentum in 2016," said zulily President and CEO Darrell Cavens. "Our merchandising and technology teams delivered on a great customer experience by bringing in new and unique products at incredible prices while continuing to innovate on the site experience across platforms. I remain excited about our continued strong operational execution and improved performance from our shifts in marketing strategy last year. We continue to discover new ways to leverage the partnership with QVC and believe our continued knowledge sharing will contribute to incremental growth in 2016 and beyond."

34.     On that day, during the Company's First Quarter 2016 Earnings Call with analysts and investors, Defendant Cavens attributed the Company's stronger customer growth to its marketing strategies, stating in relevant part:

Now an update on our core business. Our efforts over the last year in marketing, merchandising, technology and operational execution are all contributing to an improved customer experience, resulting in stronger growth.

First, on marketing. As you may recall, we made a shift early last year into broad-based marketing channels, with a focus on acquiring customers with a higher lifetime value. Since then, we continue to see the quality of our acquired customers improve, and saw Q1 orders increase 18% year-over-year, up from 16% growth in Q4 and 8% in Q3. Repeat is a key component of this sustained growth, with 90% of our total orders in Q1 coming from repeat customers, up from 86% a year ago and flat from the fourth quarter.

Defendant George added:

[T]here has been a nice flow of new customers from zulily to QVC through this program. Again, I wouldn't say highly material yet, but a meaningful number. And those customers, the quality of those customers as we measure customer

quality is probably as good and actually probably better than any other marketing acquisition channel.

35.     On May 15, 2016, during the Company's Investor Meeting Call with analysts and investors, Defendant Jastrzebski reassured investors of the Company's focus on the quality of its customer base, stating in part:

> The marketing brings new customers into our franchise and around and around that cycle goes. This is based on numbers for the U.S. but a very similar cycle is happening in every one of our countries around the world.

> And as we grow our sales, and as we move more and more of our business into the digital space, ***we're very cognizant of the fact that we got to be staying on top of what the quality of those customers are that are coming into the franchise.*** We've invested considerable funds and spent a lot of time analyzing and making sure that we're managing our credit, we're managing how the payments are working through our system. And as you can see, that over this time period since 2008, ***we've been able to manage our bad debt to about 1% of our business, and that is not starting to grow in any kind of dramatic way.***

36.     On June 15, 2016, during the Company's Piper Jaffray Consumer Conference meeting with analysts, Defendant George, in response to an analyst question concerning how the company is able to beat revenue and OIBDA estimates despite disappointing consumer trends, stated the following:

> Well, I think it starts with we have a customer that is fairly well off. She is well above average household income, so she doesn't feel quite the same economic pressure maybe as the average consumer. I do think as she is more selective about where she is purchasing and what she is purchasing, she is more likely to concentrate her spend with us…. So, if she gets that everything we offer is a value. I think all that helps us in this current environment.

> We've also tried to focus over the years on price integrity as a core element of building customer trust…. All of that being said, I can't pretend that we're immune to economics cycle either. And so, it's a tough environment out there, and we've got to fight for every sale. ***I think we just have to be that much better on every item, every decision we make in an environment where there is not much of a tailwind and so it really is a battle for share.***

***

> And so the zulily customer will see that event, if she wants to buy that today's special value, she's got to click through to QVC, become a QVC member and then make the transaction.

> And we're seeing meaningful numbers of zulily customers come to QVC everyday through that one link and there are many other ways that we're marketing the two brands and become QVC customers.

37.     The statements contained in ¶¶ 27-36 were materially false and/or misleading when made because Defendants failed to disclose that: (1) the Company was aggressively loosening the credit standards of its Easy-Pay program to attract a large group of new customers; (2) the Company's strong sales growth was due to this loose credit policy; (3) accounts receivable associated with this new group of customers posed a high risk of write-off; and (4) as a result of the foregoing, the Company's positive statements about its business, operations, and prospects lacked a reasonable basis.

38.     On August 5, 2016, the Company issued a press release announcing financial results for the second quarter ended June 30, 2016, in which the Company disclosed "significant headwinds" and sales declines as compared to prior periods, stating in part:

> "We reported solid second quarter results, with good sales growth in most markets," said QVC President and CEO Mike George. "Late in the quarter, we experienced a deceleration in demand in the US that has continued. As a result, our near-term perspective is more cautious. Longer term, we remain well-positioned with our highly differentiated retail model, strong customer retention, and our ability to deliver compelling experiences across immersive commerce platforms."

