**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

BRISTOL COUNTY RETIREMENT
SYSTEM, Individually and On Behalf of All
Others Similarly Situated,

                          Plaintiff(s),

         vs.

QURATE RETAIL, INC.,
MICHAEL A. GEORGE,
GREGORY B. MAFFEI, AND
THADDEUS JASTRZEBSKI,

                          Defendant(s).

Civil Action No. 1:18-cv-02300-MEH

Hon. Michael E. Hegarty

**DEMAND FOR JURY TRIAL**

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATION OF FEDERAL SECURITIES LAWS**

**LABATON SUCHAROW LLP**
Jonathan Gardner (*pro hac vice*)
Christine M. Fox (*pro hac vice*)
Theodore J. Hawkins (*pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: 212.907.0700
Facsimile: 212.818.0477

*Lead Counsel for Plaintiff and the Proposed Class*

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ............................................................................. 2

II.     JURISDICTION AND VENUE ...................................................................... 13

III.    PARTIES ........................................................................................................ 14

        A.      Lead Plaintiff ...................................................................................... 14

        B.      Defendants .......................................................................................... 14

IV.     SUBSTANTIVE ALLEGATIONS ................................................................ 17

        A.      Background – QVC and its Easy Pay Program .................................. 17

        B.      Defendants Dramatically Increased the Availability of Easy Pay
                Credit in the Summer of 2015 ............................................................ 20

        C.      It Was Well Known at Qurate that a Large Increase in the
                Availability of Easy Pay Credit Would Inflate Sales and Lead to an
                Increase in Defaults and Bad Debt Expense ...................................... 23

        D.      A Forensic Accounting Analysis Shows Defendants Increased
                Easy Pay During the Class Period to Inflate Sales ............................. 27

                1.      Charting Qurate's Bad Debt Shows How Defendants
                        Sought to Stem Slumping Sales in 2015 With Increased
                        Offering of Easy Pay Credit ..................................................... 28

                2.      Estimating the Effect of Easy Pay in the Fourth Quarter of
                        2015 .......................................................................................... 31

        E.      Defendants Artificially Inflated Qurate's Sales Using Easy Pay to
                Ensure They Would Be Paid Million-Dollar Bonuses for 2015 .......... 32

        F.      Defendants also Sought to Artificially Inflate Qurate's Stock Price
                to Reduce the Acquisition Cost of Zulily ........................................... 36

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING
        STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD .......... 37

        A.      Qurate's Materially Misstated Revenues During the Class Period ...... 37

        B.      False SOX Certifications ................................................................... 38

C.      Defendants' Materially False and Misleading Statements and
        Omissions Regarding the Source and Sustainability of Qurate's
        Sales Growth and the Pervasiveness and Use of Easy Pay Credit ...................... 39

        1.      Second Quarter 2015 Results - August 5, 2015 ......................................... 40

        2.      Third Quarter 2015 Results - November 4, 2015 ..................................... 42

        3.      Investor Day - November 12, 2015 ............................................................ 43

        4.      ICR Conference - January 13, 2016 .......................................................... 44

        5.      Fourth Quarter and Year End 2015 Results - February 26,
                2016 ............................................................................................................ 45

        6.      UBS Global Consumer Conference - March 10, 2016 ............................ 50

        7.      First Quarter 2016 Results - May 9, 2016 ................................................. 51

        8.      Investor Day - May 16, 2016 ...................................................................... 55

        9.      Goldman Sachs Conference - June 15, 2016 ............................................ 57

        10.     Piper Jaffray Annual Consumer Conference - June 15, 2016 .................. 58

        11.     The Truth Begins To Emerge, But Defendants Continue to
                Mislead Investors ...................................................................................... 58

VI.     POST-CLASS PERIOD EVENTS ..................................................................... 68

VII.    ADDITIONAL EVIDENCE OF SCIENTER ................................................... 71

A.      Certain Defendants' Stock Sales During the Class Period Were
        Highly Unusual and Suspicious ........................................................................ 72

        1.      The Value and Amount of Trading by Defendants George
                and Maffei Was Highly Unusual ............................................................... 73

        2.      The Presence of 10b5-1 Trading Plans Adopted by the
                Individual Defendants Does Not Absolve Them of Liability ................... 77

B.      Defendants Knew or Were Reckless in Not Knowing that A
        Significant Expansion of the Company's Easy Pay Program Would
        Materially Increase its Bad Debt Expense ........................................................ 79

C.      Defendants Artificially Inflated Qurate's Sales with Easy Pay
        Credit to Ensure Payment of Outsized Bonuses in a Year of
        Otherwise Poor Financial Performance ................................................. 82

D.      Defendants Sought to Increase the Value of Qurate's Stock Price to
        Reduce the Price Paid for Zulily .......................................................... 83

VIII.   LOSS CAUSATION/ECONOMIC LOSS ....................................................... 84

IX.     CLASS ACTION ALLEGATIONS .................................................................. 86

X.      PRESUMPTION OF RELIANCE .................................................................... 88

XI.     NO SAFE HARBOR ........................................................................................ 90

XII.    CONTROL PERSON ALLEGATIONS ........................................................... 91

XIII.   CLAIMS FOR RELIEF .................................................................................... 93

COUNT I For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
        Against All Defendants ........................................................................... 93

COUNT II For Violation of Section 20(a) of the Exchange Act Against the
        Individual Defendants ............................................................................ 96

PRAYER FOR RELIEF .............................................................................................. 98

JURY DEMAND ........................................................................................................ 98

Court-appointed Lead Plaintiff Indiana Public Retirement System ("Indiana" or "Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned counsel, hereby brings this Amended Class Action Complaint (the "Complaint") against Qurate Retail, Inc. ("Qurate" or the "Company"), Michael A. George, Gregory B. Maffei, and Thaddeus Jastrzebski (collectively, "Defendants").[1]  The allegations herein are based on Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by QVC Group Inc., Liberty Interactive Corporation, and Qurate (together the "Liberty Media Entities"); securities analysts' reports and advisories the Liberty Media Entities; press releases and other public statements issued by the Liberty Media Entities; media reports about the Liberty Media Entities; and consultation with experts in the areas of: (1) accounting; and (2) loss causation and damages.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of itself and the class it seeks to represent, Plaintiff alleges as follows:

---

[1] Michael A. George ("George"), Gregory B. Maffei ("Maffei"), and Thaddeus Jastrzebski ("Jastrzebski") are referred to collectively as the "Individual Defendants."

## I.  NATURE OF THE ACTION

1.  This is a federal securities class action brought on behalf of all persons and entities that purchased or otherwise acquired QVC Stock[2] during the period from August 5, 2015 through September 8, 2016, inclusive (the "Class Period"), and were damaged thereby.  The action is brought against Qurate and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.  Qurate is a retail company that sells consumer products mostly through live merchandise-focused televised shopping programs, websites, and mobile applications.[3]  QVC, Inc. ("QVC") is Qurate's largest wholly owned subsidiary, accounting for roughly 87.5 % of the Company's total revenue in 2016 and reaching 23 million customers.  QVC has more than 17,000 employees and has retail operations in the U.S., Japan, Germany, the United Kingdom, Italy, France, and through a joint venture in China.  In the U.S., QVC distributes live product-focused programming to viewers 24 hours per day, 364 days per year, and presents, on average, 800 products every week. Internationally, QVC distributes live programming between 8 to 24 hours per day, depending on the market.  QVC classifies its products into six categories: home, apparel, beauty, accessories, electronics and jewelry.

---

[2] "QVC Stock" means the publicly traded Series A QVC Group common stock traded during the Class Period on the NASDAQ Global Select Market under the symbol QVCA.

[3] During the Class Period, Qurate Retail Inc. was known as "QVC Group" and the assets that made up QVC Group were all wholly-owned subsidiaries of Liberty Interactive Corporation. In March 2018, QVC Group was rebranded as Qurate Retail Inc., and in April 2018 Liberty Interactive was renamed Qurate.  Thus, this Complaint refers to Qurate as the Company throughout the Class Period and the terms "Qurate" and "QVC Group" are used interchangeably herein.  After the rebranding, the ticker symbol "QVCA" was changed to "QRTEA."

3.      As a promotional tool used to increase sales, QVC offers a payment plan called "Easy Pay" to its customers in the United States, the United Kingdom, Germany and Italy (known as Q-Pay in Germany and Italy).  Easy Pay allows QVC customers to pay for certain merchandise in monthly installments, with the first installment typically billed to the customer's credit card when the items ships.  Generally, a customer's credit card is subsequently billed up to five additional monthly installments until the total purchase price of the product has been billed by QVC.  The product price, shipping and handling, and any applicable sales tax are divided according to the specified number of payments.  Prior to 2015, QVC offered Easy Pay on a subset of its products.

4.      When a customer seeks to purchase an item on Easy Pay credit, the customer is only required to provide a credit card, debit card, or gift card number, before using Easy Pay.  QVC does not perform a credit check before allowing a customer to purchase an item using Easy Pay.  Thus, QVC incurs significant risk on these purchases.  While QVC customers can use any credit or debit card to pay for items on Easy Pay, QVC also offers its own proprietary credit card called the "Q Card," which provides additional promotions and benefits to its users.

5.      Prior to the beginning of the Class Period, QVC was suffering from declining revenue and an exodus of new customers who, as Defendant George later admitted, historically purchased larger ticket items from QVC, such as electronics and cookware.   Without informing investors, Defendants dramatically increased the availability of Easy Pay credit, beginning in the summer of 2015 by increasing the number and type of products on which the Company offered Easy Pay and relaxing rules regarding Easy Pay installment payments in order to attract new customers and increase sales.

6.      As part of Defendants' acceleration in the provision of Easy Pay, no later than August 2015, QVC introduced a program called "Easy Pay Every Day."  That program allowed any customer with a Q Card to purchase any product offered on QVC using an Easy Pay installment plan.  Specifically, the program gave Q Card holders the ability to pay for any purchase over three monthly installments. There was no extra charge or minimum purchase amount required.  In addition and at around the same time, Defendants ramped up the number of Easy Pay offers available to customers, which meant that more products were available on installment, and customers did not need to pay the full price up front.

7.      At the start of the Class Period, Defendants specifically declined to disclose the extent to which the Company was relying on Easy Pay to increase sales. During an August 5, 2015 earnings call, a Wells Fargo analyst directly asked Defendant George whether the Company could "quantify the impact of EasyPay" for the quarter ended June 30, 2015.  Rather than answer the question, George demurred, claiming that while Easy Pay was an *"important promotional tool"* there was "*[n]othing [he could] really quantify" and "I don't know [that I] can give you sort of additional quantification."*  This was a gross misrepresentation.  In fact, Defendants had dramatically increased the amount of Easy Pay being offered to consumers in order to artificially inflate sales and internally were tracking Easy Pay penetration on a regular basis. Indeed, throughout the Class Period, Defendants hid the fact that sales were being artificially inflated through Easy Pay. As a result, investors were unaware that an increasing percentage of customers, including new customers, were paying on installment and that this was leading to higher default rates and bad debt.

8.      During the Class Period, Defendants repeatedly attributed Qurate's  growth to broad-based marketing and a more personalized customer experience, which the Company claimed would lead to continued revenue growth.  For example, Defendants falsely stated:

> • "[W]e experienced outstanding customer growth in 2015. On a trailing 12-month basis, total consolidated customer count increased 3% to 12.6 million customers, and in the U.S., customer count grew 4% to 8.3 million. Those are both records for total customers served. ***We think these strong customer dynamics are the result of our focus on compelling merchandise and content and our increasing focus on personalizing our digital platforms.***" (February 26, 2016, ¶103).

9.      As to Easy Pay, Defendants routinely downplayed its effect on QVC's sales growth, falsely stating, among other things:

> • "***While this new Easy Pay practice has not materially impacted our overall sales***, it clearly adds value to our profitable Q Card program, saves on credit card processing fees, and is an effective tool to help us protect and grow the Q Card over time." (May 9, 2016, ¶117);

> • that Easy Pay was "***not necessarily critical to accelerating sales, but just something that we need to be able to offer*** . . ."  (Aug. 5, 2016, ¶140); and

> • that the pullback in Easy Pay offerings in 2Q 2016 was "***unlikely . . . . a huge driver***" in the Company's sales slowdown that quarter (Aug. 5, 2016, ¶141).

10.     However, Defendants' statements during the Class Period were materially false and misleading when made because Defendants failed to disclose that: (a) the Company had aggressively increased the use of Easy Pay in the summer of 2015 by increasing the number and type of products on which it offered Easy Pay, adding lower-priced products to Easy Pay, and relaxing rules regarding Easy Pay installment payments in an effort to artificially inflate the Company's sales and attract new customers; (b) the Company's reported strong sales growth was

due to its substantially expanded Easy Pay program and was not sustainable, organic growth; (c) accounts receivable associated with the expanded use of Easy Pay posed a higher risk of write-off; (d) the Company misstated its 2015 and Q1 2016 bad debt expense in violation of Generally Accepted Accounting Principles ("GAAP"); and (5) as a result of the foregoing, Defendants' statements about Qurate's sales lacked a reasonable basis.

11.     Defendants manipulated QVC's sales by increasing the availability of Easy Pay despite knowing that the increased use of Easy Pay credit would lead to increased levels of defaults and bad debt on the Company's books.  Indeed:

> • During the Class Period, QVC "really ramped" up the use of Easy Pay because sales had been down for "quite a while" and management at QVC knew sales would be boosted if items were available with Easy Pay.  Easy Pay was typically used for larger items, such as electronics. However, in 2015, Easy Pay was being offered on more products and with additional installment periods. The use of Easy Pay continued to increase in the latter half of 2015.  ¶47(a).

> • The Company began using Easy Pay on everything in 2015 because sales were down and Easy Pay was a major sales driver. Because Easy Pay historically had collectability issues, an internal rule was created for Easy Pay in early 2014 which required that, during a promotion, only one-third of QVC's products could be sold on Easy Pay in order to mitigate collectability problems. ***However, in 2015, the Company began offering Easy Pay on everything and Easy Pay's one-third rule was no longer being enforced.*** ¶47(b).

> • QVC decided to increase the use of Easy Pay in an effort to boost sales.  Easy Pay was originally only used on a few select products such as the "Daily Deal" and high priced products, but QVC began using it more and more beginning in 2015 to increase sales.  In 2015, Easy Pay also was being used on clearance items and the more Easy Pay was used, the more default and collection issues there were.  ¶47(c).

• There was a significant increase in Easy Pay Flash events in 2015 which increased the use of Easy Pay.  Flash events were windows of time in which Easy Pay was offered.  The planning team, led by Doug Howe, who reported directly to Defendant George, decided what items would be offered with Easy Pay.  ¶47(d).

• In addition, QVC increased the number of installments a customer could use to pay back balances through Easy Pay from three payments to up to five payments.  Easy Pay was extended to additional products including lower ticket items. ¶47(e).

• In approximately September 2015, the Company rolled out a plan to allow all purchases on the Q Card, *including very low priced items*, to be paid in Easy Pay installments. The plan to link Easy Pay to the Q Card was done to drive sales which had been down. QVC even accepted gift cards in some markets for Easy Pay purchases.  ¶47(f).

• The decision to expand the use of Easy Pay came from the Company's "C-Suite" which included Defendant George and Doug Howe (Executive Vice President and Chief Merchandising Officer).  ¶47(g).

• Reports were generated on how often customers were using Easy Pay (referred to as the "take rate"), as well as other analytics related to that metric.  New customers typically came to QVC for big ticket items and were more likely to default, while returning customers were less likely to default. ¶47(h).

• In 2015, QVC increased the availability of Easy Pay credit to such an extent that more than *70% of QVC's sales were made through Easy Pay*. ¶47(i).

• In 2015, it was a frequent topic of discussion at weekly strategy meetings that Easy Pay was being used too much.  These meetings were being attended by some of Defendant George's direct reports including Doug Howe. ¶47(j).

12.     By the end of 2015, Defendants' scheme to artificially prop up Qurate's stock price was working and equity analysts opined that QVC was generating organic growth (rather than relying on the artifice of Easy Pay credit to prop-up sales).  On February 10, 2016, a Wells Fargo analyst announced that QVC Stock was their "top pick for 2016," giving the stock an

7

"outperform" rating.  But it was clear from the analyst's comments that the market had no idea:

(i) how QVC had dramatically increased its dependence on Easy Pay in order to drive sales, and

(ii) that QVC's default rates and bad debt were increasing due to the increased availability of

Easy Pay.

13.     Defendants knew, or were reckless in not knowing, that bad debt was rising

during the Class Period because of a flood of additional Easy Pay sales to new customers, among

others, who posed additional risk of non-payment. For example:

> • Easy Pay was underwritten by the Company and everyone at QVC knew that the more Easy Pay was offered the more QVC would see an increase in delinquencies. ¶48(b).
>
> • Defaults were going up during the Class Period. QVC had a report that was circulated every week to ten days that detailed customer defaults and bankruptcies, and listed customers with over $25,000 in Easy Pay balances.  This report was put together by QVC's finance team, which included Defendant Jastrzebski. Defendant Jastrzebski's team monitored defaults closely and in 2015, there was an increase in the number of customer accounts being sent to collection on reports generated by QVC's Customer Service or "CSR" System.  ¶49(a).
>
> • The Company used an in-house customer relationship management ("CRM") system built by Qurate's IT department to track Easy Pay installment plans and reports were circulated at least monthly with information about Easy Pay usage.  Reports were circulated with sales and Easy Pay default information and the C-Suite knew about the increased use of Easy Pay and its default rate.  ¶49(b).
>
> • Concerns about Easy Pay were consistently discussed in high-level weekly Officers' Meetings which all of Qurate's officers, attended, including Defendants George and Jastrzebski. Delinquencies and defaults on Easy Pay purchases were metrics that QVC's finance team followed closely and the finance team would have alerted the attendees of the Officers' Meetings to any changes in that metric. ¶49(c).