> ***

> Beginning in early June QVC's US sales began to experience significant headwinds, which have continued. The sales declines, as compared to prior periods, have averaged in the mid to high single digit percentages. QVC has developed many initiatives intended to reverse the negative trends and QVC is optimistic, although there is no guarantee, that these actions will have a positive effect. However, even if these initiatives begin to reverse these trends, it is

believed that QVC's US net revenue and adjusted OIBDA will likely experience negative growth rates for the third quarter.

39.     On that same day, during the Company's Second Quarter 2016 Earnings Call with analysts and investors to further discuss the recent headwinds and sales decline, the Company disclosed "higher than expected write-offs on Easy Pay purchases from October and November of last year" and announced increased reserves for prior period purchases.

40.     On the same conference call, however, Defendant George continued to mislead the market by downplaying issues with Easy-Pay and the downturn in sales, stating in relevant part:

> We believe a number of factors contributed to the soft sales trend.  The retail environment certainly continues to be challenging. In particular, we're seeing unusually aggressive markdown activity as department stores clear out spring and summer fashion goods. And we're also feeling the pressure from continued industry softness in key categories like jewelry, handbags and consumer electronics.
>
> We are also concerned that rising bad debt rates, which other parties have referenced, suggested that consumers may be feeling greater financial pressures… [I]t appears that all of the distractions this summer from world events and the U.S. election season are also having some impact and we anticipate additional sales pressure from the Olympics starting today.
>
> Finally, one of our largest brands faced a significant drop-off in sales at QVC and other outlets, which did materially impact our overall results.
>
> ***
>
> Beginning in April, we saw higher than expected write-offs on Easy Pay purchases from October and November of last year. Accordingly, we increased the reserves for these prior period-purchases and this catch-up accounts for approximately two-thirds of the Q2 bad debt increase. The remaining increase reflects the higher write-off experience.
>
> ***
>
> [I]f you're referring to the change in Easy Pay…where *we're being a little more conservative on Easy Pay, that probably has some impact, but I don't think that's - I think that's unlikely to be a huge driver*, but it could be one of five or six contributing factors possibly.

Defendant George further added:

> Given heightened write-off risks, we choose to moderate our Easy Pay usage beginning in June, which puts some additional pressure on our sales.
>
> ***
>
> We do think Easy-Pay is important and even though we've moderated the usage of it, we're certainly still using it in a meaningful way. To me - because we don't have a lot of promotional levers in our business, it is I think part of the why QVC story that our customers get and value, and because of the high loyalty of our customers, it ends up being a relatively modest expense.
>
> In fact, most write-offs associated with Easy Pay, the overwhelming amount of the write-offs associated with Easy Pay are actually from new customers where you don't have quite the same experience base, the write-off rates from our existing customers especially once they have made a few purchases or have been with us a couple of years, is really quite low.
>
> So overall, you're talking about a program that has a less than 2% expense rate. And so, we view it as an ***extremely efficient program*** that does create a differentiation for QVC. And because the bad debt write-off rates popped up a bit, we're being a little bit cautious right now about the use of it, but we see it as an important ongoing program and not necessarily critical to accelerating sales, but just something that we need to be able to offer and that we fully expect to be able to continue to offer it.

41.     On news of the Company's sales and growth downturn, the Company's stock price fell $5.69 per share, or 21.63 percent, to close on August 5, 2016 at $20.61 per share.

42.     On September 8, 2016, during Goldman Sachs Global Retailing Conference in New York City, the Company disclosed to investors that it expects to see "higher default rates" associated with these sales.  The negative trend, while improved, would still continue to impact its business. During the call, Defendant George stated in part:

> So, we did announce on our Q2 earnings call that while we had a pretty solid Q2 and growth across all of our segments, we had seen a slowdown in the business starting in roughly early June that had persisted throughout the comp, a slowdown kind of in the high-single digits. I would say, as we look forward over the last

16

several weeks, that trend has largely continued, modestly improved. So, we're seeing a little bit better trend, but still negative comps in our business.