> • Bad debt was always a topic of discussion during Tuesday morning leadership meetings with C-Suite executives and was tracked by QVC's finance department in its SAP Financial System. Defaults would be reported to QVC's customer care department where a dunning process would take place.  ¶49(d).

14.    A forensic accounting analysis performed under the supervision of Plaintiff's counsel shows just how much Defendants relied upon Easy Pay credit to boost sales.  In fact, based upon Qurate's disclosures regarding the write-off rates and bad debt expense rate associated with Easy Pay (at the end of the Class Period), ***Easy Pay sales during the Class Period generally ranged from 50% to 75% of QVC's net sales***.  ***In the fourth quarter of 2015, however, Defendants increased the availability of Easy Pay to such an extent that more than 83% of Qurate's total net sales were generated using Easy Pay credit.***  Indeed, Qurate's 4Q 2015 earnings (and related EBITDA) were inflated by approximately $11.2 million as a result of Defendants' decision to significantly expand the Easy Pay program in 4Q 2015.

15.    The truth regarding the Company's sales, the massive expansion of the Easy Pay program, and resultant increase in Qurate's bad debt rates was revealed to the market through two partial disclosures beginning on August 5, 2016, when the Company issued a press release announcing its financial results for the second quarter ended June 30, 2016.  The Company disclosed "significant headwinds" and sales declines compared with prior periods and revealed that its bad debt expense had shot up by $15 million dollars as a direct result of its Easy Pay program.  The Company further disclosed, "**higher than expected write-offs on Easy Pay purchases from October and November of last year**" and announced that, "**[g]iven heightened write-off risks, we choose to moderate our Easy Pay usage beginning in June...**" However, Defendants continued to mislead the market by falsely attributing the sales slowdown

in the second quarter to a variety of other factors, including "aggressive markdown activity" by department stores during clearance sales, a drop-off in sales for one of its largest brands, and even lowered QVC station viewership from "distractions" in the summer due to television coverage of world events and the 2016 U.S. presidential election. On news of Qurate's higher write-offs on Easy Pay purchases and the Company's decision to cut back on Easy Pay offerings, which revealed that the Company's earlier sales growth was not organic and sustainable, the Company's stock price fell $5.69 per share, or **21.63%**, to close on August 5, 2016 at $20.61 per share on unusually high trading volume.

16.     The previously undisclosed risks associated with the massive increase in Easy Pay usage, especially among new customers, was fully revealed on September 8, 2016, when the Company revealed, at a sell-side analyst conference, that the sales slowdown the Company disclosed in August had "largely continued" and would continue to impact Qurate's business. Moreover, despite a pullback on the Company's use of Easy Pay in the second quarter, write-off rates associated with Easy Pay "tick[ed]-up" and were "disproportionately concentrated" in new or very occasional customers.  Further, the increased write-off rates was a trend that had persisted and "**doesn't appear to be getting a lot better**." On this news, the Company's stock price fell $1.87 per share, or *8.71%*, to close on September 8, 2016 at $19.59 per share on unusually high trading volume.

17.     Defendants were motivated to artificially inflate Qurate's sales, in part, so that they would be paid large bonuses that were tied to specific target revenue numbers for Qurate. Qurate's Executive Officers were eligible to receive performance-based bonuses, in addition to their base salary which were structured to align with the Company's financial performance. The

Company provides a target EBITDA number in its proxy statement that must be achieved before

any bonus is paid to Qurate's executives.[4]  Each year, the Company increased its target based on

a projection of modest, single-digit growth.  During the Class Period in 2015, Qurate's EBITDA

had to equal or exceed $1,969.9 million before any bonus would be paid. This target

performance number materially affected Defendant George's compensation, who was eligible for

a performance bonus of up to 260% of his base salary.  The other officers also received

performance bonuses subject to the Company's revenue growth.  However, Qurate's sales were

exceedingly low in 2015, and Defendants acknowledged the Company was experiencing

significant headwinds.  In the first quarter of 2015, revenue was $2,214 million, down from

$2,434 million in revenue in the first quarter of 2014.  Similarly, in 2Q 2015, revenue was

$2,252 million, compared to $2,483 million in 2Q 2014.  Revenue decreased even further to

$2,153 million in 3Q 2015, a decline quarter over quarter from the previous year, putting the

Individual Defendants' bonuses at risk.  By the end of 3Q 2015, Qurate's net retail sales were

tracking 8.7% behind what the Company achieved for the same three quarters of 2014. Knowing

the Company was falling short of its target EBITDA for executive bonuses, Defendants rapidly

expanded the Company's use of Easy Pay beginning in the summer of 2015 in an attempt to

increase sales before year-end.  This expansion occurred just in time to bridge the gap between

the Company's low sales over the first three quarters of 2015 and what the Company would need

to achieve in order for its officers to receive bonuses.  ***As a result of this expansion, the***

***Company's 4Q 2015 revenue shot up to $3,370 million, the highest it had been all year and***

***above the level achieved in the same quarter during the previous year.  As reported, EBITDA***

---

[4] EBITDA refers to the Company's earnings before interest, taxes, depreciation, and amortization.

***for 2015 was $1,969 million, somehow exactly what the executive officers needed to receive***

***their incentive based bonuses.***

18.     The increase in Defendants' compensation resulting from performance bonuses in

2015 was significant. Defendant George, for example, was paid a salary of $1,125,509 as well as

a performance bonus amounting to $1,000,000.  Thus, the addition of George's bonus almost

doubled his total compensation. And given the EBITDA target and the Company's performance

for the first two quarters of 2015, ***Defendant George's bonus would not have been paid absent***

***Defendants' decision to significantly expand use of the Easy Pay program.***

19.     Moreover, unbeknownst to investors, during the Class Period, Defendants George

and Maffei had been heavily selling QVC Stock in unusual and suspicious amounts **totaling**

**more than $44.5 million in proceeds**.  Indeed, Defendants George and Maffei sold large

tranches of stock that were suspiciously timed and out of line with their prior trading practices.

As a result of these Class Period trades, these Defendants profited from the artificial inflation in

the price of QVC Stock caused by their false and misleading statements and omissions. Notably,

on October 1, 2015—the same date the acquisition of Zulily, Inc. ("Zulily") was consummated—

Defendant George executed trades amounting to $7,144,409.50 in proceeds.  This highly

suspicious transaction was Defendant George's largest transaction throughout the Class Period.

As discussed more fully herein, the value and amount of trading these Defendants engaged in

during the Class Period were highly unusual.  Defendant George sold 1,470,110 shares of QVC

Stock during the Class Period for proceeds of more than $38.5 million, while Defendant Maffei

sold 224,505 shares of QVC Stock during the Class Period for proceeds of more than $6 million.

20.     As a result of Defendants' false and misleading statements and omissions, the precipitous decline in the price of Qurate's common stock and the Lead Plaintiff's and other Class members' significant losses were foreseeable to Defendants.

## II.     JURISDICTION AND VENUE

21.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

23.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts that constitute the violations of law complained herein, including the preparation and public dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Qurate transacts business in this District, and the Company's headquarters are located within this District at 12300 Liberty Boulevard, Englewood, Colorado 80112.

24.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities markets, including NASDAQ.

### III.    PARTIES

#### A.    Lead Plaintiff

25.     On November 26, 2018, the Court appointed Indiana as Lead Plaintiff for the

Class pursuant to the Private Securities Litigation Reform Act (the "PSLRA").  ECF No. 28.

Indiana is a pension fund that is based in Indianapolis, Indiana and offers pension, retirement

plans and various other benefits to its participants.  The System serves the needs of

approximately 467,000 members and retirees representing more than 1,200 employers, including

public universities, school corporations, municipalities, and state agencies throughout the state of

Indiana.  Indiana is a sophisticated institutional investor that had $34.2 billion in assets under

management at fiscal year-end 2018.  As set forth in the Certification previously submitted to the

Court (ECF No. 18-1), Lead Plaintiff purchased QVC Stock at artificially inflated prices during

the Class Period and suffered damages as a result of the federal securities law violations and

materially false and misleading statements and omissions alleged herein.

#### B.    Defendants

26.     Qurate is a Delaware corporation with its principal executive offices located at

12300 Liberty Boulevard, Englewood, Colorado 80112.  Qurate markets and sells retail goods

through live merchandise-focused televised shopping programs, websites, and mobile

applications.  Qurate is currently comprised of eight wholly-owned subsidiaries including QVC,

HSN, Zulily, Ballard Designs, Frontgate, Garnet Hill, Grandin Road, and Improvements.

27.     During the Class Period, QVC Inc. was part of QVC Group and Series A shares

of QVC Group were publicly traded on NASDAQ under the ticker symbol "QVCA."  In

14

addition, during the Class Period, QVC Group was a wholly-owned subsidiary of Liberty Interactive Corporation.

(a)     On March 9, 2018, Liberty Interactive Corporation entered into a complex transaction which included the acquisition and spin off of an Alaska-based telecommunication company called General Communications Inc.  In connection with that transaction, Liberty Interactive Corporation rebranded itself as Qurate Retail Inc., the current corporate Defendant in this case.  Notably, Qurate Retail Inc. was comprised of the same businesses and assets previously attributed to QVC Group.

(b)     On the same date—March 9, 2018—ticker symbols "QVCA" and "QVCB" were changed to new ticker symbols "QRTEA" and "QRTEB." Thus, after Qurate Retail Inc. came into existence, investors who held shares QVC Group stock (QVCA) received exactly the same number of shares of QRTEA stock, which continued trading on NASDAQ.

28.     Defendant George served as the CEO and President of QVC Inc. from April 2006 to March 2018, and November 2005 to March 2018, respectively.  Defendant George made false and misleading statements on the Company's Earnings Conference Calls ("Earnings Calls") on August 5, 2015, November 4, 2015, February 26, 2016, May 9, 2016 and August 5, 2016 and during the Company's 2015 and 2016 Investor Days on November 12, 2015 and May 16, 2016. Further, Defendant George made false and misleading statements at conferences on January 13, 2016, March 10, 2016 and June 15, 2016, and in Press Releases dated August 5, 2015, May 9, 2016 and August 5, 2016.

29.     Defendant Maffei has been President and Chief Executive Officer of Liberty Interactive Corporation from February 2006 to the present.  He also has served as a director of

Liberty Interactive Corporation from November 2005 to the present. Defendant Maffei signed and certified the Company's Form 10-K for fiscal 2015 and the Company's Form 10-Q for the quarterly periods ending June 30, 2015, September 30, 2015, March 31, 2016, and June 30, 2016. Further, Defendant Maffei made false and misleading statements in the Company's Press Release dated February 26, 2016.

30.     Defendant Jastrzebski served as Executive Vice President and CFO of Qurate's subsidiary QVC, Inc. from July 2013 to May 17, 2018. Defendant Jastrzebski was QVC's Principal Accounting Officer & Executive Vice President of Strategy until May 2018. Defendant Jastrzebski made false and misleading statements at the Company's 2016 Investor Day on May 16, 2016.

31.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Qurate's reports to the SEC, press releases, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

IV.    **SUBSTANTIVE ALLEGATIONS**

A.    **Background – QVC and its Easy Pay Program**

32.    Qurate markets and sells various consumer products primarily through live merchandise-focused televised shopping programs, websites, and mobile applications.  Qurate is currently comprised of eight leading retail brands – QVC, HSN, Zulily, Ballard Designs, Frontgate, Garnet Hill, Grandin Road and Improvements, all dedicated to providing a "third way to shop" that goes beyond transactional e-commerce and traditional stores. Each brand maintains its own logo and shopping experience within the organization. The Company is a leader in video commerce, with a worldwide reach of nearly 370 million homes via 16 television channels and multiple media outlets.  Qurate has 27,000 employees in the US, UK, Germany, Japan, Italy, France, Poland and China. This action centers on QVC, Qurate's largest and most important brand.

33.    As shown in the chart below, QVC, Inc. ("QVC") is by far Qurate's largest wholly owned subsidiary, accounting for roughly 87.5 % of the Company's total revenue in 2015 and reaching 23 million customers.





\* Operating income before depreciation and amortization ("OIBDA") is a metric used to measure financial performance.  During the Class Period, Qurate used an adjusted OIBDA formula to measure the Company's financial performance. Qurate's adjusted OIBDA refers to the Company's revenue less the cost of sales, operating expenses, selling, and general and administrative expenses (excluding stock compensation).  Qurate executives regularly referred to this OIBDA metric during the Company's earnings calls.

34.     In the U.S., QVC distributes its programming live 24 hours per day, 364 days per year and presents on average 800 products every week.  QVC has more than 17,000 employees and has retail operations in the U.S., Japan, Germany, United Kingdom, Italy, France, and through a joint venture in China.  Internationally, QVC distributes live programming between 8 to 24 hours per day, depending on the market.  QVC classifies its products into six categories: home, apparel, beauty, accessories, electronics and jewelry.

35.     As a promotional tool used to increase sales, QVC offers a payment plan called Easy Pay to its customers in the United States, United Kingdom, Germany and Italy (known as Q-Pay in Germany and Italy).  Easy Pay allows QVC customers to pay for certain merchandise in up to six monthly installments, with the first installment typically billed to the customer's credit card when the merchandise is shipped. The customer's credit card is subsequently billed two to five additional monthly installments until the total purchase price of the products has been billed by QVC. The product price, shipping and handling, and any applicable sales tax is divided among the specified number of payments. ***When a customer places an order using Easy Pay, QVC requests authorization from the credit card company for just the amount of the first installment, not the total purchase amount.***

36.      QVC does not perform a credit check before allowing a customer to purchase an item using Easy Pay.  Thus, if an Easy Pay installment plan is offered for a particular item, the customer is only required to provide a credit card, debit card, or gift card number before using Easy Pay.  QVC thus incurs significant risk on these purchases.

37.     While QVC customers can use any credit or debit card to pay for items on Easy Pay, QVC also offers its own proprietary credit card called the "Q Card," which provides

19

additional promotions and benefits to its users.  According to the Company, the Q Card is

managed by Synchrony Bank.

> **B.**     **Defendants Dramatically Increased the Availability of Easy Pay Credit in the Summer of 2015**

38.     Prior to 2015, QVC offered Easy Pay only on a subset of its products, including

larger ticket items such as electronics.

39.     In 2015, QVC was suffering from declining revenue and flat growth in new

customers who, as Defendant George has admitted, historically purchased larger ticket items,

including electronics and cookware.[5]  During the Class Period, Defendants ramped up the use of

Easy Pay because sales had been down for a while and management at QVC knew sales would

be boosted if more items were available to purchase on Easy Pay.

40.     Defendants knew or recklessly disregarded that a large increase in the availability

of Easy Pay would lead to increased sales, but also would lead to an increase in customer

defaults and ultimately an increase in the amount of bad debt on the Company's books.  Before

the Class Period, on September 4, 2014, Defendant George indicated that he knew Easy Pay was

directly correlated with bad debt, admitting during an earnings call that Easy Pay "does have

some negative working capital impact."

41.     Without informing investors about the plan to substantially increase the use of

Easy Pay credit during the Class Period and the impact it would have on the Company's default

rates and bad debt, Defendants dramatically increased the availability of Easy Pay credit,

beginning in the summer of 2015—substantially increasing both the number and price point of

---

[5] November 8, 2016 Earnings Call Transcript.

products on which QVC offered Easy Pay.  Indeed, during the Class Period, Defendants made

Easy Pay available on clearance and lower-priced items.

42.     Notwithstanding that Defendants knew a large increase in the availability of Easy

Pay would lead to increased default rates and ultimately to an increase in bad debt, Defendants

sought to reverse the Company's decreasing sales trend and reinvigorate sales growth so

Defendants could:

(a)     keep the Company's stock price artificially high until the Company's

acquisition of Zulily (which was bought, in part, by using QVC Stock) was complete;

(b)     pay themselves seven-figure performance bonuses at the end of 2015; and

(c)     reap more than $44.5 million in insider sales proceeds during the Class

Period.

43.     As part of this ramp up in Easy Pay, QVC introduced a program called "Easy Pay

Every Day."  This promotion allowed any customer with a Q Card to purchase any product

available on QVC using the Easy Pay installment plan.  Specifically, the program gave Q Card

holders the ability to pay for any purchase over three monthly installments. There was no extra

charge or minimum purchase amount required to take advantage of the program. In addition, the

Company substantially expanded the number of products available to purchase on Easy Pay

beginning in the summer of 2015.

44.     The Company maintains an agreement with Synchrony Bank to provide revolving

credit directly to QVC customers using its Q Card.  QVC and Synchrony split the income from

purchases made on the Q Card and the receivables for those purchases were recorded on

Synchrony's books.  However, all purchases made on Easy Pay (even those on the Q Card) remained on Qurate's books.