\*\*\*

We did, however, see a bit of a tick up in write-off rates associated with our Easy-Pay program. They are still low by any standard. This is a program where we don't do any credit check. We make it available to every customer who purchases. The write-off rates are sub 2%, so it's not a big number, but we did see them move up a bit starting in Q4 of 2015 last year. ***That said, with the lag time, that only became visible to us around April, May of this year that we were starting to see a little bit higher default rate on those sales.***

43.     On this news, the Company's stock price fell $1.87 per share, or 8.71 percent, to close on September 8, 2016 at $19.59 per share.

44.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

### ADDITIONAL SCIENTER ALLEGATIONS

45.     During the Class Period, as alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew or were reckless as to whether the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew or were reckless as to whether such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

46.     The Individual Defendants permitted Qurate to release these false and misleading statements and failed to file the necessary corrective disclosures, which artificially inflated the value of the Company's securities.

47.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Qurate, their control over, receipt, and/or modification of Qurate's allegedly materially misleading statements and omissions, and/or their positions with the Company that made them privy to confidential information concerning Qurate, participated in the fraudulent scheme alleged herein.

48.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Qurate securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding Qurate's business, operations, and management and the intrinsic value of Qurate securities and caused Plaintiff and members of the Class to purchase Qurate securities at artificially inflated prices.

## LOSS CAUSATION/ECONOMIC LOSS

49.     During the Class Period, as detailed herein, Qurate and the Individual Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Qurate securities, and operated as a fraud or deceit on Class Period purchasers of Qurate securities by misrepresenting the Company's business and prospects. Later, when Defendants' prior misrepresentations and fraudulent conduct became known to the market, the price of Qurate securities declined as the prior artificial inflation came out of the price over time. As a result of their purchases of Qurate securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET**

50.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased Qurate securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

51.     At all relevant times, the markets for Qurate securities were efficient for the following reasons, among others:

(a)     as a regulated issuer, Qurate filed periodic public reports with the SEC;

(b)     Qurate regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)     Qurate was followed by several securities analysts employed by major brokerage firm(s) who wrote reports that were distributed to the sales force and certain customers

of their respective brokerage firm(s) and that were publicly available and entered the public marketplace; and

(d)     Qurate securities was actively traded in an efficient market, namely the NASDAQ, under the ticker symbol "QRTEA."

52.     As a result of the foregoing, the market for Qurate securities promptly digested current information regarding Qurate from publicly available sources and reflected such information in Qurate's stock price. Under these circumstances, all purchasers of Qurate securities during the Class Period suffered similar injury through their purchase of Qurate securities at artificially inflated prices and the presumption of reliance applies.

53.     Further, to the extent that the Defendants concealed or improperly failed to disclose material facts with regard to the Company, Plaintiff is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## <u>NO SAFE HARBOR</u>

54.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to

any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Qurate who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired Qurate securities between August 5, 2015 and September 7, 2016, inclusive (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Qurate, and the directors and officers of Qurate and their families and affiliates at all relevant times.

56.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of April 30, 2018, Qurate had: (1) 440,356,117 shares of Class A common stock outstanding; and (2) 29,258,343 shares of Class B common stock outstanding.

57.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)      Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)      Whether the price of Qurate securities was artificially inflated; and

(f)      The extent of damage sustained by Class members and the appropriate measure of damages.

58.      Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

59.      Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in securities class action litigation.  Plaintiff has no interests that conflict with those of the Class.

60.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## CLAIMS FOR RELIEF

### COUNT  I
### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

61.      Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

62.      During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

63.     Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Qurate securities during the Class Period.

64.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Qurate securities. Plaintiff and the Class would not have purchased Qurate securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

65.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Qurate securities during the Class Period.

**COUNT  II**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

66.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

67.    The Individual Defendants acted as controlling persons of Qurate within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control public statements about Qurate, the Individual Defendants had the power and ability to control the actions of Qurate and its employees. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23;

B.    Awarding Plaintiff and the members of the Class damages and interest;

C.    Awarding Plaintiff's reasonable costs, including attorneys' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  September 6, 2018


_s/ Ivy T. Ngo_____

**Ivy T. Ngo**
Franklin D. Azar & Associates, P.C.
14426 East Evans Avenue
Aurora, CO 80014
Telephone:   (303) 757-3300
E-Mail:        ngoi@fdazar.com
*Local Counsel for Plaintiff Bristol County Retirement System*


**Guillaume Buell**
Thornton Law Firm, LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Telephone    (617) 531-3933
E-Mail:        gbuell@tenlaw.com
*Counsel for Plaintiff Bristol County Retirement System*