45.     At the start of the Class Period, an analyst questioned the extent to which the Company was relying on Easy Pay to increase sales. During an August 5, 2015 earnings call, a Wells Fargo analyst directly asked Defendant George whether Qurate could "quantify the impact of EasyPay" for the quarter ended June 30, 2015.  Rather than answer the question, George demurred, claiming that while Easy Pay was an *"important promotional tool"* there was *"nothing [he could] really quantify" and "I don't know [that I] can give you sort of additional quantification."*  This was a gross misrepresentation.  In fact, Defendants had dramatically increased the amount of Easy Pay being offered to consumers in order to artificially inflate sales and internally were tracking Easy Pay penetration on a regular basis. Indeed, throughout the Class Period, Defendants hid the fact that sales were being artificially inflated through Easy Pay. Investors were unaware that an increasing percentage of customers, including new customers, were paying on installments and that this would lead to higher default rates and bad debt.

46.     By the end of 2015, Defendants' scheme to prop up Qurate's stock price was working.  Because the extent to which Easy Pay had been used remained undisclosed to investors, equity analysts believed that QVC was generating organic growth.  On February 10, 2016, a Wells Fargo analyst announced that Qurate was their "top pick for 2016," giving the stock an "outperform" rating.  The analyst specifically stated that "[w]e would also note that outside of a few more 'Easy Pay' offers throughout the quarter, the promotional cadence of QVC's emails was largely unchanged from last year in Q4'15, giving us further confidence in sales and margins."

**C.      It Was Well Known at Qurate that a Large Increase in the Availability of Easy Pay Credit Would Inflate Sales and Lead to an Increase in Defaults and Bad Debt Expense**

47.      Qurate boosted its sales number by dramatically increasing the availability of Easy Pay during the Class Period.

(a)      During the Class Period, QVC "really ramped" up the use of Easy Pay because sales had been down for "quite a while" and management at QVC knew sales would be boosted if items were available with Easy Pay.  Easy Pay was typically used for larger items, such as electronics. However, in 2015, Easy Pay was being offered on more products and with additional installment periods.  The use of Easy Pay continued to increase in the latter half of 2015.

(b)      The Company began using Easy Pay on everything in 2015 because sales were down and Easy Pay was a major sales driver.  Because Easy Pay historically had collectability issues, an internal rule was created for Easy Pay in early 2014 which required that, during a promotion, only one-third of QVC's products could be sold on Easy Pay in order to mitigate collectability problems.  *However, in 2015, the Company began offering Easy Pay on everything and Easy Pay's one-third rule was no longer being enforced.*

(c)      QVC decided to increase the use of Easy Pay in an effort to boost sales. Easy Pay was originally only used on a few select products such as the "Daily Deal" and high priced products, but QVC began using it more and more beginning in 2015 to increase sales.  In 2015, Easy Pay also was being used on clearance items and the more Easy Pay was used, the more default and collection issues there were.

(d)     There was a significant increase in Easy Pay Flash events in 2015 which increased the use of Easy Pay.  Flash events were windows of time in which Easy Pay was offered.  The planning team, led by Doug Howe, who reported directly to Defendant George, decided what items would be offered with Easy Pay.

(e)     In addition, QVC increased the number of installments a customer could use to pay back balances through Easy Pay from three payments to up to five payments.  Easy Pay was extended to additional products including lower ticket items.

(f)     In approximately September 2015, the Company rolled out a plan to allow all purchases on the Q Card, ***including very low priced items***, to be paid in Easy Pay installments. The plan to link Easy Pay to the Q Card was done to drive sales which had been down.  QVC even accepted gift cards in some markets for Easy Pay purchases.

(g)     The decision to expand the use of Easy Pay came from Qurate's "C-Suite" which included Defendant George and Doug Howe.

(h)     Reports were generated on how often customers were using Easy Pay (referred to as the "take rate"), as well as other analytics related to that metric.  New customers typically came to QVC for big ticket items and were more likely to default, while returning customers were less likely to default.

(i)     In 2015, QVC increased the availability of Easy Pay credit to such an extent that more than ***70% of QVC's sales were made through Easy Pay***.

(j)     In 2015, it was a frequent topic of discussion at weekly strategy meetings that Easy Pay was being used too much.  These meetings were being attended by some of Defendant George's direct reports including Doug Howe.

48.     It was common knowledge within Qurate that any increase in Easy Pay would lead to higher rates of default and write-off.

(a)     Because Easy Pay historically had collectability issues, an internal rule was created for Easy Pay in early 2014 which required that, during a promotion, only one-third of QVC's products could be sold on Easy Pay in order to mitigate these collectability problems. However, in 2015, the Company began offering Easy Pay on everything and Easy Pay's one-third rule was no longer being enforced.  In 2015, it was a frequent topic of discussion at weekly strategy meetings that Easy Pay was being used too much.  These meetings were being attended by some of Defendant George's direct reports including Doug Howe.

(b)     Easy Pay was underwritten by the Company and everyone at QVC knew that the more Easy Pay was offered the more QVC would see an increase in delinquencies.

(c)     The more Easy Pay was used, the more default and collection issues there were.  In order to purchase on Easy Pay, a customer only needed a valid credit card. The Company did not do a credit check before allowing a customer to use Easy Pay.

(d)     New customers typically came to QVC for big ticket items and new customers were more likely to default.  Returning customers were less likely to default.

49.     The Defendants knew the amount of bad debt on Qurate's books was increasing during the Class Period because of the rise in Easy Pay availability.

(a)     Defaults were going up during the Class Period.  QVC had a report that was circulated every week to ten days that detailed customer defaults and bankruptcies, and listed customers with over $25,000 in Easy Pay balances.  This report was put together by QVC's finance team, which included Defendant Jastrzebski.   Defendant Jastrzebski's team

monitored defaults closely. In 2015, there was an increase in the number of customer accounts being sent to collection on reports generated by QVC's Customer Service or "CSR" System.

(b)     The Company used an in-house CRM system built by Qurate's IT department to track Easy Pay installment plans, and that reports were circulated monthly (and sometimes more frequently) with information about Easy Pay usage.  QVC would know right away if a customer missed an installment payment.   Executives with access to the CRM system had access to which customers used Easy Pay and if they had defaulted.  Reports were circulated with sales and Easy Pay default information and the C-Suite knew about the increased use of Easy Pay and its default rate.

(c)     Qurate was a Company obsessed with sales metrics and their drivers. QVC had up to the minute, real-time visibility into its sales including Flash Sales offering Easy Pay.  Information about Easy Pay was widely available and C-Suite executives at Qurate could easily access the information. Concerns about Easy Pay and its effect on sales were routinely discussed during weekly executive Officers' Meetings. All of Qurate's officers, including Defendants George and Jastrzebski, attended the weekly executive Officers' Meetings held on Tuesday.  Delinquencies and defaults on Easy Pay purchases were metrics that QVC's finance team followed closely and the finance team would have alerted the attendees of the executive Officers' Meeting to any changes to that metric.

(d)     Bad debt was always a topic of discussion during Tuesday morning leadership meetings with C-Suite executives.  Bad debt was tracked by QVC's finance

department in its SAP Financial System. Defaults would be reported to QVC's customer care department where a dunning process would take place.[6]

### D. A Forensic Accounting Analysis Shows Defendants Increased Easy Pay During the Class Period to Inflate Sales

50.     A forensic accounting analysis performed under the supervision of Plaintiff's counsel shows just how much Defendants relied upon Easy Pay credit to boost sales.  In fact, based upon Qurate's disclosures regarding the write-off rates and bad debt expense rate associated with Easy Pay, it can be inferred that Easy Pay sales during the Class Period generally ranged from 50% to 75% of QVC's net sales.  **In the fourth quarter of 2015, however, Defendants loosened the availability of Easy Pay to such an extent that more than 83% of Qurate's total net sales were generated using Easy Pay credit.**

51.     The extent to which Defendants relied upon Easy Pay credit during the Class Period can be estimated using the following method:  After the end of the Class Period, Qurate represented that Easy Pay "write-off rates are sub-2%."[7]  In addition, Qurate recorded bad debt expenses to account for estimated write-offs.  A bad debt expense will reduce earnings, including EBITDA, in the period revenue is recorded.  Qurate said it used an estimated bad debt expense based on its most recent six-to-nine month historical write-off experience.[8]

---

[6] "Dunning process" is the process of communicating with customers to ensure the collection of accounts receivable. As accounts become more overdue, communications progress from gentle reminders to more frequent letters and phone calls.

[7] 9/8/16 Goldman Sachs Transcript, p.5.  Write-off rates refer to the portion of sales that are not ultimately collected from the customer. As an example, using Qurate's representation, Qurate will write-off less than $2 million for each $100 million of Easy Pay revenue (*i.e.*, sub-2%). Plaintiffs' forensic accountant reasonably inferred that Qurate's write-offs were close to 2%.

[8] 8/5/16 Earnings Call Transcript, p.5.

52.     As of November 11, 2016, Qurate reported that its bad debt expense had been recorded within the range of 1.0% to 1.5% of revenue (*i.e.*, on-average bad debt expense was 1.25% of revenue).[9] Thus, based on these disclosures, it can be inferred that Easy Pay sales typically ranged from 50% (1% divided by 2%) to 75% (1.5% divided by 2%) of QVC's net sales at any given time.  Dividing the Company's bad debt expense by the write-off rate allowed Plaintiff's forensic accountant to estimate the approximate percent of sales subject to the write-off risk.  These calculations are based upon the reasonable inference that only Easy Pay sales were exposed to significant write-off risk.

### 1.     Charting Qurate's Bad Debt Shows How Defendants Sought to Stem Slumping Sales in 2015 With Increased Offering of Easy Pay Credit

53.     Qurate acknowledged (at the end of the Class Period) that its Easy Pay Program caused an increase in write-offs for sales in 4Q 2015.   As seen in the following chart, these write-offs increased Qurate's bad debt expense significantly in 2016 as compared to 2015:



54.     On August 5, 2016—the first partial disclosure date—Qurate acknowledged that the change in the bad debt expense rate resulted in a $15 million increase in bad debt expense in

---

[9] QVC Investor Day 11/10/16, Appendix at p.26.

2Q 2016. Qurate further disclosed that this increase was primarily related to increased Easy Pay sales.

55.     After the close of the Class Period, on November 11, 2016, Qurate ultimately disclosed a "Normalized" calculation showing its bad debt expense rate as if the rate had been adjusted in the period in which the related sales occurred (*i.e.*, not in the later period in which the write-off occurred).  The following chart compares Qurate's "As Reported" rate to the "Normalized" bad debt expense rate:



56.     The above chart shows that Qurate accelerated earnings during the period Easy Pay sales were expanded (2015) but before the attendant increased Easy Pay write-offs were experienced (2016).  Further, the chart shows that the positive earnings impact from an understated bad debt reserve was particularly pronounced in 4Q 2015 while the negative earnings impact was particularly pronounced in 2Q 2016, when Qurate was forced to increase its bad debt reserve to accommodate the increased Easy Pay write-off activity.

57.     As illustrated in the chart below, Qurate's fourth quarter of each year represented Qurate's most significant revenue period.  Due to the seasonality of revenue, Qurate's investor

presentations focus on revenue growth as compared to the prior year quarter (*e.g.*, 4Q 2015 is

compared to 4Q 2014).[10]



58.     And the following chart presents QVC's revenue growth by quarter for each of

the years 2014 through 2016.



59.     These charts show the effects of Defendants' increased use of Easy Pay on

reported revenue.  Qurate reported revenue growth in each quarter during 2014.  But in 2015,

Qurate reported that revenue growth had decreased in each of the first three quarters.  In 4Q

────────────────
[10] 11/10/16 Investor Day presentation, p.6, n.1.

30

2015, however, Qurate reported revenue growth for the first time in 2015 as the impact of increasing Easy Pay sales was felt.  And Qurate continued to report revenue growth in the first two quarters of 2016.[11]  At that time, though, Qurate slowed its use of Easy Pay, which culminated in declining revenue in each of the last two quarters of 2016.

### 2.      Estimating the Effect of Easy Pay in the Fourth Quarter of 2015

60.      Using Defendants' disclosures regarding post-Class-Period write-offs associated with Easy Pay, along with Qurate's reported bad debt rates, Plaintiff's forensic accountants were able to estimate both how much QVC was dependent upon Easy Pay to boost sale, and the amount Defendants increased Easy Pay in at least one quarter during the Class Period—the fourth quarter of 2015.

61.      Qurate identified the "Bad Debt bps Change" as 40 bps or 0.4% when "Normalized" for the write-off impact of Easy Pay transactions for 4Q 2015.[12]  Thus, the write-offs unaccounted for by Qurate's average existing bad debt expense rate is $11.2 million, which is calculated as follows: $2,800 million of sales[13] in 4Q 2015 multiplied by 0.4%.  Notably, this amount is only the portion of additional Easy Pay write-offs that Qurate's pre-existing bad debt expense rate could not accommodate.

62.      Qurate used the following formula to internally estimate write-offs: Revenue x Bad debt expense rate = Estimated write-offs.  The same formula that Qurate used to estimate write-offs associated with actual revenue can be used to estimate the additional Easy Pay revenue

---

[11] "Given heightened write-off risks, we did choose to moderate our Easy Pay usage beginning in June, which put some additional pressure on our sales." (8/5/16 Earnings Call Transcript, p.5.)
[12] Liberty Investor Day 11/10/16, Appendix at p.26.
[13] 2015 Form 10-K, p.73.

associated with actual write-offs.  Thus, the inverse formula employed by Plaintiff's forensic accountants can be re-written as: Write-offs ÷ Bad debt expense rate = Estimated Revenue.

63.     Implementing the formula above for 4Q 2015 yields this result: incremental write-offs of $11.2 million ÷ 2% Easy Pay write-off equals *$560 million of additional Easy Pay revenue in 4Q 2015*. A similar calculation using the total normalized bad debt expense rate for 4Q 2015 shows that *more than 83% of Qurate's total revenue in 4Q15* (1.65% ÷ 2.00% = 83% x $2.8 billion =  $2.3 billion) *was generated using Easy Pay.*

64.     Accordingly, Defendants were heavily reliant on Easy Pay to support sales. Although there is insufficient data to recreate the exact magnitude of Defendants' increase in the availability of Easy Pay credit during the entire Class Period, it is abundantly clear from the available data that Defendants heavily increased the amount of Easy Pay offered in 4Q 2015 without disclosing it to the market.

**E.     Defendants Artificially Inflated Qurate's Sales Using Easy Pay to Ensure They Would Be Paid Million-Dollar Bonuses for 2015**

65.     Qurate's Executive Officers including Defendant George were eligible to receive performance-based bonuses, in addition to their base salary every year, but only if they hit certain earnings benchmarks for the year.

66.     Defendants increased Easy Pay at the precise time needed to inflate sales to hit the earning target needed to achieve executive bonuses in 2015, a feat that effectively doubled Defendant George's salary.  Because the bonuses are structured to align with the Company's financial performance, the Company provides a target QVC EBITDA number that must be achieved before any bonus is paid.  In 2014, QVC had to achieve an EBITDA of $1,864.6 million before any Executive Officer would be eligible to receive a bonus.  Similarly, during the

Class Period in 2015, QVC's EBITDA had to equal or exceed $1,969.9 million—a 5.65%

increase from the previous year's target—before any bonus would be paid.

67.     This target performance number materially affected Defendant George's

compensation, who was eligible for a performance bonus above and beyond his base salary.



68.     Defendant Maffei also received a performance bonus based upon the financial

performance of Qurate's parent company, Liberty Interactive.  Thus, Maffei also had an interest

in inflating Qurate's overall revenue so that he was eligible to receive a bonus.[14]

---

[14] In 2014, the Company increased its target QVC Global EBITDA by 5.65% to determine
2015 performance based bonus compensation.  In 2015, the Company increased its QVC Global
EBITDA by 1.94% to determine 2016 performance based bonus compensation.



69.     Qurate's sales were slumping in 2015 and Defendants have admitted the Company was experiencing significant headwinds during this time.  In the first quarter of 2015, revenue was $2,214 million, down from $2,434 million in revenue in the first quarter of 2014.  Similarly, in Q2 2015, revenue was $2,252 million, down from $2,434 million in revenue in the first quarter of 2014.  Revenue decreased even further in Q3 2015 to $2,153 million, prompting concern that the Individual Defendants would not receive their performance-based compensation.



70.     Knowing the Company was falling short of its target EBITDA for executive

bonuses, Defendants rapidly expanded the Company's use of Easy Pay in the late summer and

fall to increase sales before year-end.  This expansion occurred just in time to bridge the gap

between the Company's low sales over the first three quarters of 2015, and what the Company

had to achieve for its officers to receive bonuses.  As a result of this expansion, the Company's

4Q 2015 total revenue shot up to $3,370 million, the highest it had been all year. And for the first

time in 2015, Qurate's revenue exceeded the revenue from the previous year's quarter.

71.     As reported, the actual EBITDA for 2015 was $1,969.9 million, somehow <u>exactly</u>

what the Company needed for Defendant George to receive bonus.  **However, an analysis

conducted by Plaintiff's forensic accountants (described above) revealed that Qurate's 4Q

2015 earnings and related EBITDA were inflated by at least $11.2 million due to the

deferral of the related bad debt expense until 2Q16.** Thus, Defendants necessarily would <u>not</u>

have achieved the EBITDA number needed to pay bonuses absent their decision to substantially

loosen the availability of Easy Pay credit without adequately reserving for the attendant bad

debts.

72.     Because the Company ultimately reached its target EBITDA metric, Defendant

George received an additional ***$1 million in bonus compensation***.  This effectively doubled his

$1,125,509 base salary for the year. Defendant Maffei also benefitted from the expansion of

Easy Pay to the tune of $1,874,240 in corporate performance based compensation.[15]

---

[15] The Company provides no publicly available information regarding Jastrzebski's
compensation structure.

**F.**    **Defendants also Sought to Artificially Inflate Qurate's Stock Price to Reduce the Acquisition Cost of Zulily**

73.    Immediately after Defendants dramatically increased the availability of Easy Pay credit at QVC, Qurate announced in August 2015 that it was planning to acquire the online retailer Zulily as part of a strategy to attract new customers.[16]   Notably, the purchase price was to be paid in part through the issuance of additional QVC Stock.   **Thus, in the face of declining sales, Defendants sought to maintain the price of QVC Stock at an artificially high level until the completion of the transaction on October 1, 2015.**

74.    In August 2015, Defendants announced Qurate's plan to acquire Zulily for $2.4 billion, half of which was to be paid in newly issued shares of Qurate's Series A stock.   With its "QVC-like characteristics," Zulily presented an opportunity for QVC to expand its customer reach.   While emphasizing the personalization aspect of Zulily's business, which generates "a million versions of their website every day," QVC sought to achieve increasing customer loyalty from Zulily's millennial customers.

75.    With this acquisition looming and Qurate's sales falling, QVC aggressively expanded its Easy Pay program beginning in the summer of 2015 by: (i) substantially increasing the number and type of products on which it offered Easy Pay; (ii) adding lower-priced products to Easy Pay; and (iii) relaxing rules regarding Easy Pay installment payments in order to attract new customers and increase sales. The Defendants knew or recklessly disregarded that this

---

[16] Based in Seattle, Washington, Zulily is an online retailer that sells products through flash sales on its website.  Zulily's merchandise includes clothing and home products such as kitchen accessories and home décor.  Zulily offered a more personalized retail experience, sending individual emails to each of its customers showing products based on the customer's browsing and purchasing behavior. Zulily's average customer ranged from 20 to 45 years old, substantially younger than QVC's average 35 to 70 year old customers.

massive expansion of Easy Pay would increase QVC's bad debt exposure.  Nonetheless, the Company ramped up its use of Easy Pay to artificially inflate the stock price prior to the October acquisition.  This allowed the Company to pay less for Zulily.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.   Qurate's Materially Misstated Revenues During the Class Period

76.   Qurate's revenues posted during the Class Period were materially false and misleading because Defendants' failure to disclose other material information misled investors into believing that Qurate's revenue growth was organic and sustainable and would not result in excess defaults and bad debt.  Specifically, Defendants failed to disclose that:

(a)   the Company aggressively increased the use of Easy Pay in the summer of 2015 by increasing the number and type of products on which it offered Easy Pay, adding lower-priced products to Easy Pay, and relaxing rules regarding Easy Pay installment payments in an effort to artificially inflate the Company's sales (¶¶47-49);

(b)   QVC's strong sales growth was due to its expanded Easy Pay program, rather than an improved customer experience or organic growth (¶¶47-49);

(c)   Increases in Easy Pay credit offered would lead to increased defaults and write-offs based on known collectability issues, and this heightened risk was exacerbated by the Company's failure to conduct credit checks before permitting new customers to use Easy Pay (¶¶47-49); and

(d)   Qurate's growth rate was unsustainable because it was fueled by expanding Easy Pay which Defendants knew was going to lead to increased defaults and bad debt. (¶¶47-49).

77.     Qurate's materially false and misleading revenue numbers are set forth below:

**Qurate Class Period Revenue (millions)[17]**

| **2015** | **3Q15** | **4Q15** | **FY15** |
|---|---|---|---|
| Revenue | $2,153 | $3,370 | $9,989 |

| **2016** | **1Q16** | **2Q16** |
|---|---|---|
| Revenue | $2,510 | $2,563 |

78.     Notably, the 2Q15 and 3Q15 Forms 10-Q; the FY15 Form 10-K; and the 1Q16, 2Q16, and 3Q16 Forms 10-Q included certifications signed by Defendant Maffei, representing that the "report does not contain any untrue statement of material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this [ ] report," and pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), representing that the Company's Quarterly Reports "fully compl[y] with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934 and information contained in the Form 10-Q fairly represents, in all material respects, the financial condition and results of operations of the Company."

**B.     False SOX Certifications**

79.     Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, Defendant Maffei signed certifications appearing in Qurate's mandatory periodic filings with the SEC throughout the Class Period, stating that he had evaluated Qurate's internal controls and disclosed in

---

[17] The referenced data was reported in the Company's Class Period SEC filings, press releases, conference call transcripts, and earnings presentation slides.

Qurate's Class Period SEC filing all issues that were "reasonably likely to materially affect

[Qurate's] internal control over financial reporting."

80.     Defendant Maffei signed these certifications in connection with Qurate's: (a)

Form 10-Q, filed August 5, 2015; (b) Form 10-Q, filed November 5, 2015; (c) Form 10-K, filed

February 26, 2016; (d) Form 10-Q, filed May 9, 2016; and (e) Form 10-Q, filed August 5, 2016.

81.     Specifically, Defendant Maffei falsely certified for the Form 10-Q filed August 5,

2015 and Form 10-Q filed November 5, 2015 that he:

> (c) evaluated the effectiveness of the registrant's disclosure
> controls and procedures and presented in this quarterly report our
> conclusions about the effectiveness of the disclosure controls and
> procedures, as of the end of the period covered by this quarterly
> report based on such evaluation; and
>
> (d) disclosed in this quarterly report any change in the registrant's
> internal control over financial reporting that occurred during the
> registrant's most recent fiscal quarter (the registrant's fourth fiscal
> quarter in the case of an annual report) that has materially affected,
> or is reasonably likely to materially affect, the registrant's internal
> control over financial reporting[.]

**C.      Defendants' Materially False and Misleading Statements and Omissions
Regarding the Source and Sustainability of Qurate's Sales Growth and the
Pervasiveness and Use of Easy Pay Credit**

82.     Plaintiff alleges that the statements highlighted in bold and italics within this

section were materially false and misleading because, among other reasons, they omitted to

disclose material information of which Defendants were aware or were reckless in not knowing.

As alleged herein, such statements artificially inflated or artificially maintained the price of QVC

Stock and operated as a fraud or deceit on all persons and entities who purchased or otherwise

acquired that common stock during the Class Period. Because Defendants chose to speak on the

issues described below, it was important that they not mislead investors or withhold material

information.  As described below, Defendants created an impression of a state of affairs at Qurate that differed in a material way from the one that actually existed.

### 1.    Second Quarter 2015 Results - August 5, 2015

83.    On August 5, 2015, the Company issued a press release announcing its financial results for the second quarter 2015. In the press release, Defendant George discussed the Company's "terrific quarter."  Defendant George attributed the Company's positive results, in part, to strong customer growth, stating "*[o]ur overall customer base and our new customer additions increased at some of the strongest rates in years. Our strong quarter reflects our disciplined execution of strategies aimed at extending our leading global video and eCommerce position.*"

84.    During the related Earnings Call the same day, Defendant George parroted the same false statements made in the Company's press release, stating, in relevant part:

> We drove solid local currency revenue, and adjusted OIBDA growth in every one of our consolidated markets. Our e-commerce growth accelerated significantly, with nearly half of our e-commerce orders coming from mobile devices. ***Our overall customer base and our new customer additions increased at some of the strongest rates we've seen in years.***
>
> *   *   *
>
> ***We believe these strong results in the quarter reflect our disciplined execution of strategies, aimed at extending our leading global video and e-commerce position.***
>
> *   *   *
>
> Our consolidated customer base increased 5%, and new customers increased 9%. And in the U.S., total customer account increased 7%, and new customers increased 12%, driven by strengths in product and programming, personalization initiatives, enhanced digital marketing, growing mobile penetration and the new S&H rates.

85.     When Matt Nemer, a Wells Fargo analyst, asked George specifically whether

Qurate could "quantify the impact of Easy Pay" for the quarter ended June 30, 2015, George did

not answer the question, claiming only that Easy Pay was an ***"important promotional tool"*** for

Qurate:

> ***Nothing that I can really quantify. I mean, we certainly use
> EasyPay as an important promotional tool. As we've talked in the
> past, it's a relatively efficient vehicle for us. And so, we use it
> strategically when we need to, and the offers and events are
> always changing a fair amount. So I don't know if that can give
> you sort of additional quantification, but it's definitely an
> important tool for us***.

86.     On August 5, 2015, Defendants filed Qurate's Report on Form 10-Q for the

second quarter ended June 30, 2015. Maffei certified this filing.

87.     The statements made by Defendant George about Qurate's positive results and

customer growth, as well as the statements (and omissions) about Easy Pay, contained in ¶¶83-

85, were materially false and  misleading when made in that they failed to disclose that:

(a)     the Company aggressively increased the use of Easy Pay in the summer of

2015 by increasing the number and type of products on which it offered Easy Pay, adding lower-

priced products to Easy Pay, and relaxing rules regarding Easy Pay installment payments in an

effort to artificially inflate the Company's sales (¶¶47-49);

(b)     QVC's strong sales growth was due to its expanded Easy Pay program,

rather than an improved customer experience or organic growth (¶¶47-49);

(c)     Increases in Easy Pay credit offered would lead to increased defaults and

write-offs based on known collectability issues, and this heightened risk was exacerbated by the

Company's failure to conduct credit checks before permitting new customers to use Easy Pay (¶¶47-49); and

(d)     Qurate's growth rate was unsustainable because it was fueled by expanding Easy Pay which Defendants knew was going to lead to increased defaults and bad debt. (¶¶47-49).

88.     Moreover, the statement made by Defendant George, contained in ¶85, that he was unable to quantify the impact of Easy Pay in the second quarter was materially false and misleading when made. Senior Management at the Company were informed about Easy Pay usage and increasing delinquencies and defaults: (i) at weekly Officers' Meetings attended by George and Jastrzebski; and (ii) through reports circulated at least monthly which tracked Easy Pay usage at QVC. (¶¶47-49).

89.     The market accepted the rosy picture Defendants portrayed.  For example, Brean Capital, LLC analysts reported on August 6, 2015, that QVC "reported one of its strongest and deepest quarters in a long time."  On August 6, 2015, UBS maintained its "buy" recommendation on Qurate's stock.

90.     On August 5, 2015, Qurate's stock price closed at $31.02 per share, up 7.3% in above average trading volume from a close on August 4, 2015 of $28.90 per share.

## 2.     Third Quarter 2015 Results - November 4, 2015

91.     On November 4, 2015, the Company announced its third quarter 2015 financial results.  During the related Earnings Call the same day, Defendant George attributed the Company's stronger customer growth to its marketing strategies, stating in part: "*We saw especially strong growth in the US with total customer account increased 5% and we continue*

*to be encouraged by our new customer acquisition rates in Japan and Italy, which has been a*

*focus for us.*"

92.    Defendant George emphasized the Company's customer retention, stating:

> *On a consolidated basis we grew our overall customer base 4%, and new customers 2%, and we improved retention rates across all customer segments existing, new, and reactivated. This strong customer growth was fueled by engaging products and programming, continued work on personalization initiatives, enhanced digital marketing and growing mobile penetration.*

93.    On November 5, 2015, Defendants filed Qurate's Report on Form 10-Q for the third quarter ended September 30, 2015. Maffei certified this filing.

94.    The statements made by Defendant George about Qurate's customer growth and programming, contained in ¶¶91-92, were materially false and misleading for the reasons described in ¶87.

95.    On November 4, 2015 analysts from both UBS and Wunderlich Securities issued buy recommendations on Qurate noting that QVC's third quarter results were generally in line with their estimates.

96.    On November 5, 2015, Brean Capital, LLC issued an analyst report on Qurate commenting on QVC's strong results, "in what is increasingly looking like a challenging retail environment."   On November 5, 2015, Wells Fargo issued an outperform rating on QVC, noting in part, that "we like the momentum QVC has going into the holidays."

### 3.    Investor Day - November 12, 2015

97.    On November 12, 2015, during the Company's Investor Day call with analysts and investors, Defendant George again made positive statements concerning the Company's growth, stating in part:

*So we have very consistent and stable revenue growth*, certainly ups and downs by quarter and across markets, but over any long period of time, our customer growth has been – *our revenue growth has been stable.*

\* \* \*

The core of the story are these extraordinarily advantaged profitability rates.  We are simply more profitable than any other multi-category retailer – period – by a substantial margin.  And not only are we highly profitable, *we keep growing our profitability every year.*

\* \* \*

We love our unique brand and the deep connections we've formed with our customers.  We love our global diversity.  We love our success across digital eCommerce and mobile platforms.  We love this highly loyal and repeating customer base and growing customer base and we love these highly advantaged financials that are driven at the core of the model.

98.      The statements made by Defendant George about Qurate's customer growth and profitability contained in ¶97, were materially false and misleading for the reasons described in ¶87.

99.      Wells Fargo analysts were impressed by the Company's results, stating that the Company's Investor Day left them "even more bullish" on the Company's stock. The report gave the Company's stock an "outperform" rating.

### 4.      ICR Conference - January 13, 2016

100.      On January 13, 2016, during an ICR conference at which Defendant George participated, the Company discussed its growing customer base and improved margins. Defendant George emphasized the Company's profitability:

More important is our profitability. Our adjusted OIBDA margins are the best of any multicategory retailer of size. *No one else can come close to our OIBDA margins. And those high OIBDA*

*margins we grow every year.* We've grown them, on average, by 18 basis points a year over the last five years. That's excluding investments in new markets; and *even after investments, we've grown by about 10 basis points. So high margin, sustainable growth in margins.*

And the margins on a cash-flow basis look even better. *So we were at the top of the chart on profitability*, but the bottom of this chart, which is on capital usage as a percent of OIBDA. So very capital efficient, capital-light business.

101.     The statements made by Defendant George about Qurate's customer and margin growth and profitability, contained in ¶100, were materially false and misleading for the reasons described in ¶87.

### 5.     Fourth Quarter and Year End 2015 Results - February 26, 2016

102.     On February 26, 2016, the Company issued a press release announcing financial results for the fourth quarter and year ended December 31, 2015. In the press release, Defendant Maffei discussed the Company's solid revenue growth, stating:

> *QVC generated another quarter of solid revenue growth, particularly QVC US, which we view as very strong given the backdrop of a soft US retail environment.*

103.     During the related Earnings Call the same day, the Company reported solid results and increased sales in all categories except jewelry, leading to a 3% increase in U.S. revenue. Defendant George discussed the Company's new web and mobile platforms and the Company's plan to establish a new service center in Poland.  Defendant George attributed the Company's positive results in part to the Company's "outstanding customer growth."  George stated, *"[w]e experienced outstanding customer growth in 2015. On a trailing 12-month basis total consolidated customer count increased 3% to 12.6 million customers, and in the U.S. customer count grew 4% to 8.3 million. Those are both records for total customers served. We think*

*these strong customer dynamics are the result of our focus on compelling merchandise and*

*content and our increasing focus on personalizing our digital platforms.*"

104.    On February 26, 2016, Qurate filed its Annual Report on Form 10-K for the year

ended December 31, 2015 ("2015 10-K"). Defendant Maffei certified this filing.

105.    The 2015 10-K addressed Qurate's bad debt expense, which the Company

claimed had decreased in 2015, at the same time Defendants were aggressively increasing the

availability of Easy Pay credit:

> **Retail Related Adjustments and Allowances.** QVC records adjustments and allowances for sales returns, inventory obsolescence and uncollectible receivables. Each of these adjustments is estimated based on historical experience. Sales returns are calculated as a percent of sales and are netted against revenue in our consolidated statements of operations. For the years ended December 31, 2015, 2014 and 2013, sales returns represented 19.1%, 19.4% and 19.8% of QVC's gross product revenue, respectively. The inventory obsolescence reserve is calculated as a percent of QVC's inventory at the end of a reporting period based on, among other factors, the average inventory balance for the preceding 12 months and historical experience with liquidated inventory. The change in the reserve is included in cost of retail sales in our consolidated statements of operations. At December 31, 2015, QVC's inventory was $929 million, which was net of the obsolescence adjustment of $84 million. *QVC's allowance for doubtful accounts is calculated as a percent of accounts receivable at the end of a reporting period, and the change in such allowance is recorded as bad debt expense in our consolidated statements of operations. At December 31, 2015, QVC's trade accounts receivable were $1,370 million, net of the allowance for doubtful accounts of $86 million.* Each of these estimates requires management judgment and may not reflect actual results.
>
> \* \* \*
>
> QVC's SG&A expenses include personnel, information technology, provision for doubtful accounts, credit card income, production costs and marketing and advertising expenses. *Such*

*expenses decreased $12 million,* and remained consistent as a percent of net revenue at 8.2% and increased $19 million, and remained consistent as a percent of net revenue at 8.2% for the year ended December 31, 2014.

The decrease in 2015 was primarily related to a $48 million favorable impact of exchange rates, a $12 million increase in credit card income, and a $10 million decrease in bad debt expense, partially offset by a $53 million increase in personnel expense. The increase in credit card income was due to favorable economics of the Q card portfolio in the U.S. *The decrease in bad debt was mainly due to a lower electronics Easy- Pay mix, higher usage of the Q Card in the U.S. and lower write- offs in Germany.* The increase in personnel expenses was primarily due to severance costs related to the establishment of the Global Business Service center and One Q, and also due to merit, bonus and benefits increases in the U.S. and internationally, including the start- up in France.

106.    The 2015 10-K also disclosed that the Company's disclosure controls and procedures were not effective as of December 31, 2015 because of a material weakness in its internal control over financial reporting.  The 2015 10-K reported:

In accordance with Exchange Act Rules 13a-15 and 15d-15, the Company carried out an evaluation, under the supervision and with the participation of management, including its chief executive officer and its principal accounting and financial officer (the "Executives"), of the effectiveness of its disclosure controls and procedures as of the end of the period covered by this report. Based on that evaluation, the Executives concluded that the Company's disclosure controls and procedures were not effective as of December 31, 2015 because of the material weakness in our internal control over financial reporting that is described below in "Management's Report on Internal Control Over Financial Reporting."

\*   \*   \*

*We have identified a material weakness in QVC's internal control over financial reporting, that, if not properly remediated,*

*could adversely affect our business and results of operations*.[18] A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements will not be prevented or detected on a timely basis. As described in "Item 9A. -Controls and Procedures," **we have concluded that our internal control over financial reporting was ineffective as of December 31, 2015 due to a material weakness at our wholly-owned subsidiary, QVC. The identified material weakness, at December 31, 2015, relates to information technology controls and the associated information produced by QVC.** Specifically, the following items were not designed and operating effectively:

· Segregation of duties to ensure that incompatible functions did not overlap and that the activities of individuals with incompatible functions or who have access to certain critical transactions were appropriately monitored; and

· Controls over the review of manual and post-close journal entries and the completeness and accuracy of reports utilized in the financial reporting process to support control activities.

Controls were established during the year to monitor and compensate for the segregation of duties and critical access issues, but as of December 31, 2015, the controls were not functioning properly to adequately mitigate the risk associated with the gaps and conflicts noted. This material weakness did not result in any material misstatements of our consolidated financial statements and disclosures for any annual or interim period.

107.    In the 2015 10-K, Qurate identified the following relevant risk factors:

*QVC cannot predict whether customers will pay all of their Easy-Pay installments.* In addition, QVC-U.S. has an agreement with a large consumer financial institution (the "Bank") pursuant to which the Bank provides revolving credit directly to QVC's customers for the sole purpose of purchasing merchandise from QVC with a QVC branded credit card ("Q Card"). QVC receives a portion of the net economics of the credit card program according to percentages that vary with the performance of the portfolio. *We*

---

[18] Emphasis in original.

> ***cannot predict the extent to which QVC's customers will use the
> Q Card, nor the extent that they will make payments on their
> outstanding balances.***

108.    The statements made by Defendants George and Maffei about Qurate's customer

growth, contained in ¶¶102-103, 105, were materially false and  misleading when made in that

they failed to disclose that:

(a)    the Company aggressively increased the use of Easy Pay in the summer of

2015 by increasing the number and type of products on which it offered Easy Pay, adding lower-

priced products to Easy Pay, and relaxing rules regarding Easy Pay installment payments in an

effort to artificially inflate the Company's sales (¶¶47-49);

(b)    QVC's purported strong sales growth was due to its expanded Easy Pay

program, rather than an improved customer experience or organic growth (¶¶47-49);

(c)    Increases in the amount of Easy Pay credit offered would lead to increased

defaults and write-offs based on known collectability issues, and this heightened risk was

exacerbated by the Company's failure to conduct credit checks before allowing new customers to

use Easy Pay (¶¶47-49);

(d)    Qurate's growth rate was unsustainable because it was fueled by

expanding Easy Pay which Defendants knew was going to lead to increased defaults and bad

debt (¶¶47-49);

(e)    Qurate misstated its 2015 bad debt expense in violation of GAAP

because—in calculating the bad debt expense—Defendants failed to take into account that the

Company had aggressively increased Easy Pay knowing or recklessly disregarding that it would

lead to an increase in write offs and bad debt in the future; and

49

(f)     Defendants significantly inflated the availability of Easy Pay credit in 4Q

2015 without raising its bad debt expense rate to account for the increase (¶¶50-64).

109.    Similarly, Qurate's risk disclosure about Easy Pay (¶107) was insufficient

because it failed to disclose that the Company had significantly increased Easy Pay availability

including to new customers, thus materially increasing the risk of default and a reversal in bad

debt expense trends.

110.    On February 26, 2016, UBS issued an analyst report reacting favorably to

Qurate's fourth quarter and year-end earnings report and issuing a "buy" recommendation on the

stock.  On the same day, Wells Fargo issued an analyst report giving the stock an "outperform"

rating.  On February 29, 2016, Brean Capital, LLP also reiterated its "buy" rating for QVC.

### 6.      UBS Global Consumer Conference - March 10, 2016

111.    On March 10, 2016, during a UBS Global Consumer Conference at which

Defendant George participated, the Company discussed adjustments to its shipping and handling

costs and its customer demographics.   Defendant George described the QVC customer base as

"amazingly diverse," and stated, "*[A] pretty diverse set of customers in a pretty healthy and

growing customer base. So we're excited that the customer base grows every year and grows in

a healthy way.*"

112.    Defendant George attributed this growth to the Company's new shipping charges,

stating, "*I think we saw pretty healthy new name growth over the last 12 months that it's hard

to prove cause and effect but I think that healthy new name growth was bolstered by the new

shipment and handling charges. And so we think that's derisked the business and it's probably

a pretty sustainable place that we can grow from going forward.*"

113.    The statements made by Defendant George about Qurate's customer growth

sustainability, contained in ¶¶111-112, were materially false and misleading for the reasons

described in ¶108.

### 7.    First Quarter 2016 Results - May 9, 2016

114.    On May 9, 2016, the Company issued a press release announcing financial results

for the first quarter ended March 31, 2016.  In the press release, Defendants Maffei and George

addressed the Company's solid revenue growth, stating in part:

> "QVC generated another strong quarter of revenue growth,
> particularly in the US, and posted impressive increases in mobile
> penetration of orders in the US and on a consolidated basis. Zulily
> started off strong in 2016 with accelerating revenue growth and a
> six-fold increase in adjusted OIBDA on strong operational
> execution," said Greg Maffei, Liberty Interactive President and
> CEO.

> \* \* \*

> "We generated very solid top-line growth, with local currency
> gains in nearly every market," said QVC President and CEO Mike
> George. "We continued to benefit from our strategies and
> investments to enhance and extend the reach of our commerce
> platforms. We delivered double-digit gains for both consolidated
> eCommerce revenue and mobile orders. Our top-line performance
> and the continued expansion of our commerce platforms
> demonstrate how strongly the QVC brand resonates with
> consumers."

115.    During the related Earnings Call the same day, the Company announced a strong

quarter with a 5% increase in U.S. revenue. The Company also attributed its stronger customer

growth to its marketing strategies, stating in relevant part:

> Now an update on our core business. Our efforts over the last year
> in marketing, merchandising, technology and operational execution
> are all contributing to an improved customer experience, resulting
> in stronger growth.

First, on marketing. As you may recall, we made a shift early last year into broad-based marketing channels, with a focus on acquiring customers with a higher lifetime value. Since then, we continue to see the quality of our acquired customers improve, and saw Q1 orders increase 18% year-over-year, up from 16% growth in Q4 and 8% in Q3. Repeat is a key component of this sustained growth, with 90% of our total orders in Q1 coming from repeat customers, up from 86% a year ago and flat from the fourth quarter.

116.    Defendant George also emphasized the Company's profitability, stating "*[W]e saw significant improvement in our profitability.* Our adjusted OIBDA margin expanded from 1% to 7% as a percentage of net sales driven by strong supply chain execution as well as operating improvements. *Our gross margin improved as a result of operational efficiency from our transportation and fulfillment center automation investments.*" Defendant George also described the Company's customer growth in light of the Zulily acquisition, adding "*[T]here's been a nice flow of new customers from Zulily to QVC through this program. Again, I wouldn't say highly material yet, but a meaningful number. And those customers, the quality of those customers as we measure customer quality, is probably as good and actually probably better than any other marketing acquisition channel.*"

117.    The Company also explained the impact of changes to its operating model and the introduction of the Q Card's new Easy Pay Every Day program.  George stated:

"I'd also note that while our Easy Pay receivables balance declined 30% from year end, it's up 28% year over year. The largest driver of this increase is a new program we launched in the US in Q3 of last year in which we allow users of our private label Q Card to put any purchase on three easy payments. In Q1 we saw our Q Card penetration increase 345 basis points to 23% of total net sales. *While this new Easy Pay practice has not materially impacted our overall sales, it clearly adds value to our profitable Q Card program, saves on credit card processing fees, and is an effective tool to help us protect and grow the Q Card over time.*"

118.    On May 9, 2016, Defendants filed Qurate's Report on Form 10-Q for the first

quarter ended March 31, 2016 ("1Q 2016 10-Q"). Maffei certified the filing.

119.    In the 1Q 2016 10-Q, Defendants mentioned, *for the first time,* an increase in bad

debt expense due *primarily* to the Easy Pay program.  Specifically, Defendants disclosed the

following:

> QVC's SG&A expenses include personnel, information
> technology, provision for doubtful accounts, production costs,
> credit card income, marketing and advertising expenses. Such
> expenses increased $3 million, and as a percentage of net revenue,
> decreased from 8.9% to 8.7% for the three months ended March
> 31, 2016 compared to the prior year.
>
> For the three months ended March 31, 2016, the increase was
> primarily due to increases in bad debt expense of $5 million and
> software expense of $2 million, offset by decreases in personnel
> costs of $5 million. **The increase in bad debt expense is
> primarily related to the Easy-Pay program in the U.S.**

The increase in bad debt expense was <u>not</u> mentioned or discussed during the Company's

earnings call the same day.

120.    The statements made by Defendant George about Qurate's Easy Pay program, its

marketing strategy and the Company's profitability, contained in ¶¶116-117, were materially

false and misleading when made in that they failed to disclose that:

(a)    the Company aggressively increased the use of Easy Pay in the summer of

2015 by increasing the number and type of products on which it offered Easy Pay, adding lower-

priced products to Easy Pay, and relaxing rules regarding Easy Pay installment payments in an

effort to artificially inflate the Company's sales (¶¶47-49);

(b)    QVC's purported strong sales growth was due to its expanded Easy Pay

program, rather than an improved customer experience or organic growth (¶¶47-49);

(c)     Increases in the amount of Easy Pay credit offered would lead to increased defaults and write-offs based on known collectability issues, and this heightened risk was exacerbated by the Company's failure to conduct credit checks before allowing new customers to use Easy Pay (¶¶47-49);

(d)     Qurate's growth rate was unsustainable because it was fueled by expanding Easy Pay which Defendants knew was going to lead to increased defaults and bad debt (¶¶47-49);

(e)     Qurate misstated its Q1 2016 bad debt expense in violation of GAAP because—in calculating the bad debt expense—Defendants failed to take into account that the Company had aggressively increased Easy Pay knowing or recklessly disregarding that it would lead to an increase in write offs and bad debt in the future; and

(f)     Defendants significantly inflated the availability of Easy Pay credit in Q1 2016 without raising its bad debt expense rate to account for the increase (¶¶50-64).

121.    Defendants' statements regarding the increase in Easy Pay receivables balance in Q1 2016 as compared to Q1 2015 (¶117) also were materially misleading when made and failed to disclose just how much the Company had expanded the Easy Pay program (increasing Easy Pay penetration from approximately 50% of all sales to more than 83% of all sales) and how the Easy Pay program had been expanded not only to Qurate's most loyal Q Card customers, but also to scores of new customers for whom the Company had no sales history and who were using other types of credit or debit payments, not the Q Card.

122.    Moreover, the statements about the increased bad debt expense in Q1 2016 (¶119), buried deep in Qurate's 10-Q, also were materially misleading when made and failed to

disclose: (i) the full extent of the increased defaults Defendants were seeing from the significant

expansion of the Easy Pay program in Q3 2015; and (ii) that Qurate would be required to record

materially higher bad debt expense levels in Q2 2016 due to the experience the Company was

already seeing with the Easy Pay expansion among new customers.

123.     On May 9, 2016, UBS issued an analyst report reiterating a "buy"

recommendation for Qurate based, in part, on QVC's "Q1 result above Street forecasts."  On

May 10, 2016, KeyBanc Capital Markets also issued an analyst report on Qurate reporting,

"QVCA's model leaves it well positioned in an uncertain retail environment."

### 8.     Investor Day - May 16, 2016

124.     On May 16, 2016, the Company held its 2016 Investor Day in which Defendants

Maffei, George, and Jastrzebski participated.  During the meeting, the Company attributed its

"incredible metrics" to its differentiated shopping experience and unique business model.

125.     Defendant Jastrzebski also discussed the Company's credit and debt management:

> And as we grow our sales and as we move more and more of our
> business into the digital space, *we're very cognizant of the fact
> that we've got to be staying on top of what the quality of those
> customers are that are coming into the franchise. We've invested
> considerable funds and spent a lot of time analyzing and making
> sure that we're managing our credit, we're managing how the
> payments are working through our system.* And as you can see,
> over this time period since 2008, *we've been able to manage our
> bad debt to about 1% of our business, and that is not starting to
> grow in any kind of dramatic way.*

126.     Defendants pointed to the following misleading chart to support the assertion that

Defendants were managing their debt to 1% of the business:



127.     Defendant George added, "***I think we've been able to architect a model where we can make money whatever is trending, always trying to add -- we know we can never raise prices on products. So it's always about trying to come out with the next version of a highly curated product, and find some incremental benefit that we can provide the customer at probably same selling price. And that's how we will continue to drive growth.***"

128.     During the Investor Day, George downplayed the range of products the Company offered under its Easy Pay program, falsely stating:

> And you add to that this easy pay program that always gets a lot of attention but is actually this incredibly efficient way to give the customer a reason to buy on QVC that no one else can offer. ***I certainly don't want to suggest that we can offer this kind of value on every single item in our web assortments, because we can't and we don't.*** But on everything that drives meaningful volume at QVC, this is what we do every day. That's why the customer keeps coming back.

129.     The statements made by Defendants Jastrzebski and George about the Company's expansion and credit management, contained in ¶¶125, 127-128, were materially false and misleading for the reasons described in ¶120.  In addition, George's statements about the

Company's credit management in ¶125 were materially false or misleading because, as the below chart shows, Qurate failed to disclose that it had to significantly increase its bad debt expense rate in 2016 as a direct result of its expansion of the Easy Pay program in 2015.  Moreover, Defendants failed to disclose that their 2015 bad debt expense rate was actually much higher because of the expansion of Qurate's Easy Pay program during the Class Period.



130.    UBS issued a report reiterating a buy recommendation, reporting "QVCA provides a compelling mix of future revenue growth, margin expansion potential and capital returns."

### 9.    Goldman Sachs Conference - June 15, 2016

131.    On June 15, 2016, the Company attended a Goldman Sachs Conference at which Defendant George described the Company's customer demographic and successful customer retention and acquisition as follows:

> So we've been fortunate to be able to sustain a pretty steady growth rate of new customers over years and the past generations. ***We'll add 1.9 million to 2 million new customers in the US every year and have done that every year, year after year and about 4 million worldwide.*** If you look at that 1.9 million to 2 million in

the US as an example, there's definitely a life stage element to QVC. So you see the biggest influx of new customers in let's say the 45 to 55 year old age range. But importantly, to your question, we'll add a large number, probably 250,000 millennial customers this year, find other 400,000, 500,000 Gen X customers this year.

132.   The statements made by Defendant George about the Company's reliable customer base and expanding demographic, contained in ¶131, were materially false and misleading for the reasons described in ¶120.

### 10.   Piper Jaffray Annual Consumer Conference - June 15, 2016

133.   On June 15, 2016, Defendant George participated in Piper Jaffray's 36th Annual Consumer Conference, providing insight on why Qurate was able to overcome a disappointing retail climate. Defendant George discussed the importance of customer loyalty and ability to offer compelling value to customers.  In response to an analyst question regarding how QVC is able to "buck[ ] the trend", Defendant George explained "*Our first price[sic] is our best price. We've always sort of shied away from the traditional promotional cycle*."

134.   The statements made by Defendant George about the Company's promotional practice, contained in ¶133, were materially false and misleading for the reasons described in ¶120.

### 11.   The Truth Begins To Emerge, But Defendants Continue to Mislead Investors

#### (a)   Second Quarter 2016 Results – August 5, 2016 (*1st Partial Disclosure*)

135.   On August 5, 2016, before the market opened, Qurate issued a press release announcing its financial results for the second quarter ended June 30, 2016, in which the

Company disclosed "significant headwinds" and sales declines as compared to prior periods,

stating in part:

> "We reported solid second quarter results, with good sales growth in most markets," said QVC President and CEO Mike George. "Late in the quarter, we experienced a deceleration in demand in the US that has continued. As a result, our near-term perspective is more cautious. Longer term, we remain well-positioned with our highly differentiated retail model, strong customer retention, and our ability to deliver compelling experiences across immersive commerce platforms."
>
>     \*    \*    \*
>
> Beginning in early June QVC's US sales began to experience significant headwinds, which have continued. The sales declines, as compared to prior periods, have averaged in the mid to high single digit percentages. QVC has developed many initiatives intended to reverse the negative trends and QVC is optimistic, although there is no guarantee, that these actions will have a positive effect. However, even if these initiatives begin to reverse these trends, it is believed that QVC's US net revenue and adjusted OIBDA will likely experience negative growth rates for the third quarter.

    136.    During the related Earnings Call during the trading day, the Company disclosed

"**higher than expected write-offs on Easy Pay purchases from October and November of**

**last year**" and announced *increased reserves for prior period purchases*.[19] Specifically, George

disclosed:

> **Given heightened write-off risks, we did choose to moderate our Easy Pay usage beginning in June, which put some additional pressure on our sales.**
>
>     \*    \*    \*
>
> **Bad debt expense increased about 100 basis points, driven by higher write-offs on our Easy Pay receivables.** We accrue for

---

[19] Disclosures are identified in **bold and underlined**.

bad debt based on historical experience, and there's a lag of about six to nine months to true up prior-period estimates. Beginning in April, we saw higher than expected write-offs on Easy Pay purchases from October and November of last year.

**Accordingly, we increased the reserves for these prior-period purchases, and this catch-up accounts for approximately two-thirds of the Q2 bad debt increase. The remaining increase reflects the higher write-off experience.** Our overall reserve rate, it's important to note, is still under 2%, which is quite low compared to most retailers.

Looking forward, we do expect bad debt to create approximately 20 basis points of pressure for the remainder of the year. **We have responded to these challenges by moderating our Easy Pay usage and reducing the number of installments available to customers. While Easy Pay remains a key component of our model, we are proceeding with this more measured approach until we see healthier customer behavior.**

Given the current business pressures in the US, in addition to our efforts to reaccelerate sales and moderate bad debt, we're keeping tight control of all operating costs, and we have cut our planned capital expenditures for the year by about $20 million to $25 million.

137.    Defendant George also provided details of the increase in bad debt expense,

stating in relevant part:

**Beginning in April, we saw higher than expected write-offs on Easy Pay purchases from October and November of last year. Accordingly, we increased the reserves for these prior-period purchases, and this catch-up accounts for approximately two-thirds of the Q2 bad debt increase. The remaining increase reflects the higher write-off experience.**

138.    Defendant George added:

**[W]e did actually -- we did pull back on Easy Pay in June**. . . . [w]e've been a little more active in clearance events than we historically would be, and we did a little more of that in July, and we'll probably do a little more of that in August, where we'll be a little more aggressive on our discounting, to get the apparel and jewelry businesses in particular a little bit cleaner.

That will put some downward pressure on product margins, and then we'll just kind of keep watching it. . . . We just want to do those in a very measured way, as we move through this current sales pressure.

\* \* \*

**We do think Easy-Pay is important and, even though we moderated the usage of it, we're certainly still using it in a meaningful way.** To me, because we don't have a lot of promotional levers in our business, it is I think part of the why QVC story that our customers get and value. And because of the high loyalty of our customers, it ends up being a relatively modest expense.

**In fact, most write-offs associated with Easy Pay, the overwhelming amount of the write-offs associated with Easy Pay are actually from new customers, where you don't have quite the same experience base. The write-off rates from our existing customers, especially once they have made a few purchases or have been with us a couple of years, is really quite low.**

**So overall, you're talking about a program that has a less than 2% expense rate,** and so we view it as this extremely efficient program that does create a differentiation for QVC. **And because the bad debt write-off rates popped up a bit, we're being a little bit cautious right now about the use of it,** but we see it as an important ongoing program, and not necessarily critical to accelerating sales, but just something that we need to be able to offer, and we fully expect to be able to continue to offer it.

139.    Despite Defendants' partial disclosures regarding increased write-offs and higher bad debt attributed to Easy Pay, Defendants continued to falsely assure investors that Easy Pay usage had been curbed in March/April 2016, and that its moderation would not affect sales going forward.  For example, Defendant George attempted to downplay the Easy Pay issues and divert customers' attention away from the real situation, blaming the poor results in part on a variety of other factors, including *"aggressive markdown activity"* by department stores during clearance sales, a drop-off in sales for one of its largest brands, and even lowered QVC station viewership

from *"distractions"* in the summer due to television coverage of world events and the 2016 U.S.

presidential election.  Specifically, in an attempt to downplay issues with Easy-Pay and blame

QVC's sales downturn on a variety of other factors, George falsely stated:

> Since mid-June, we've seen softening demand in most categories. Consumer electronics and jewelry further weakened. Our kitchen cook and beauty businesses slowed. And our fashion categories, which had been our strongest performers throughout the year, experienced the biggest drop-offs relative to their previous trend.
>
> ***We believe a number of factors contributed to the soft sales trend. The retail environment certainly continues to be challenging.***  In particular, we're seeing unusually aggressive markdown activity, as department stores clear out spring and summer fashion goods. And we're also feeling the pressure from continued industry softness in key categories like jewelry, handbags and consumer electronics.
>
> ***We're also concerned that rising bad debt rates, which other parties have referenced, suggest[ed] that consumers may be feeling greater financial pressures***. Given heightened write-off risks, we did choose to moderate our Easy Pay usage beginning in June, which put some additional pressure on our sales. ***And while harder to quantify, it appears that all of the distractions this summer from world events and the US election season are also having some impact, and we anticipate additional sales pressure from the Olympics, starting today. Finally, one of our largest brands faced a significant drop-off in sales at QVC and other outlets, which did materially impact our overall results.***

140.    Defendant George also falsely claimed that Easy Pay was *"**not necessarily**

***critical to accelerating sales, but just something that we need to be able to offer . . ."***  and

falsely assured investors that the Company was "respond[ing] to these challenges by ***moderating***

***our Easy Pay usage and reducing the number of installments available to customers. While***

***Easy Pay remains a key component of our model, we are proceeding with this more measured***

***approach until we see healthier customer behavior."***

141.     In response to an analyst's question about quantifying how much changes in behavior related to the QCard affected the Company's sales downtown, George replied that the downturn  was due to an "unusually difficult confluence of events" or at least five "contributing factors" including the moderation of Easy Pay during the quarter:

> If you're referring to the change in Easy Pay…where we're being a little more conservative on Easy Pay, ***that probably has some impact. But I don't think that's - I think that's unlikely to be a huge driver***. But it could be one of five or six contributing factors possibly.

142.     On August 5, 2016, Defendants also filed Qurate's Report on Form 10-Q for the second quarter ended June 30, 2016 ("2Q 2016 10-Q").  Maffei certified the filing.

143.     In the 2Q 2016 10-Q, the Company disclosed an increase in bad debt expense of $15 million, "primarily related to an increase in Easy-Pay sales penetration and higher default rates experienced related to the Easy-Pay program in the U.S." [20]

144.     In reaction to Qurate's partial disclosure on August 5, 2016, the Company's common stock price fell $5.69 per share, **or 21.63%**, to close at $20.61 per share on August 5, 2016 on unusually high trading volume.

145.     The statements made by the Company and Defendant George about the reasons behind QVC's sales declines and effect of Easy Pay, contained in ¶¶139-141 were materially false and  misleading when made in that they failed to disclose that:

(a)     the Company aggressively increased the use of Easy Pay in the summer of 2015 by increasing the number and type of products on which it offered Easy Pay, adding lower-

---

[20] 2Q 2016 10-Q, p. 38.

priced products to Easy Pay, and relaxing rules regarding Easy Pay installment payments in an effort to artificially inflate the Company's sales (¶¶47-49);

       (b)     QVC's purported strong sales growth was due to its expanded Easy Pay program, rather than an improved customer experience or organic growth (¶¶47-49);

       (c)     Increases in the amount of Easy Pay credit offered would lead to increased defaults and write-offs based on known collectability issues, and this heightened risk was exacerbated by the Company's failure to conduct credit checks before allowing new customers to use Easy Pay (¶¶47-49);

       (d)     Qurate's growth rate was unsustainable because it was fueled by expanding Easy Pay which Defendants knew was going to lead to increased defaults and bad debt (¶¶47-49); and

       (e)     the extent to which a pullback in Easy Pay was going to negatively affect sales moving forward.

146.    On August 7, 2016, Edward Yruma of Pacific Crest Securities issued a research report on Qurate entitled, "*QVC Group 2Q: Cautious Commentary*."  In the report, Yruma wrote, in part:

> **Key Investment Points**
>
> At this stage, we think a confluence of many factors and a bit of consumer anxiety drove uncharacteristic weakness.  QVC noted a number of items that led to mid-to-high single digit declines in its U.S. business . . . **. we think Easy Pay is the most worrisome**. QVC pulled back on Easy Pay offers in June amid rising debt write-offs that began in April from purchases made in October and November. . . .**The recent weakness may have underscored the importance of Easy Pay to the QVC customer.**

147.    On August 8, 2016, Alex J. Fuhrman of Craig Hallum Capital Group LLC issued

a research report on Qurate entitled: "*Four Things Are Going Wrong for QVC Right Now; Three*

*Should be Fixed by Year-End.*"   In the report, Fuhrman reported, in relevant part:

> QVC Group reported in-line Q2 results on Friday, but cautioned
> that after a strong April and May, sales declined in the mid-to-high
> single digits in June and have remained similarly weak thus far in
> Q3.  We are significantly lowering our estimates in the back half of
> the year, but expect the business to recover in 2017.
>
> *   *   *
>
> **Headwind #4: Easy Pay Pullback.  When Will It Be Resolved?
> A Few Weeks.**  In response to a slight increase in bad debt rates,
> QVC reduced its use of Easy Pay (interest-free monthly payments).
> This exacerbated already weakening trends, and it appears
> additional Easy Pays are being added back to certain items.

148.    On August 8, 2016, Matthew Harrigan of Wunderlich Securities issued a research

report on Qurate entitled: "*Normally Unflappable QVC U.S. Hit Bump, Even Zulily Excels,*" in

which Harrigan noted that "**QVC also consciously moderated its Easy Pay exposure by**

**tightening credit standards starting in early June**." (emphasis in original).

>    **(b)      Goldman Sachs Retail Conference - September 8, 2016 (*2nd
>              Partial Disclosure*)**

149.    On September 8, 2016, during the trading day, at the Goldman Sachs Global

Retail Conference in New York City, the Company disclosed to investors that the sales

slowdown the Company disclosed in August had "largely continued" and would continue to

impact Qurate's business.  During the call, Defendant George stated, in part:

> So we did announce on our Q2 earnings call that while we had a
> pretty solid Q2 and growth across all of our segments, we had seen
> a slowdown in the business starting in roughly early June that had
> persisted through the call, a slowdown kind of in the high-single
> digits.

65

I would say as we look forward over the last several weeks, that trend has largely continued, modestly improved. **So we're seeing a little bit better trend, but still negative comps in our business.**

150.     In response to a question from Matt Fassler of Goldman Sachs, Defendant George

revealed that weak trends had persisted and that despite a pullback on the Company's use of

Easy Pay, increased write-off rates was a trend that "**doesn't appear to be getting a lot better**."

Specifically, George stated:

So let me just frame first of all how we issue credit at QVC and then what we've seen.

So there are two forms of credit at QVC. One is if you make a purchase on our proprietary QCard. That's a card that is managed by Synchrony. And we and Synchrony kind of split the income on that card, but those receivables are on Synchrony's books.

The second way we issue credit is through our Easy Pay program, where for certain items we will offer customers the opportunity to buy this product on two to six payments. That program -- we incur the risk on it.

On the QCard program, we've really seen no worsening of credit trend.  .  .  .**We did, however, see a bit of a tick up in write-off rates associated with our Easy Pay Program.** They are still low by any standard. This is a program where we don't do any credit check. We make it available to every customer who purchases. The write-off rates are sub-2%.

So it's not a big number, **but we did see them move up a bit starting in Q4 of last year. That said, with the lag time, that only because visible to us around April, May of this year that we were starting to see a little bit higher default rate on those sales.**

So because of some of the general news in the environment about credit worsening, we did decide to get a little more conservative in our use of Easy Pay. Hard for us to tell whether that's a bit of an anomaly that we're experiencing or a reflection of some underlying consumer pressure. But to err on the safe side, we did slightly pull back our use of Easy Pay.

> **That trend doesn't appear to be worsening. It doesn't appear
> to be getting a lot better, but it doesn't appear to be worsening.**
>
> \*   \*   \*
>
> What you see with Easy Pay is -- the best customer who uses Easy
> Pay, who's probably the customer that also has a QCard, has
> extremely, extremely low write-off rates. **The write-offs are
> disproportionately concentrated in either new customers or
> very occasional customers. . . .**But even with this best customer,
> while the absolute rates are low, **we did see a slight tick up in Q4,
> which is, again, why we got a little more conservative.**

151.    On this news, Qurate's stock price fell $1.87 per share, **or 8.71%,** to close at

$19.59 per share on September 8, 2016 on unusually high trading volume.

152.    On September 8, 2016, Eric J. Sheridan of UBS issued a research report on

Qurate entitled: "*QVC Group Q3 Noise Continues; Long-Term Thesis Intact*" where Sheridan

highlighted issues with Easy Pay as one reason for the Company's stock price drop:

> Today, CEO of QVC Mike George presented at an investor
> conference and laid out the following as an update on Q3 operating
> trends: 1) the slowdown in the US business has persisted in Q3
> ("modestly improved but still negative comps for the business"
> with QTD operating trends down high-single digits YoY); 2) the
> greatest pressures remain among QVC's core/most loyal customer
> base (impacted by macro), while retention and viewership remain
> healthy; 3) the most pronounced pullback was observed in
> apparel/fashion (in line with previous comments; slowdown from
> double digit growth to flat over the summer), and; 4) **EasyPay:
> while write-off rates ticked up in Q4 '15/earlier this year (as
> mgmt noted in its Q2 call), rates remain generally low (<2%;
> only limited impact on P&L)**. . . .

153.    On September 9, 2016, Matthew Harrigan of Wunderlich Securities issued a

research report on Quarte entitled, "*QVC U.S. Consumer Engaged and Entertained, Albeit

Jaded, on Purchase Activity,*" in which Harrigan noted:

Buy-rated QVC Group (QVCA) stock sold off 8.7% yesterday in the immediate wake of QVC CEO Mike George's comments at the Goldman Sachs 23rd Annual Retailing Conference that any rebound from the high single-digit QVC U.S. sales declines that ensued in early June remains tentative.

\* \* \*

**Credit noise**

**The slight headwind from credit issues has arisen almost entirely from the Easy Pay program on certain items rather than the Q Card that is managed in concert with Synchrony Bank. (Synchrony has the receivables on its books while splitting Q Card income with QVC). Conversely, the Easy Pay program does incur internal risk at QVC itself even as there has been no deterioration in Q Card credit trends.** Even so, Easy Pay incurs a continued mild sub 2% write-off rate even with deleterious activity increasing in Q4 albeit with visibility emerging only in April and May. It is still unclear whether this is a bit of an anomaly or more attributable to underline consumer pressure, but the overall trend remains relatively static**.** Interestingly, the best customer who uses Easy Pay also often has a Q Card with very low credit costs, with **the issue rising more with new and occasional customers that may actually be shopping for credit opportunities.**

## VI.   POST-CLASS PERIOD EVENTS

154.   On November 8, 2016, Qurate announced its financial results for the third quarter ended September 30, 2016, in which the Company revealed "declines in consumer electronics" due in part to a pull back on Easy Pay offerings on electronics and other products.  Defendant George admitted that expanded Easy Pay credit "**did have, we believe, a real but modest impact on the overall slowdown."**  Moreover, Defendant George admitted Easy Pay had propped up QVC's consumer electronics category.  According to George, Easy Pay **"had a bigger impact in areas like consumer electronics where we pull back Easy Pay more sharply since electronics accounts for a disproportionate share of our bad debt**."  According

to George, **"Declines in consumer electronics, which has been a challenging category for [the Company], accelerated in mid-year as [QVC] . . . pulled back Easy Pay usage . . ."** George further stated that **"there's no question that some of the decline in consumer electronics . . .was driven by that more conservative usage [of Easy Pay]. . . . I certainly think it was a factor in our Q3 performance."** The Company also disclosed that by November 2016, bad debt was still at elevated levels.  According to George, by November, write offs had "stabilized at [a] modestly elevated rate."

155.    When George was directly asked by a Bank of America analyst whether Easy Pay was at the heart of the Company's problems, although George admitted Easy Pay was a factor in the Company's poor results, he refused to fully acknowledge the extent to which Defendants manipulated QVC's sales numbers to serve their financial goals:

> [T]here's no question that some of the decline in consumer electronics, by no means all of it, was driven by that more conservative usage [of Easy Pay]. **But there's been some analysis that there's this tight correlation between Easy Pay and our sales. That correlation is simply not that strong. We use it strategically. We pulled it back slightly. The areas where we had pressure weren't highly correlated necessarily with a pullback in Easy Pay. So I certainly think it was a factor in our Q3 performance. I think if we were really aggressively increasing Easy Pay usage I'm sure we would have grown faster than we did.**

156.    On November 8, 2016, Defendants filed QVC's Report on Form 10-Q for the third quarter ended September 30, 2016, in which the Company disclosed that an increase in bad debt expense "primarily related to an increase in Easy-Pay sales penetration and higher default rates experienced related to the Easy-Pay program in the U.S." (p. 41).

157.    On November 8, 2016, Eric J. Sheridan of UBS issued a research report on Qurate

entitled: "QVC Group Further Clarity Points to Path Forward," in which Sheridan noted that

Qurate had experienced "Only modest increase in write-offs on Easy Pay (bad debt worsened

10bps vs. 100 bps in Q2)."

158.    On November 10, 2016, Qurate held its Annual Investor Meeting.  During the

meeting, Maffei stated: "The market has been very fixated on a couple of things. How much

Easy Pay, what is Amazon doing, are customers cord cutting. **We are not saying those are**

**without effect on the recent declines."**

159.    Defendant George also commented on the increased bad debt levels due to Easy

Pay:

> Let's talk about credit. Credit is an important part of the value
> story. It's got a lot of attention recently. We do offer credit through
> our Easy Pay program. We think it's a wonderful, low-cost reason
> to buy on QVC. It does not cost us much when you look at the
> P&L impact of it.
>
> **We did see our write-off rates start to creep up in Q4. That**
> **surprised us, because they've been going down for three or**
> **four years. They're still sub-2% of credit receivables are**
> **written off, so a very low number. But we wanted to**
> **understand that, and we did what we typically do is we took a**
> **cautious approach. We on the margin pulled back a little bit,**
> **not dramatically, in our credit usage in Q3 as we monitor those**
> **trends.** They do appear by and large to have stabilized. **We think**
> **it may have had a modest impact on Q3 sales, again,**
> **particularly in areas like electronics**.

160.    In the slides for the November 10th Investor Meeting, QVC **disclosed that it first**

**identified an increase in write off rates related to Q4 2015 sales in March 2016.**  The

Company attributed the increased write off rates to the QCard *Easy Pay Every Day* Program

launched in August 2015 which enabled Q Card users to pay for any product over 2-6

installments.  According to the slide: "Launch of QCard EZ Every Day drove strong QCard

growth (+300 [basis points] pen) . . . Led to jump in AR; program now anniversaried." The slides

also confirm that the Company pulled back "slight[ly]" in Easy Pay offerings in June 2016 as it

monitored write off trends; stating "likely some impact on sales, but not highly correlated."



## VII.    ADDITIONAL EVIDENCE OF SCIENTER

161.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly

disregarded, that the public documents and statements issued or disseminated in the name of the

Company, or in their own name, were materially false and misleading; knew or recklessly

disregarded that such statements or documents would be issued or disseminated to the investing

public; and knowingly and substantially participated or acquiesced in the issuance or

dissemination of such statements or documents as primary violations of the federal securities

laws. Defendants, by virtue of their receipt and/or access to information reflecting the true facts

regarding Qurate, their control over, and/or receipt and/or modification of Qurate's allegedly

materially misleading misstatements, were active and culpable participants in the fraudulent

scheme alleged herein.

162.    Defendants knew and/or recklessly disregarded the false and misleading nature of

the information which they caused to be disseminated to the investing public. The ongoing

fraudulent scheme described herein could not have been perpetrated during the Class Period

without the knowledge and complicity, or at least, the reckless disregard, of Qurate personnel at

the highest levels of the Company.

163.    The following additional allegations all support a strong inference of scienter:

(a)    Defendants George and Maffei's stock sales during the Class Period were

highly unusual, suspicious in timing and amount, and inconsistent with prior trading practices;

(b)    Defendants knew or were reckless in not knowing that a significant

expansion of the Company's Easy Pay program would materially increase its bad debt expense;

(c)    Evidence that Defendants sought to artificially inflate Qurate's sales

numbers in 2015 in order for certain Defendants to receive outsized bonuses; and

(d)    Evidence that Defendants sought to artificially increase the value of

Qurate's stock to reduce the price paid to acquire Zulily.

## A.    Certain Defendants' Stock Sales During the Class Period Were Highly Unusual and Suspicious

164.    Defendants George and Maffei engaged in stock sales during the Class Period that

were suspiciously timed and out of line with their prior trading practices.  As a result of these

Class Period trades, these Defendants profited from the artificial inflation embedded in the

trading price of QVC Stock caused by their false and misleading statements and omissions to

investors during the Class Period.  All of their insider sales occurred before the first partial

disclosure and before the substantial decline in the price of QVC Stock.

> 1.      **The Value and Amount of Trading by Defendants George and Maffei Was Highly Unusual**

165.    The Class Period sales of QVC Stock by Defendants George and Maffei were

highly unusual and suspicious as measured by (i) the total amount of shares sold, (ii) the contrast

with these Individual Defendants' own prior trading history, and (iii) the timing of the sales.

Such sales therefore raise a strong inference of scienter.  In addition, the proceeds obtained by

Defendant George during the Class Period were substantial in relation to his compensation

during the Class Period.

166.    To evaluate the Individual Defendants' selling activity, Plaintiff used the

publicly-available trading data that the Individual Defendants are required to report to the SEC

on the Form 4.  Plaintiff analyzed the trading by the Individual Defendants during the Class

Period and during the equal-length period immediately preceding the Class Period beginning

June 30, 2014 and ending August 4, 2015 (the "Control Period").  The Forms 4 filed during the

Class Period and Control Period are hereby incorporated by reference, and a summary of the

relevant sales of QVC Stock during the Class and Control Period are set forth below.

167.    To analyze Defendants George and Maffei's stock sales, Plaintiff calculated the

total sales made by each Defendant, together with the cash proceeds from such sales, during the

Control and Class Periods.  Those totals were then compared to identify whether these

Defendants' sales during the Class Period were consistent with their sales during the Control

Period.  George's and Maffei's specific trading dates also were evaluated compared to the two

partial disclosure dates. These analyses reveal that Defendants George and Maffei's Class Period

stock sales were extremely large, unusual, and suspicious.

### CLASS PERIOD TRADING IN QVC STOCK BY MICHAEL GEORGE AND GREGORY MAFFEI

| Filer Name | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|
| George (Michael A) | 270,110 | Sale | $26.45 | $7,144,409.50 | 1-Oct-15 |
| George (Michael A) | 150,000 | Sale | $26.89 | $4,033,500.00 | 7-Dec-15 |
| George (Michael A) | 150,000 | Sale | $26.54 | $3,981,000.00 | 5-Jan-16 |
| George (Michael A) | 150,000 | Sale | $25.44 | $3,816,000.00 | 2-Feb-16 |
| George (Michael A) | 150,000 | Sale | $25.82 | $3,873,000.00 | 2-Mar-16 |
| George (Michael A) | 150,000 | Sale | $25.10 | $3,765,000.00 | 5-Apr-16 |
| George (Michael A) | 150,000 | Sale | $26.24 | $3,936,000.00 | 3-May-16 |
| George (Michael A) | 150,000 | Sale | $27.02 | $4,053,000.00 | 2-Jun-16 |
| George (Michael A) | 150,000 | Sale | $26.24 | $3,936,000.00 | 11-Jul-16 |
| **Total Shares Sold During Class Period and Proceeds** | **1,470,110** | | | **$38,537,909.50** | |
| | | | | | |
| Maffei (Gregory B) | 125,000 | Sale | $26.91 | $3,363,750.00 | 15-Dec-15 |
| Maffei (Gregory B) | 99,505 | Sale | $26.86 | $2,672,704.30 | 16-Dec-15 |
| **Total Shares Sold During Class Period and Proceeds** | **224,505** | | | **$6,036,454.30** | |
| | | | | | |
| **TOTALS** | **1,694,615** | | | **$44,574,363.80** | |

**CONTROL PERIOD TRADING IN LIBERTY INTERACTIVE AND QVC BY MICHAEL GEORGE AND GREGORY MAFFEI**
**(6/30/14 – 8/4/15)**

| Filer Name | Number of Shares | Transaction Type | Price | Transaction Value | Transaction Date |
|---|---|---|---|---|---|
| George (Michael A) | 106,007 | Sale | $28.33 | $3,003,178.31 | 24-Nov-14 |
| George (Michael A) | 106,007 | Sale | $28.91 | $3,064,662.37 | 5-Dec-14 |
| George (Michael A) | 106,007 | Sale | $28.52 | $3,023,319.64 | 9-Dec-14 |
| George (Michael A) | 106,007 | Sale | $28.71 | $3,043,460.97 | 11-Dec-14 |
| George (Michael A) | 212,014 | Sale | $27.22 | $5,771,021.08 | 2-Feb-15 |
| George (Michael A) | 212,014 | Sale | $28.95 | $6,137,805.30 | 7-Apr-15 |
| George (Michael A) | 67,482 | Sale | $39.05 | $2,635,172.10 | 1-Jul-15 |
| George (Michael A) | 270,111 | Sale | $27.83 | $7,517,189.13 | 1-Jul-15 |
| **Total Shares Sold During Control Period and Proceeds** | **1,185,649** | | | **$34,195,808.90** | |
| | | | | | |
| Maffei (Gregory B) | 79,385 | Sale | $27.79 | $2,206,109.15 | 17-Dec-14 |
| **Total Shares Sold During Control Period and Proceeds** | **79,385** | | | **$2,206,109.15** | |
| | | | | | |
| **TOTALS** | **1,265,034** | | | **$36,401,918.05** | |

**(a)      The Amount of QVC Stock Sold During the Class Period by Defendants George and Maffei Was Extremely Large**

168.     The proceeds from Qurate shares sold during the Class Period by Defendants George and Maffei were extremely large.

169.     Defendant George sold 1,470,110 shares of QVC Stock during the Class Period for proceeds of **$38,537,909.50.**

170.     Defendant Maffei sold 224,505 shares of QVC Stock during the Class Period for proceeds of **$6,036,454.30**.

         **(b)**     **Defendants George and Maffei's Stock Sales During the Class Period Were Inconsistent With Their Prior Trading Practices**

171.    Defendants George and Maffei's Class Period stock sales were not only large in terms of proceeds, but also inconsistent with these Defendants' own prior selling activity during the Control Period.

172.    Collectively, Defendants George and Maffei increased their total stock sales during the Class Period by approximately **34%** from 1,265,034 shares sold during the Control Period to 1,694,615 shares sold during the Class Period.  Individually, Defendants George and Maffei stock sales also increased sharply during the Class Period.

173.    Separately, Defendants George and Maffei also substantially increased the number of Qurate shares they sold: **Maffei more than doubled the number of shares of QVC Stock he sold** – from 79,385 shares sold during the Control Period to 224,505 sold shares during the Class Period. George sold approximately 24% more shares of QVC Stock during the Class Period – selling 1,185,649 shares during the Control Period and 1,470,110 shares during the Class Period.

174.    Defendants George and Maffei's sales, as measured in dollars, also increased dramatically.  **Defendant Maffei's proceeds from Qurate sales almost tripled during the Class Period** – from $2.2 million during the Control Period to $6 million during the Class Period. Defendant George's trading also significantly increased from $34.2 million during the Control Period to $38.5 million during the Class Period.  **Collectively, proceeds from these Defendants' stock sales increased 22.5% during the Class Period, from approximately $36.4 million during the Control Period to appropriately $44.6 million during the Class Period.**

**(c)     The Timing of the Stock Sales Was Suspicious**

175.    Defendants George and Maffei's Class Period sales of QVC Stock were suspiciously timed in that these Defendants sold their shares *after* learning of materially non-public information about the drastic increase in the use of Easy Pay, *but before* the public disclosure of increasing bad debt and default due to the increased use of Easy Pay.  Indeed, Defendants George and Maffei sold their QVC Stock *before* the first partial disclosure on August 5, 2016.  **Importantly, on October 1, 2015—the same date the Zulily acquisition was consummated—Defendant George executed trades amounting to $7,144,409.50 in illicit proceeds.  This highly suspicious transaction was Defendant George's largest transaction throughout the Class Period.**

**(d)     The Proceeds Obtained by Defendant George Were Substantial In Relation to His Compensation during the Class Period**

176.    The proceeds obtained by Defendant George were substantial in relation to his compensation level during the Class Period. As set forth below, in 2016, Defendant George's total compensation including base salary, stock and option awards, incentive plan and other compensation was $13.2 million, significantly less than George's proceeds of $38.5 million from his Class Period trading.

**2.     The Presence of 10b5-1 Trading Plans Adopted by the Individual Defendants Does Not Absolve Them of Liability**

177.    Rule 10b5-1, 17 C.F.R. § 240.10b5-1 provides that a person will be deemed to have traded "on the basis of" material nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.  To provide a safe harbor under the "aware of" standard, the SEC created an affirmative defense to insider trading claims

for trades made pursuant to a binding agreement or plan ("10b5-1 Plans" or "Plans"). *See Selective Disclosure and Insider Trading,* 65 Fed. Reg. 51,716, 51,727-28 (Aug. 24, 2000). Pursuant to SEC Rule 10b5-1(c), a 10b5-1 Plan is a defense to insider trading liability **only** if it is entered into by an insider "**[b]efore becoming aware**" of inside information, and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading. (emphasis added).

178.    Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomson Reuters, *Corporate Counsel's Guide to Insider Trading and Reporting,* Ch. 12:26 (2018). Conversely, the adoption and/or modification of these Plans while in possession of material non-public information is highly suspicious and supports a strong inference of scienter.

179.    Based on Form 144 filings with the SEC, it appears that Defendant George entered into a new trading plan for QVC Stock *during* the Class Period and/or modified or cancelled his existing Qurate trading plans *during* the Class Period. Indeed, George reported a trading plan with an effective date of November 16, 2015.[21]

180.    Further, although some of the Individual Defendants' stock sales may have been made pursuant to 10b5-1 Plans, the circumstances of those sales are sufficiently suspicious to overwhelm any exculpatory inference that might otherwise have been available to pre-planned sales based on such Plans. Indeed, even if the Individual Defendants had entered into 10b5-1 Plans prior to the Class Period and traded within those same plans throughout the Class Period

---

[21] Information about Maffei's trading plans, if any, could not be derived from Forms 4 and 144 filed with the SEC during the Class Period.

(which Defendant George did not), such plans are under heavy SEC scrutiny in light of a *Wall Street Journal* investigation that found that insiders who were trading pursuant to 10b5-1 Plans were still trading at opportune times and reaping better-than-expected results.  According to the November 27, 2012 *Wall Street Journal* article entitled "Executives' Good Luck in Trading Own Stock," executives trading pursuant to 10b5-1 Plans are still able to time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

181.    Accordingly, Defendants George and Maffei's trading behavior during the Class Period raises a strong inference of suspicious and unusual trading activity and their trading plans do not provide these Defendants with a safe harbor.

**B.      Defendants Knew or Were Reckless in Not Knowing that A Significant Expansion of the Company's Easy Pay Program Would Materially Increase its Bad Debt Expense**

182.     Defendants' false and misleading statements were not simply a case of mismanagement or mistake; but rather Defendants knew or recklessly disregarded that substantially increasing the availability of Easy Pay credit at QVC would lead to increased defaults and bad debt on Qurate's books.

183.     In 2015, the Company began using Easy Pay on everything because sales were down and Easy Pay was a major sales driver.  Because Easy Pay historically had collectability issues, an internal rule was created for Easy Pay in early 2014 which required that, during a promotion, only one-third of QVC's products could be sold on Easy Pay in order to mitigate these collectability problems.  ***However, in 2015, the Company began offering Easy Pay on everything and Easy Pay's one-third rule was no longer being enforced.*** In 2015, it was a

frequent topic of discussion at weekly strategy meetings that Easy Pay was being used too much. These meetings were being attended by some of Defendant George's direct reports including Doug Howe.

184.    The plan to link Easy Pay to the Q Card was done to drive sales which had been down.  The decision to expand the use of Easy Pay came from Qurate's "C-Suite" which included Defendant George and Doug Howe.  In 2015, QVC increased the availability of Easy Pay credit to such an extent that more than ***70% of QVC's sales were made through Easy Pay***. In addition, QVC increased the number of installments a customer could use to pay back balances through Easy Pay from three payments to up to five payments.  Easy Pay was extended to additional products including lower ticket items and everyone at QVC knew that the more Easy Pay was offered, the more QVC would see an increase in delinquencies.

185.    Easy Pay was traditionally offered on Electronics, but prior to the Class Period, it was being offered on more products and with additional installment periods. The use of Easy Pay continued to increase in the latter half of 2015 and defaults were going up during the Class Period.  QVC had a report that was circulated every week to ten days that detailed customer defaults and bankruptcies, and listed customers with over $25,000 in Easy Pay balances.  This report was put together by QVC's finance team, which included Defendant Jastrzebski and which monitored defaults closely. In 2015, there was an increase in the number of customers being sent to collections on reports generated by QVC's Customer Service or "CSR" System.

186.    Easy Pay was originally only used on a few select products such as the "Daily Deal" and high priced products, but that QVC began using it more and more beginning in 2015 to increase sales.  In 2015, Easy Pay also was being used on clearance items.  The more Easy Pay

was used, the more default and collection issues there were.  The Company used an in-house

CRM system built by Qurate's IT department to track Easy Pay installment plans, and reports

were circulated monthly (and sometimes more frequently) with information about Easy Pay

usage.   Executives with access to the CRM system had access to which customers used Easy

Pay and if they had defaulted.  In addition, reports were circulated with sales and Easy Pay

default information and the C-Suite knew about the increased use of Easy Pay and its default

rate.

187.    There was a significant increase in Easy Pay Flash events in 2015 which

increased the use of Easy Pay.  Flash events were windows of time in which Easy Pay was

offered.  The planning team, led by Executive Vice President and Chief Merchandising Officer

Doug Howe, who reported directly to Defendant George, decided what items would be offered

with Easy Pay.  Delinquencies and defaults on Easy Pay purchases were metrics that QVC's

finance team followed closely and the finance team would have alerted the attendees of the

weekly Officers' Meetings to any changes in that metric.  All of Qurate's officers, including

Defendants George and Jastrzebski attended the high-level Officers' Meetings.  Concerns about

Easy Pay and sales at the time were consistently discussed in Officers' Meetings.

188.    Reports were generated on how often customers were using Easy Pay (referred to

as the "take rate"), as well as other analytics related to that metric. New customers typically

came to QVC for big ticket items and new customers were more likely to default.  Returning

customers were less likely to default.  Bad debt was always a topic of discussion during Tuesday

morning leadership meetings with C-Suite executives.  Bad debt was tracked by QVC's finance

department in its SAP Financial System.  Defaults would be reported to QVC's customer care

department where a dunning process would take place.

189.    During the Class Period, QVC "really ramped" up the use of Easy Pay because

sales had been down for "quite a while" and management at QVC knew sales would be boosted

if items were available with Easy Pay.  During the Class Period, QVC extended Easy Pay to all

items bought on the Q Card, *including very low priced items*. QVC even accepted gift cards in

some markets for Easy Pay purchases.

### C. Defendants Artificially Inflated Qurate's Sales with Easy Pay Credit to Ensure Payment of Outsized Bonuses in a Year of Otherwise Poor Financial Performance

190.    There is also evidence that Defendants dramatically increased the availability of

Easy Pay credit in order to pay themselves lavish bonuses that otherwise could not have been

achieved in the face of sluggish sales.

191.    Qurate's Executive Officers are eligible to receive performance-based bonuses

that are structured to align with the Company's financial performance.  In 2015, QVC's EBITDA

had to equal or exceed $1,969.9 million before any bonus would be paid.

192.    Qurate's sales were exceedingly low in 2015, amidst the Company's significant

headwinds. For the first three quarters of 2015, revenue was $2,214 million, $2,252 million, and

$2,153 million, respectively.  This decline threatened the Individual Defendants' performance-

based bonuses in 2015.

193.    Knowing the Company's declining revenue would impact their compensation,

Defendants rapidly expanded the Company's use of Easy Pay in August 2015 to increase sales

and achieve this target EBITDA before year-end.  This expansion pulled the Company's sales

out of its precipitous decline and in 4Q15, the Company's revenue shot up to $3,370 million. This abnormally high quarter was just enough to enable Defendants to receive their seven-figure bonuses.  In fact, the Company achieved its target EBITDA *exactly*, reporting an actual EBITDA for 2015 of $1,969.9 million.

194.    Moreover, an analysis conducted by Plaintiff's forensic accountants revealed Qurate's 4Q15 earnings and related EBITDA were inflated by $11.2 million. Thus, Defendants would not have achieved the EBITDA target needed to pay bonuses absent their decision to substantially loosen the availability of Easy Pay credit.

### D.    Defendants Sought to Increase the Value of Qurate's Stock Price to Reduce the Price Paid for Zulily

195.    In August 2015, immediately after Defendants dramatically increased the availability of Easy Pay credit at QVC, Qurate announced that it was planning to acquire online retailer Zulily. Qurate planned to acquire Zulily for $2.4 billion, $392.98 million of which was to be paid in newly issued shares of Series A stock. Notably, the purchase price was to be paid in part through the issuance of additional QVC Stock.

196.    Thus, in the face of declining sales, Defendants sought to maintain the price of Qurate's stock at an artificially high level until the completion of the transaction on October 1, 2015 to keep the price of Zulily from going up as Qurate's sales declined.

197.    With the acquisition looming and Qurate's sales falling, QVC aggressively expanded the amount of credit offered through its Easy Pay program beginning in the summer of 2015 by increasing the number and type of products on which it offered Easy Pay, adding lower-priced products to Easy Pay, and relaxing rules regarding Easy Pay installment payments in an effort to artificially inflate the Company's sales.  Because it was well known within the

Company that an uptick in the use of Easy Pay would increase Qurate's bad debt exposure, Defendants were on notice that their expansion would increase QVC's bad debt.  Nonetheless, the Company ramped up its use of Easy Pay to artificially inflate the stock price prior to the October acquisition.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

198.   During the Class Period, as detailed herein, Qurate and the Individual Defendants engaged in a course of conduct that artificially inflated and/or artificially maintained the price of QVC Stock and operated as a fraud or deceit on the Class Period purchasers of QVC Stock by making the materially false and misleading statements and omissions recited above.

199.   When the truth was disclosed and became known to the market, the price of QVC Stock declined precipitously as the prior artificial inflation was removed from the price of the stock. As a result of their purchases of QVC Stock at artificially inflated prices during the Class Period, Lead Plaintiff and other members of the Class suffered a substantial economic loss (i.e., damages under the federal securities laws). The price decline in QVC Stock was a direct result of the nature and extent of the materially false and misleading statements and omissions revealed to investors and the market. The misstatements and omissions described herein also concealed risks regarding the Company's bad debt expense and it was foreseeable that the value of QVC Stock would be adversely affected when the concealed risks materialized. Thus, the Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiff and the Class.

200.   The truth about QVC's business was disclosed through two partial disclosures regarding issues with the Company's expanded use of Easy Pay beginning after the market

closed on August 5, 2016 with the release of the Company's second quarter 2016 results, and

concluding on September 8, 2016, during a Goldman Sachs Global Retail Conference where the

Company announced increased write-off rates associated with the Easy Pay program and

acknowledged there would be "higher default rates associated with those sales."

(a)     *August 5, 2016 – First Partial Disclosure*

(i)     The release of the Company's financial results for the second

quarter ended June 30, 2016, on August 5, 2016, before the market opened, was a partial

disclosure in which the Company disclosed that it was experiencing "significant headwinds,

which have continued" and sales had significantly decelerated across all product categories.

Defendant George attributed these issues, in part, to the Company's use of Easy Pay.  According

to George, "[b]eginning in April [2016], [Qurate] saw higher than expected write-offs on Easy

Pay purchases from October and November of last year."  Defendant George further admitted

that "[g]iven heightened write-off risks, we did choose to moderate our Easy Pay usage

beginning in June [2016], which puts some additional pressure on sales."

(ii)     In reaction to these disclosures, QVC's stock price fell from a

close on August 4, 2016 of $26.30 per share to a close on August 5, 2016 of $20.61 per share, ***or

a drop of approximately 21.63%.***

(b)     *September 8, 2016 – Second Partial Disclosure*

(i)     On September 8, 2016, during the trading day, at the Goldman

Sachs Global Retail Conference in New York City, the Company further revealed the extent to

which it relied on an aggressive Easy Pay credit policy to boost sales.  Defendant George

admitted that the Company's debt problems were not improving, and that the Company expected

to see continued "higher default rates" associated with these sales.  Defendant George also

explained this trend would continue to impact its business: "[W]e had seen a slowdown in the

business starting in roughly early June that had persisted through the call, slowdown kind of in

the high single digits.  I would say, as we look forward over the last several weeks, that trend has

largely continued, modestly improved. So, we're seeing a little bit better trend, but still negative

comps in our business."

        (ii)     In reaction to these disclosures, on September 8, 2016, QVC's

stock price fell from its close on September 7, 2016 of $21.46 per share to a close of $19.59 per

share on September 8, 2016, *or approximately 8.71%.*

## IX.    CLASS ACTION ALLEGATIONS

    201.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of all persons and entities who purchased or otherwise

acquired QVC Stock[22] during the period from August 5, 2015 through September 8, 2016,

inclusive (the "Class Period"), and were damaged thereby (the "Class").[23]  Excluded from the

Class are: (i) the Defendants; (ii) the present and former officers and directors of the Company[24];

(iii) the Company's subsidiaries; (iv) members of the immediate families of the Individual

Defendants; (v) any entity in which any Defendant has or had a controlling interest; and (vi) the

---

[22] "QVC Stock" means the publicly traded Series A QVC Group common stock traded during the Class Period on the NASDAQ Global Select Market under the symbol QVCA.

[23] During the Class Period, QVC Inc. was part of QVC Group and its Series A shares were publicly traded on NASDAQ Global Select Market under the ticker symbol "QVCA."  On March 12, 2018, QVC Inc. became part of Qurate Retail, Inc. and its Class A shares began trading under the ticker symbol "QRTEA."

[24] For purposes of Paragraph 201, the "Company" means Qurate Retail, Inc., QVC, Inc., and/or Liberty Interactive Corporation.

legal representatives, heirs, successors, and assigns of any such excluded party with respect to any trades in QVC Stock made in that capacity.

202.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.   Throughout the Class Period, QVC Stock was actively traded on the NASDAQ under the ticker symbol "QVCA." As of the Company's Report on Form 10-Q for the quarter ended June 30, 2016, filed on August 5, 2016, QVC Group had 446,645,121 shares of Series A shares outstanding owned by thousands of persons.

203.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)     Whether the Exchange Act was violated by Defendants;

(b)     Whether Defendants omitted and/or misrepresented material facts;

(c)     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)     Whether the price of QVC Stock was artificially inflated or artificially maintained; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

204.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class

sustained damages from Defendants' wrongful conduct.

205.     Plaintiff will adequately protect the interests of the Class and has retained counsel

experienced in securities class action litigation. Plaintiff has no interests that conflict with those

of the Class.

206.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy.  Furthermore, as the damages suffered by individual Class

members may be relatively small, the expense and burden of individual litigation make it

impossible for members of the Class to individually redress the wrongs done to them.  There will

be no difficulty in the management of this action as a class action.

## X.     PRESUMPTION OF RELIANCE

207.     Plaintiff alleges that throughout the Class Period, Defendants omitted to disclose

material information of which Defendants were aware or were reckless in not knowing.  Such

statements artificially inflated or artificially maintained the price of QVC Stock and operated as a

fraud or deceit on all persons and entities who purchased or otherwise acquired that stock during

the Class Period. Because Defendants chose to speak on the issues described in section V, it was

important that Defendants not mislead investors or withhold material information. To the extent

that the Defendants concealed or improperly failed to disclose material facts with respect to the

Company and its business, Plaintiff is entitled to a presumption of reliance in accordance with

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

208.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's Series A shares traded in an efficient market;

(d)    the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's Series A shares; and

(e)    Plaintiff and other members of the Class purchased QVC Stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

209.    At all relevant times, the market for QVC Stock was efficient for the following reasons, among others:

(a)    as a regulated issuer, the Company filed periodic public reports with the SEC;

(b)    The Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services;

(c)    The Company was followed by several securities analysts employed by major brokerage firm(s) including (1) UBS; (2) Wells Fargo; (3) Wunderlich; (4) Stephens; (5)

FBN; and (6) Brean Capital, who wrote reports that were distributed to the sales force and

certain customers of their respective brokerage firm(s) and were publicly available and entered

the public marketplace; and

(d)     QVC Stock was actively traded in an efficient market, the NASDAQ,

under the ticker symbol "QVCA."

210.    As a result of the foregoing, the market for QVC Stock promptly digested current

information regarding the Company from publicly available sources and reflected such

information in its common stock price(s).  Under these circumstances, all purchasers of QVC

Stock during the Class Period suffered similar injury through their purchase of QVC Stock at

artificially inflated prices and the presumption of reliance applies.

## XI.    NO SAFE HARBOR

211.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions.  To the extent certain statements alleged to be false or misleading are determined to

be mixed statements of historical or present information and future information, such statements

are not entitled to the safe harbor with respect to the part of the statement that refers to historical

or present conditions.

212.    To the extent certain of the statements alleged to be false or misleading may be

characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.

213.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, or the forward-looking statement was authorized or approved by an executive officer of Qurate who knew that the statement was false when made.

## XII.   CONTROL PERSON ALLEGATIONS

214.     The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

215.     During the Class Period, the Individual Defendants followed, tracked, and were aware of the Company's bad debt reserves and that the Company's expansion of Easy Pay to increase sales would lead to increased write-offs and bad debt.

216.     The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were

provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein.

217.    The Individual Defendants, because of their positions of control and authority as senior executive officers (and as President for Defendant George and Chairman for Defendant Maffei), had access to the adverse, undisclosed information about Qurate's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.

218.    As senior officers and controlling persons of a publicly-held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

219.    Each of the Individual Defendants is liable as a primary participant in a wrongful scheme and course of business that operated as a fraud and deceit on purchasers of Qurate's

common stock during the Class Period, which included the dissemination of materially false and

misleading statements (both affirmative statements and statements rendered misleading because

of material omission) regarding how the Company's expansion of Easy Pay would lead to

increased write-offs and bad debt. The scheme: (i) deceived the investing public regarding

Qurate's operations and the true value of Qurate's common stock; and (ii) caused Plaintiff and

other members of the Class to purchase Qurate's common stock at artificially inflated prices,

which fell as the truth concerning the effects of Easy Pay on the Company's bad debt and the

Company's inability to collect payments on outstanding Easy Pay installments.

220.    In making the statements complained of herein, the Individual Defendants, who

were senior officers and controlling persons of Qurate, were acting on behalf of the Company in

the regular course of business. Therefore, each of the statements made by the Individual

Defendants is attributable to the Company.

## XIII.   CLAIMS FOR RELIEF

### COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

221.    Plaintiff repeats and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

222.    This Count is asserted against Qurate and the Individual Defendants and is based

upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

thereunder by the SEC.

223.    During the Class Period, Qurate and the Individual Defendants engaged in a plan,

scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly

engaged in acts, transactions, practices and courses of business which operated as a fraud and

deceit upon Plaintiff and the other members of the Class; made various untrue statements of

material facts and omitted to state material facts necessary in order to make the statements made,

in light of the circumstances under which they were made, not misleading; and employed

devices, schemes and artifices to defraud in connection with the purchase and sale of securities.

224.    Such scheme was intended to, and, throughout the Class Period, did: (i) deceive

the investing public, including Plaintiff and other Class members, as alleged herein; (ii)

artificially inflate and artificially maintain the market price of QVC Stock; and (iii) cause

Plaintiff and other members of the Class to purchase or otherwise acquire QVC Stock at

artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct,

Defendants, and each of them, took the actions set forth herein.

225.    Pursuant to the above plan, scheme, conspiracy and course of conduct, and by the

use of means or instrumentalities of interstate commerce and/or of the mails, each of the

Defendants made statements in quarterly and annual reports, SEC filings, press releases and

other statements and documents described above, including statements made to securities

analysts and the media that were designed to influence the market for QVC Stock.  Such reports,

filings, releases and statements were materially false and misleading in that they failed to

disclose material adverse information and misrepresented the truth about the Company's

business, including the serious problems with the Company's administrative infrastructure.

226.    As described above, Qurate and the Individual Defendants acted with scienter

throughout the Class Period, in that they either had actual knowledge of the misrepresentations

and omissions of material facts set forth herein, or acted with reckless disregard for the truth in

that they failed to ascertain and to disclose the true facts, even though such facts were available

to them.

227.   The Individual Defendants are liable both directly and indirectly for the wrongs

complained of herein.  Because of their positions of control and authority, the Individual

Defendants were able to and did, directly or indirectly, control the content of the statements of

the Company.  As officers and/or directors of a publicly-held company, the Individual

Defendants had a duty to disseminate timely, accurate, and truthful information with respect to

the Company's businesses, operations, financial condition and prospects.

228.   As a result of the dissemination of the aforementioned false and misleading

reports, releases and public statements, the market price of QVC Stock was artificially inflated

throughout the Class Period.  In ignorance of the adverse facts concerning the Company's

business and financial condition which were concealed by Defendants, Plaintiff and the other

members of the Class purchased QVC Stock at artificially inflated prices and relied upon the

price of the common stock, the integrity of the market for the securities and/or upon statements

disseminated by the Company and the Individual Defendants, and were damaged thereby.

229.   During the Class Period, QVC Stock was traded on an active and efficient market.

Plaintiff and the other members of the Class, relying on the materially false and misleading

statements described herein, which the Company and the Individual Defendants made, issued or

caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise

acquired shares of QVC Stock at prices artificially inflated and/or artificially maintained by

Defendants' wrongful conduct.

230.     Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of QVC Stock was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of QVC Stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

231.     By reason of the conduct alleged herein, Qurate and the Individual Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

232.     As a direct and proximate result of the wrongful conduct of Qurate and the Individual Defendants, Plaintiff and the other members of the Class suffered damages in connection with their purchases and sales of the Company's common stock during the Class Period.

### COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

233.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

234.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of its business affairs.  Because of their senior positions, they knew the adverse non-

public information about the Company's business, including the serious problems regarding how the Company's expansion of Easy Pay would lead to increased write-offs and bad debt.

235.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

236.    Because of their positions of control and authority as senior officers of the Company, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, public filings, and other statements which Qurate made and disseminated in the marketplace during the Class Period concerning the Company's results of operations.  In their capacities as senior officers of the Company, the Individual Defendants had direct involvement in the day-to-day operations of the Company and reviewing and approving the Company's public statements.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated and/or artificially maintained the market price of QVC Stock.

237.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company.  By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct

complained of herein.  Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

238.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Qurate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Declaring this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, certifying Lead Plaintiff as Class Representative pursuant to Federal Rule of Civil Procedure 23(c), and appointing Labaton Sucharow LLP as Class Counsel pursuant to Rule 23(g);

(b)    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff's reasonable costs and expenses, including attorneys' fees, expert fees, and its other costs and expenses; and

(d)    Awarding such equitable, injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  May 30, 2019

**LABATON SUCHAROW LLP**

By: *Jonathan Gardner*
Jonathan Gardner
Christine M. Fox
Theodore J. Hawkins
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  jgardner@labaton.com
cfox@labaton.com
thawkins@labaton.com

*Counsel for Lead Plaintiff and the Proposed
Class*

THE SHUMAN LAW FIRM
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: rusty@shumanlawfirm.com

*Local Counsel for Lead Plaintiff and the
Proposed Class*

WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
Malcolm T. Brown
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4714
Facsimile: (212) 686-0114
Email: brown@whafh.com

*Additional Plaintiff's Counsel*