**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02300-MEH

BRISTOL COUNTY RETIREMENT SYSTEM,
Individually and on Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

QURATE RETAIL, INC.,
MICHAEL A. GEORGE,
GREGORY B. MAFFEI, AND
THADDEUS JASTRZEBSKI,

      Defendants.

---

**LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND PLAN OF ALLOCATION AND
MEMORANDUM OF LAW IN SUPPORT**

---

## **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................................... iii

MOTION ........................................................................................................................... 1

MEMORANDUM OF LAW ............................................................................................. 1

PRELIMINARY STATEMENT ....................................................................................... 2

PRELIMINARY APPROVAL AND THE NOTICE PROGRAM ................................... 4

ARGUMENT ..................................................................................................................... 5

I.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND
      ADEQUATE UNDER THE APPLICABLE STANDARDS AND SHOULD
      BE APPROVED ........................................................................................... 5

      A.    The Standards for Final Approval of Class Action Settlements ................... 5

      B.    Application of the Tenth Circuit's Factors Supports Final Approval of
            the Settlement .............................................................................................. 7

            1.    The Settlement Was Fairly and Honestly Negotiated ......................... 7

            2.    Serious Questions of Law and Fact Exist Placing the Ultimate
                  Outcome of the Action in Doubt ......................................................... 9

                  (a)    Risks Concerning Falsity and Materiality ................................ 11

                  (b)    Statute of Limitations .............................................................. 11

                  (c)    Scienter .................................................................................... 12

                  (d)    Loss Causation and Damages Challenges ................................ 13

            3.    The Value of the Immediate Recovery Outweighs the Mere
                  Possibility of Future Relief After Protracted and Expensive
                  Litigation ......................................................................................... 15

            4.    The Judgment of the Parties that the Settlement Is Fair and
                  Reasonable ....................................................................................... 17

i

C.    Application of the Factors Identified in the Amendments to Rule 23 Supports Approval of the Settlement as Fair, Reasonable, and Adequate ................................................................................................ 19

    1.    Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class ............................................................................. 19

    2.    The Settlement Is the Result of Arm's-Length Negotiations ............. 19

    3.    The Relief Provided to the Settlement Class Is Adequate and the Settlement Treats Class Members Equitably Relative to Each Other .......................................................................................... 20

II.    THE PLAN OF ALLOCATION IS FAIR, ADEQUATE, AND REASONABLE AND SHOULD BE APPROVED ................................................. 22

III.    THE COURT SHOULD GRANT FINAL CERTIFICATION OF THE SETTLEMENT CLASS ................................................................................. 23

CONCLUSION ....................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Home Assurance Co. v. Cessna Aircraft Co.*,
  551 F.2d 804 (10th Cir. 1977) ................................................................................5

*Big O Tires, Inc. v. Bigfoot 4x4, Inc.*,
  167 F. Supp. 2d 1216 (D. Colo. 2001) ....................................................................5

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
  No. 12 Civ. 1609, 2015 WL 965693 (W.D. La. Mar. 3, 2015) ............................17

*In re Crocs, Inc. Sec. Litig.*,
  306 F.R.D. 672 (D. Colo. 2014) .................................................................. *passim*

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).............................................................................................13

*Farley v. Family Dollar Stores, Inc.*,
  No. 12-cv-00325-RM-MJW, 2014 WL 5488897 (D. Colo. Oct. 30, 2014) .....................17, 18

*Gottlieb v. Wiles*,
  11 F.3d 1004 (10th Cir. 1993) .........................................................................6, 15

*Gubricky v. Ells*,
  No. 16-cv-3180-WJM-KLM, 2018 WL 1621166 (D. Colo. Apr. 4, 2018) ......................17, 18

*Jones v. Nuclear Pharmacy, Inc.*,
  741 F.2d 322 (10th Cir. 1984) .........................................................................6, 15

*Lane v. Page*,
  862 F. Supp. 2d 1182 (D.N.M. 2012) ..................................................................16

*Law v. NCAA*,
  108 F. Supp. 2d 1193 (D. Kan. 2000) ..................................................................22

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
  667 F.3d 1331 (10th Cir. 2012) .......................................................................9, 13

*Lucas v. Kmart Corp.*,
  234 F.R.D. 688 (D. Colo. 2006) ...................................................................7, 9, 22

*Marcus v. Kansas Dep't of Revenue*,
209 F. Supp. 2d 1179 (D. Kan. 2002) ...................................................................18

*McNamara v. Pre-Paid Legal Servs, Inc.*,
189 F. App'x. 702 (10th Cir. 2006) .....................................................................12

*Merck & Co. v. Reynolds*,
559 U.S. 633 (2010)............................................................................................11

*In re Omnivision Techs. Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ...............................................................17

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*
396 F. Supp. 2d 1178 (D. Colo. 2004)..................................................................12

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
No. 01-cv-01451, 2006 U.S. Dist. LEXIS 71039 (D. Colo. Sept. 28, 2006)............8, 9, 10, 15

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
314 F.3d 1180 (10th Cir. 2002) .............................................................................6

*Schuler v. Meds. Co.*,
No. CV 14-1149 (CCC), 2016 WL 3457218 (D.N.J. June 24, 2016).....................17

*In re Thornburg Mortg., Inc. Sec. Litig.*,
912 F. Supp. 2d 1178 (D.N.M. 2012) ...................................................................14

*Todd v. STAAR Surgical Co.*,
No. CV 14-5263MWF(GJSX), 2017 WL 4877417 (C.D. Cal. Oct. 24, 2017) .........8

*Tuten v. United Airlines, Inc.*,
41 F. Supp. 3d 1003 (D. Colo. 2014)..................................................................6, 7

*In re Under Armour Sec. Litig.*,
342 F. Supp. 3d 658 (D. Md. 2018) ......................................................................11

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695 (CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ...............18

*In re Warner Commc'ns Sec. Litig.*,
618 F. Supp. 735 (S.D.N.Y. 1985), *aff'd*, 798 F.2d 35 (2d Cir. 1986)...................14

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................19

Fed. R. Civ. P. 23(a) .................................................................................................23

Fed. R. Civ. P. (b)(3).................................................................................................23

Fed. R. Civ. P. 23(e) ..............................................................................................1, 6

Fed. R. Civ. P. 23(e)(2)........................................................................................6, 19

Fed. R. Civ. P. 23(e)(2)(C)(i)....................................................................................20

Fed. R. Civ. P. 23(e)(2)(C)(ii)..............................................................................20, 23

Fed. R. Civ. P. 23(e)(2)(C)(iii)..................................................................................21

Fed. R. Civ. P. 23(e)(2)(C)(iv)..................................................................................21

Fed. R. Civ. P. 23(e)(2)(D) .......................................................................................22

Fed. R. Civ. P. 23(e)(3)........................................................................................7, 21

Fed. R. Civ. P. 23(f).................................................................................................15

## MOTION

Lead Plaintiff Indiana Public Retirement System ("Indiana" or "Lead Plaintiff"), on behalf of itself and all other members of the proposed Settlement Class, respectfully submits this motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for entry of the Parties' agreed-upon proposed Final Order and Judgment approving the proposed Settlement as fair, reasonable, and adequate, and for entry of an Order approving the proposed Plan of Allocation for the distribution of the proceeds of the Settlement as fair, reasonable, and adequate. Proposed Orders will be submitted with Lead Plaintiff's reply submission, after the September 3, 2019 deadlines for objecting and requesting exclusion from the Settlement Class have passed.[1]

In support of this motion, Lead Plaintiff submits and is filing herewith: (1) the following memorandum of law in support; and (2) the Declaration of Jonathan Gardner in Support of (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses, with annexed exhibits. Pursuant to Local Rule 7.1(a), Lead Counsel has conferred with counsel for the Defendants and they join in requesting approval of the proposed Settlement and entry of the Judgment, and take no position on approval of the proposed Plan of Allocation.

## MEMORANDUM OF LAW

Lead Plaintiff respectfully submits this memorandum in support of its motion, pursuant to Federal Rule of Civil Procedure 23(e), requesting (i) final approval of the proposed settlement of

---

[1] All capitalized terms not otherwise defined herein have the meanings set forth in the Stipulation and Agreement of Settlement, dated as of May 31, 2019 (the "Stipulation," ECF No. 44-1).

the above-captioned class action (the "Settlement"); and (ii) approval of the proposed Plan of Allocation.

## PRELIMINARY STATEMENT

As detailed in the Stipulation, Qurate Retail, Inc. ("Qurate"), Michael A. George, Gregory B. Maffei, and Thaddeus Jastrzbski (collectively, the "Defendants") have agreed to settle the Action for a payment of $5,750,000 in cash. The terms of the Settlement are set forth in the Stipulation, which was previously filed with the Court. ECF No. 44-1. This recovery is a favorable result for the Settlement Class and avoids the substantial risks and expenses of continued litigation, including the risk of recovering less than the Settlement Amount, or nothing at all.

The Settlement was reached only after Lead Plaintiff and Lead Counsel had a well-developed understanding of the strengths and weaknesses of the claims. As more fully described in the Gardner Declaration,[2] by the time the Settlement was agreed to, Lead Counsel had, among other things: (i) conducted a thorough investigation into the alleged misconduct, which included consulting with an economics expert regarding loss causation and damages and with a forensic

---

[2]    The Declaration of Jonathan Gardner in Support of (I) Lead Plaintiff's Motion for Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Gardner Declaration" or "Gardner Decl."), filed herewith, is an integral part of this submission and, for the sake of brevity in this memorandum, the Court is respectfully referred to it for a detailed description of, *inter alia*: the history of the Action; the nature of the claims asserted; the negotiations leading to the Settlement; and the risks and uncertainties of continued litigation; among other things. Citations to "¶" in this motion refer to paragraphs in the Gardner Declaration. All exhibits herein are annexed to the Gardner Declaration. For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Gardner Declaration and the second reference is to the exhibit designation within the exhibit itself.

All internal quotations and citations are omitted unless otherwise noted.

accounting expert regarding Lead Plaintiff's claims about the Company's use of Easy Pay credit to allegedly boost sales and meet performance targets, analyzing publicly available information and data concerning the Company and its securities, and conducting 27 interviews of former Qurate employees and other potential witnesses, and reviewing the public record; (ii) drafted and filed a detailed consolidated amended complaint (the "Complaint" or "Amended Complaint"); (iii) reviewed 3,000 pages of core documents produced by Defendants in connection with efforts to reach a negotiated resolution of the Action; and (iv) exchanged detailed mediation statements with Defendants and engaged in vigorous arm's-length settlement negotiations. The Settlement is the product of extensive negotiations between the Parties, which included an in-person mediation session under the auspices of a respected and experienced mediator, Michelle Yoshida, Esq.

The Settlement is a favorable result in light of the risks of continued litigation. While Lead Plaintiff and Lead Counsel believe that the claims asserted against Defendants have merit, they recognize that this Action presented a number of substantial risks, especially in light of Defendants' anticipated motion to dismiss and challenges related to falsity, the statute of limitations, scienter, loss causation, and damages. While Lead Plaintiff would advance strong counter arguments to Defendants' liability defenses, it nonetheless recognizes a substantial risk that Defendants' anticipated motion to dismiss might be granted in part or in full. Even if Defendants' motion to dismiss were unsuccessful, Defendants would have continued to press their arguments at summary judgment, at trial, and through appeals.

In light of these risks, as discussed further below and in the Gardner Declaration, Lead Plaintiff respectfully submits that the Settlement is fair, reasonable, and adequate, and warrants

final approval by the Court.  *See* Declaration on Behalf of Indiana Public Retirement System, dated August 16, 2019.  Ex. 1 at ¶4.

Additionally, Lead Plaintiff requests that the Court approve the proposed Plan of Allocation for the distribution of the Settlement, which was set forth in the Notice sent to Settlement Class Members.  The Plan of Allocation, which was developed by Lead Counsel in consultation with Lead Plaintiff's consulting damages expert, provides a reasonable and equitable method for allocating the Net Settlement Fund among Settlement Class Members who submit valid claims.

## PRELIMINARY APPROVAL AND THE NOTICE PROGRAM

On June 11, 2019, the Court entered an order preliminarily approving the Settlement and approving the proposed forms and methods of providing notice to the Settlement Class (the "Preliminary Approval Order", ECF No. 46).  Pursuant to and in compliance with the Preliminary Approval Order, through records maintained by Qurate's transfer agent and information provided by brokerage firms and other nominees, beginning on June 14, 2019, the Court-appointed Claims Administrator, Strategic Claims Services ("SCS"), caused the Notice and Claim Form (together, the "Notice Packet") to be mailed by first-class mail to potential Settlement Class Members.  *See* Declaration of Josephine Bravata, dated August 19, 2019 (the "Mailing Declaration"), Ex. 3 at ¶¶3-9.  To date, 89,675 Notice Packets have been mailed.  *Id.* at ¶8.  On July 8, 2019, the Summary Notice was published in *Investor's Business Daily* and transmitted over *PR Newswire.  Id.* at ¶10 and Exhibit C attached thereto.  The Notice and Claim Form were also posted, for review and easy downloading, on SCS's website for purposes of this Settlement, as well as Labaton Sucharow's website.  *Id.* at ¶12; Gardner Decl. ¶48.

The Notice described, *inter alia*, the claims asserted in the Action, the contentions of the Parties, the course of the litigation, the terms of the Settlement, the maximum amounts that would be sought in attorneys' fees and expenses, the Plan of Allocation, the right to object to the Settlement, and the right to seek to be excluded from the Settlement Class. *See generally* Ex. 3-A. The Notice also gave the deadlines for objecting, seeking exclusion, submitting claims, and advised potential Settlement Class Members of the scheduled Settlement Hearing before this Court. *Id.* To date, the Settlement Class's reaction to the proposed Settlement has been positive. While the deadline (September 3, 2019) for requesting exclusion or objecting to the Settlement has not yet passed, to date there have been no requests for exclusion, no objections to the proposed Settlement, and no objections to the Plan of Allocation.[3]

For all the following reasons, Lead Plaintiff respectfully requests that the Court approve the proposed Settlement and Plan of Allocation, and finally certify the Settlement Class.

## ARGUMENT

### I. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE UNDER THE APPLICABLE STANDARDS AND SHOULD BE APPROVED

#### A. The Standards for Final Approval of Class Action Settlements

Courts have long recognized a strong public policy and presumption favoring settlements. *See, e.g., Am. Home Assurance Co. v. Cessna Aircraft Co.,* 551 F.2d 804, 808 (10th Cir. 1977) (noting that "[t]he inveterate policy of the law is to encourage, promote, and sustain the compromise and settlement of disputed claims"); *see also Big O Tires, Inc. v. Bigfoot 4x4, Inc.*, 167 F. Supp. 2d 1216, 1229 (D. Colo. 2001) ("As a matter of public policy, the law favors and

---

[3]     Should any objections or requests for exclusion be received, Lead Plaintiff will address them in its reply papers, which are due to be filed with the Court on September 16, 2019.

encourages settlements . . . [and] [t]he settlement of actions should be fostered to avoid protracted, wasteful, and expensive litigation"). This policy has even more force in complex class actions such as this one, "where substantial judicial resources can be conserved by avoiding formal litigation." *Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1007 (D. Colo. 2014).

Rule 23(e) of the Federal Rules of Civil Procedure requires judicial approval of the compromise of claims brought on a class basis. The standard for determining whether to grant final approval to a class action settlement is whether the proposed settlement is "fundamentally fair, adequate, and reasonable." Fed. R. Civ. P. 23(e)(2). In making this determination, courts in the Tenth Circuit consider the following four factors:

> (1) whether the settlement was fairly and honestly negotiated; (2) whether serious questions of law and fact exist, placing the outcome of the litigation in doubt; (3) whether an immediate recovery outweighs the possibility of future relief after protracted and expensive litigation; and (4) the judgment of the parties that the settlement is fair and reasonable.

*Jones v. Nuclear Pharmacy, Inc.,* 741 F.2d 322, 324 (10th Cir. 1984); *see also Gottlieb v. Wiles,* 11 F.3d 1004, 1014 (10th Cir. 1993); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1188 (10th Cir. 2002)*; In re Crocs, Inc. Sec. Litig.*, 306 F.R.D. 672, 690 (D. Colo. 2014) (same).

Additionally, pursuant to the recent amendments to Rule 23(e)(2), a court may approve a settlement as "fair, reasonable, and adequate" after considering the following four factors, most of which overlap with the factors considered by the Tenth Circuit:

> (A)      whether the class representatives and class counsel have adequately represented the class;
>
> (B)      whether the proposal was negotiated at arm's length;
>
> (C)      whether the relief provided for the class is adequate, taking into account:
>
>>    i.      the costs, risks, and delay of trial and appeal;

      ii.      the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

      iii.      the terms of any proposed award of attorneys' fees, including timing of payment; and

      iv.      any agreement required to be identified under Rule 23(e)(3); and

(D)      whether the proposal treats class members equitably relative to each other.

For the reasons discussed herein, the proposed Settlement meets the criteria set forth by the Tenth Circuit and the federal rules.

### B. Application of the Tenth Circuit's Factors Supports Final Approval of the Settlement

#### 1. The Settlement Was Fairly and Honestly Negotiated

Where a settlement results from arm's-length negotiations between experienced counsel, "the Court may presume the settlement to be fair, adequate, and reasonable." *Lucas v. Kmart Corp.*, 234 F.R.D. 688, 693 (D. Colo. 2006). *See also Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1007 (D. Colo. 2014) ("arms-length negotiations between experienced counsel" where counsel "undertook voluntary discovery, negotiated over a methodology for estimating damages, and retained an expert to calculate the damages … show[] that the Settlement was fairly and honestly negotiated").

The Settlement here was achieved after thorough arm's-length negotiations between well-informed and experienced counsel, under the supervision of an experienced mediator, and rigorous investigation into the claims. A formal mediation session was held on March 25, 2019 and was overseen by a well-respected and experienced mediator, Michelle Yoshida, Esq. The mediation was preceded by the exchange of mediation statements as well as Qurate's production

of approximately 3,000 pages of core documents consisting of presentations, emails, and reports from Board meetings, Compensation Committee meetings, and internal financial reviews. However, the mediation session did not result in a settlement. Thereafter, the Parties engaged in additional arm's-length negotiations, both directly and facilitated by Ms. Yoshida, and ultimately accepted the mediator's proposal for a settlement on April 5, 2019. The Parties thereafter executed a settlement term sheet on April 16, 2019. *See* ¶¶37-42.

Given the arm's-length nature of the negotiations and the active involvement of an experienced mediator, there can be no question that the Settlement was fairly and honestly negotiated. *See In re Crocs,* 306 F.R.D. at 691 (approving settlement where it was the result of arm's-length negotiations and reached with the help of experienced mediator); *In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 01-cv-01451, 2006 U.S. Dist. LEXIS 71039, at *16 (D. Colo. Sept. 28, 2006) (noting the fairness of settlement where settlement negotiations were aided by the assistance of two mediators); *see also Todd v. STAAR Surgical Co.*, No. CV 14-5263MWF(GJSX), 2017 WL 4877417, at *2 (C.D. Cal. Oct. 24, 2017) (noting the arm's-length nature of the settlement where it was conducted with Michelle Yoshida as the mediator).

Moreover, as detailed in the Gardner Declaration, before the Settlement was reached, Lead Plaintiff and Lead Counsel thoroughly understood the strengths and weaknesses of the claims asserted in the Action. Before filing the Amended Complaint, Lead Counsel conducted a robust investigation that included interviews with 27 witnesses (former employees of Qurate or third parties with relevant knowledge); extensive consultation with forensic accounting and damages/causation experts; and a thorough review of publicly available information and data concerning the Company, as well as the Company's historical financial statements. ¶¶17-22, 31-

35.  Further, as noted above, prior to the mediation, Lead Counsel reviewed approximately 3,000 pages of core documents provided by Defendants that included presentations, emails, and reports from Board meetings, Compensation Committee meetings, and internal financial reviews.  ¶39. Armed with this substantial base of knowledge, Lead Plaintiff was in a position to balance the proposed settlement amount with a well-educated assessment of the likelihood of overcoming the risks of litigation.

Accordingly, the Parties "reached an agreement only after fair consideration of the strengths and weaknesses of their respective claims."  *In re Crocs,* 306 F.R.D. at 690.

### 2.    Serious Questions of Law and Fact Exist Placing the Ultimate Outcome of the Action in Doubt

"This factor requires an examination of whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt."  *In re Qwest*, 2006 U.S. Dist. LEXIS 71039, at *16.   In assessing the Settlement, the Court should balance the benefits of the substantial certain recovery for the class against the risks of continued litigation.  *See Lucas,* 234 F.R.D. at 693.  Here, a balance of these factors strongly supports the Court's final approval of the Settlement.

The principal claims in the Action are based on Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder.  To establish a claim under the Exchange Act, a plaintiff must prove: (1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *In re Level 3 Commc'ns, Inc. Sec. Litig.,* 667 F.3d 1331, 1333 (10th Cir. 2012).  Here, Lead Plaintiff alleges that Defendants issued statements concerning the Company's strong sales and organic growth, while allegedly

failing to disclose that the Company had aggressively increased the availability of credit through the Company's Easy Pay program in order to allegedly hide declining sales. Lead Plaintiff alleges that, as a result, the Company's publicly disseminated financial statements and statements to the market regarding its financial condition were materially false and misleading. ¶¶9-11.

Defendants would have vigorously challenged Lead Plaintiff on the falsity and materiality of the alleged misleading statements, scienter and loss causation. *See In re Qwest*, 2006 U.S. Dist. LEXIS 71039, at *17-18 ("The accounting issues, the scienter issues, the causation issues, and the damages issues all are complex and problematic. Presenting these issues to a jury would create substantial risks for all parties, including the plaintiffs."). Significantly, Defendants would have also argued that the Action was barred by the Exchange Act's two year statute of limitations. The principal risks are discussed below and in the Gardner Declaration. Additionally, Lead Plaintiff would have had to move for and argue, and the Court would need to rule on, class certification. Further, Lead Plaintiff would have had to oppose, and convince the Court to deny, Defendants' motions to dismiss and for summary judgment.

There was no guarantee that the claims would survive these challenges, and, even if they did, how the Court's rulings would affect the future prosecution of the case and the amount of recoverable damages. *See In re Crocs,* 306 F.R.D. at 691 (noting plaintiffs also had to "consider their likelihood of success certifying a relevant class, surviving summary judgment, and winning at trial"). Indeed, according to the most recent analysis of securities class action filings by NERA Economic Consulting, for cases filed and resolved from 2000 to 2018, of those where a motion to dismiss was decided, 75% were granted in whole or in part. *See* S. Boettrich & S. Starykh, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review* (NERA

Jan. 29, 2019), at 20, Ex. 2.

### (a)       Risks Concerning Falsity and Materiality

Regarding the falsity and materiality of the alleged misstatements, Defendants would likely have contended that QVC's use of the Easy Pay program and its risks were well known to the market.  Defendants would have further argued that even if Easy Pay credit was used as an important sales driver, as Lead Plaintiff alleges, that did not render misleading the Company's discussion of other aspects of its business that it also considered significant.  Defendants would have also argued that many of the challenged statements about customer and revenue growth were inactionable puffery.  *See In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 676 (D. Md. 2018) (statements regarding growth in revenue are statements of "corporate optimism, also referred to as 'puffery, and are inactionable statements of opinion"); ¶¶24-25.

### (b)       Statute of Limitations

One of the most significant challenges was Defendants' argument that the claims are barred by the statute of limitations under the Exchange Act, because the first of the two alleged partial disclosures (August 5, 2016) is outside the two year statute of limitations, given that the initial complaint in the action was filed on September 6, 2018.  *Id.* ¶¶28-29.

According to Defendants, the only relevant alleged disclosure was on August 5, 2016. Defendants would have argued that, as of August 5, 2016, investors had all the information they needed about the allegedly omitted information, and that the truth allegedly disclosed on September 8, 2016 was repetitive of information disclosed on August 5, 2016.  *See Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) (the two year statute of limitations begins to run when "the plaintiff actually discovered or a reasonably diligent plaintiff would have discovered the facts

constituting the violation – whichever comes first"). If successful in this argument, the September disclosure would have been dismissed as it purportedly revealed no new information, as discussed further below, and the August disclosure would have been dismissed as untimely under the statute of limitations. ¶¶28-29.

Defendants would have raised these arguments in their motion to dismiss, at summary judgment, and at trial. While Lead Plaintiff would have argued that investors learned new, relevant information on September 8, 2016 and that the September 8, 2016 date should control the statute of limitations, the Court or a jury could have disagreed, leaving the class with no recovery.

(c)    **Scienter**

Defendants would have further argued, in moving to dismiss the Complaint, that Lead Plaintiff could not plead a strong inference of scienter as to any Defendant. Defendants would likely have argued, among other things, that the Complaint did not plead how stock sales by the Individual Defendants were out of line with their past practices, or suspiciously timed. *See In re Qwest Commc'ns Int'l, Inc. Sec. Litig.* 396 F. Supp. 2d 1178, 1195 (D. Colo. 2004) ("[P]laintiffs must allege that the trades were made at times and in quantities that are suspicious enough to support the necessary strong inference of scienter."). Defendants also would have argued that any inference of scienter that might exist from stock sales was undermined by public filings demonstrating that the Company engaged in a substantial stock repurchase program throughout the Class Period. *See McNamara v. Pre-Paid Legal Servs, Inc.*, 189 F. App'x. 702, 718 (10th Cir. 2006) (securities fraud is not "economically logical in light of [defendant's] repurchase of its own stock at artificially inflated prices"). Further, Defendants likely would have argued that

incentive-based compensation is "common among executives at publicly traded companies and does not ordinarily indicate scienter." *In re Level 3*, 667 F.3d at 1346; ¶¶26-27.

### (d)    Loss Causation and Damages Challenges

Another principal risk in continuing the litigation is the difficulty of proving loss causation and damages, which would have been an issue throughout the motion to dismiss stage, class certification and at summary judgment, and would continue to be challenged in *Daubert* motions, at trial, in post-trial proceedings and appeals. To succeed at trial "a plaintiff [must] prove that the defendant's misrepresentation (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Dura Pharms*., *Inc. v. Broudo*, 544 U.S. 336, 346 (2005).

As explained in more detail in the Gardner Declaration, ¶¶30 - 36, Defendants would likely put forth credible arguments and evidence showing that a significant portion of the price declines resulted from forces unrelated to the alleged fraud, requiring complex and competing expert evidence about disaggregating or removing the effects of potentially confounding information from the price declines. Lead Plaintiff bore the burden of presenting a sound methodology to disaggregate these confounding pieces of information. If Lead Plaintiff failed to do so, the class would have received no recovery.

Defendants would also have likely argued that none of the alleged price drops could be linked to any disclosure or any alleged increased use of Easy Pay. Defendants would argue that the stock price declined on August 5 and September 8, 2016 due to the announcement of a sales slowdown caused by multiple factors (*i.e.*, challenges in QVC's apparel, accessories, jewelry, electronics, and beauty segments) and not the alleged disclosures regarding the increased use of Easy Pay. Further, Defendants would likely have argued that the alleged September disclosure

provided no new information regarding Easy Pay or the increased bad debt expense, and therefore was not a corrective disclosure at all.

As illustrated above, and in the Gardner Declaration, there was a very real risk that Lead Plaintiff would be unable to counter at summary judgment, or trial, that a substantial portion of the declines on the alleged disclosure dates were attributable to the alleged fraud. There was also substantial uncertainty surrounding Lead Plaintiff's expert's ability to isolate the stock price declines on the corrective disclosure dates attributable specifically to the alleged fraud.

Because of such challenges, Lead Plaintiff's proposed damages methodology would have come under sustained attack by Defendants, and issues relating to damages would likely have come down, at best, to an inherently unpredictable and hotly disputed "battle of the experts" where it would be impossible to predict with any certainty which arguments would find favor with a jury. *See, e.g., In re Thornburg Mortg., Inc. Sec. Litig.*, 912 F. Supp. 2d 1178, 1242 (D.N.M. 2012) ("Damages in this case, as is common in securities class actions, would likely have been reduced to a 'battle of the experts,' and 'it is virtually impossible to predict with any certainty which testimony would be credited.'"); *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 744, 745 (S.D.N.Y. 1985) (approving settlement where "it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors such as general market conditions"), *aff'd*, 798 F.2d 35 (2d Cir. 1986). The outcome could well have depended on whose testifying expert the jury believed or even whether the jury was able to sufficiently parse through the complex economic theories used by the experts.

3.    **The Value of the Immediate Recovery Outweighs the Mere Possibility of Future Relief After Protracted and Expensive Litigation**

Under the third factor for evaluating whether a settlement is fair, reasonable and adequate, the Court must consider "whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation."  *Jones*, 741 F.2d at 324; *see also Qwest*, 2006 U.S. Dist. LEXIS 71039, at *18-19 (approving securities class action settlement and noting that immediate recovery outweighed the possibility of future relief).  This factor is to be weighed "not against the net worth of the defendant, but against the possibility of some greater relief at a later time, taking into consideration the additional risks and costs that go hand in hand with protracted litigation."  *Gottlieb*, 11 F.3d at 1015.  The benefits of settling this case now far outweigh the risks of continued litigation.

In addition to the specific risks faced in this Action with respect to proving liability and damages (as discussed in detail above), Lead Plaintiff and Lead Counsel also considered the risks and costs involved in pursuing a securities class action through trial generally.  In the absence of the Settlement, continued litigation of the Action would have included resolving Defendants' motion to dismiss, the completion of fact and expert discovery, class certification, an expected motion for summary judgment, and a trial that would involve substantial expert and factual testimony with respect to both liability and damages.  Indeed, regarding class certification, there is no guarantee that a class would be certified and that certification could have been retained through summary judgment and trial. Even if the class was certified, Defendants may have petitioned the Tenth Circuit pursuant to Rule 23(f) for an interlocutory appeal.  Such appeals can take many months or even over a year to be resolved.

Further, even if the class was certified and even if Lead Plaintiff succeeded at summary

judgment and trial, it is virtually certain that Defendants would appeal. Thus, the risks and costs necessary to prosecute the claims through trial and appeals were extensive, and continued litigation of the Action would have required a significant expenditure of the Parties' and the Court's time and resources. *See Lane v. Page*, 862 F. Supp. 2d 1182 (D.N.M. 2012) ("Pursuing the litigation further would require significant judicial and party resources to complete motions for summary judgment, motions under *Daubert v. Merrell Dow Pharmaceuticals*, and *motions in limine*. Any of those decisions could then be appealed to the Tenth Circuit along with any jury verdict that might be returned.").

In contrast, the proposed Settlement provides an immediate and certain recovery of a $5.75 million payment for the benefit of the Settlement Class, without the risk, delay and expense of continued litigation. As explained in the Gardner Declaration, Lead Plaintiff's consulting damages expert has estimated that if liability were established with respect to all of the claims throughout the Class Period, maximum aggregate damages recoverable at trial, based on non-disaggregated stock price declines on both alleged disclosures dates, and removing (or "netting") gains accrued during the Class Period on pre-Class Period holdings, would exceed several hundred million dollars. However, given the disaggregation issues in this Action, Lead Plaintiff's consulting damages expert performed an analysis to remove the effects of potentially confounding information on August 5, 2016 and September 8, 2016. This analysis estimates class wide aggregate damages of between approximately $70 and $100 million, with netting of pre-Class Period gains. Accordingly, the Settlement recovers approximately 6-8% of Lead Plaintiff's estimate of disaggregated alleged damages. ¶¶31-34.

Since the passage of the Private Securities Litigation Reform Act of 1995, courts have

approved settlements that recovered a similar, or smaller, percentage of maximum damages. *See, e.g.*, *Schuler v. Meds. Co.*, No. CV 14-1149 (CCC), 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (approving $4,250,000 securities fraud settlement that reflects approximately 4.0% of the estimated recoverable damages and noting percentage "falls squarely within the range of previous settlement approvals"); *In re Omnivision Techs. Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages after deducting fees and costs was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, No. 12 Civ. 1609, 2015 WL 965693, at *9 (W.D. La. Mar. 3, 2015) (finding reasonable a $7,850,000 settlement in securities fraud action providing 7.4% to 10.3% of class's potential recovery).

In sum, Lead Plaintiff and Lead Counsel strongly believe that a recovery for the Settlement Class now far outweighs the possibility of uncertain relief for Settlement Class Members from further protracted and expensive litigation. Thus, the third factor strongly supports approval of the Settlement.

### 4.    The Judgment of the Parties that the Settlement Is Fair and Reasonable

In determining whether the proposed Settlement is fair, reasonable and adequate, the judgment of plaintiff's counsel is entitled to be given significant weight by the Court. *See Farley v. Family Dollar Stores, Inc.*, No. 12-cv-00325-RM-MJW, 2014 WL 5488897, at *3 (D. Colo. Oct. 30, 2014) ("'Counsels' judgment as to the fairness of the agreement is entitled to considerable weight.'") (citing *Lucas*, 234 F.R.D. at 695 (quoting *Marcus v. Kansas Dep't of Revenue,* 209 F. Supp. 2d 1179, 1183 (D. Kan. 2002))). *See also Gubricky v. Ells*, No. 16-cv-3180-WJM-KLM, 2018 WL 1621166, at *7 (D. Colo. Apr. 4, 2018) ("Consideration of this

factor stems from judicial deference to securities and derivative litigators' experience in the field."). In evaluating the Settlement's fairness, the Court "should not decide the merits of the lawsuit or substitute its own judgment for that of the parties." *Farley*, 2014 WL 5488897, at *2. Furthermore, where, as here, "a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable." *Marcus*, 209 F. Supp. 2d at 1182.

It is respectfully submitted that Lead Counsel is experienced and able in this area of practice (*see* Ex. 4-C). Lead Counsel, which also is well-informed about the strengths and weakness of this case, believes that the Settlement is fair, adequate, and reasonable, and particularly so in view of the risks, burdens, and expense of continued litigation. Moreover, Lead Plaintiff – a sophisticated institutional investor – actively participated in both the prosecution of the Action and the settlement negotiations. Lead Plaintiff's direct participation and approval of the Settlement is further evidence that the Settlement is fair, reasonable and adequate. *See In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) ("[U]nder the PSLRA, a settlement reached . . . under the supervision and with the endorsement of a sophisticated institutional investor . . . is 'entitled to an even greater presumption of reasonableness . . . .'").

Finally, the positive reaction of the Settlement Class to the proposed Settlement further favors approval by the Court. As of August 19, 2019, more than 89,000 Notice Packets have been mailed to potential Settlement Class Members and nominees and the Summary Notice has been published in *Investor's Business Daily* and transmitted over *PR Newswire*. *See* Ex. 3 at ¶¶8-10. To date, no Settlement Class Member has objected to the Settlement. ¶49.

**C.**     **Application of the Factors Identified in the Amendments to Rule 23 Supports Approval of the Settlement as Fair, Reasonable, and Adequate**

The proposed Settlement also meets the criteria set forth in the recent amendments to Rule 23(e)(2), most of which are covered by the Tenth Circuit factors discussed above.

**1.**     **Lead Plaintiff and Lead Counsel Have Adequately Represented the Settlement Class**

It is respectfully submitted that Lead Plaintiff and Lead Counsel have adequately represented the Settlement Class.  As set forth in the previously filed motion for preliminary approval, Lead Plaintiff, like all other members of the Settlement Class, acquired shares of QVC Stock during the Class Period at allegedly inflated prices based on allegedly untrue statements and omissions.  Thus, the claims of Lead Plaintiff and the Settlement Class would prevail or fail in unison, and the common objective of maximizing recovery from Defendants aligns the interests of Lead Plaintiff and all members of the Settlement Class.  *See* ECF Nos. 43.  Lead Plaintiff has participated in the litigation, conferred with counsel, attended the mediation, and with an informed understanding of the strengths and weaknesses of the claims, supports the Settlement.  *See* Ex. 1 at ¶¶3-4.

Additionally, throughout the Action, Lead Plaintiff had the benefit of the advice of knowledgeable counsel well-versed in shareholder class action litigation and securities fraud cases.  Labaton Sucharow is among the most experienced and skilled firms in the securities litigation field, and has a long and successful track record in such cases.  *See* Ex. 4-C.

**2.**     **The Settlement Is the Result of Arm's-Length Negotiations**

As discussed above, the Settlement was reached after arm's-length negotiations between the Parties and overseen by an experienced mediator.

### 3.    The Relief Provided to the Settlement Class Is Adequate and the Settlement Treats Class Members Equitably Relative to Each Other

Rule 23(e)(2)(C)(i) which requires that "the relief provided for the class is adequate, taking into account the costs, risks, and delay of trial and appeal," has been discussed above. *See* §I.B.2. & §I.B.3.

Rule 23(e)(2)(C)(ii) considers whether the relief is adequate, taking into account the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." As set forth below in Section II, discussing the proposed Plan of Allocation, the proceeds of the Settlement will be distributed to Settlement Class Members who submit valid and timely claims. Using the formulas of the Plan of Allocation, the Claims Administrator will calculate claimants' "Recognized Claims" using the transactional information provided by claimants in their Claim Forms, which can be mailed to the Claims Administrator, submitted online using the settlement website, or, for large investors with hundreds of transactions, submitted via e-mail to the Claims Administrator's electronic filing team. Lead Plaintiff's claim will be calculated the same way. Because most securities are held in "street name" by the brokers that buy them on behalf of clients, the Claims Administrator, Lead Counsel, and Defendants do not have Settlement Class Members' transactional data and a claims process is required. Because the Settlement does not recover 100% of alleged damages, the Claims Administrator will determine each eligible claimant's *pro rata* share of the Net Settlement Fund based upon each claimant's total "Recognized Claim" compared to the aggregate Recognized Claims of all eligible claimants.

Once the Claims Administrator has processed all submitted claims, notified claimants of

deficiencies or ineligibility, processed responses, and made claim determinations, distributions will be made to eligible claimants. Any disputes about claim determinations that cannot be resolved will be presented to the Court.

After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund (whether by reason of tax refunds, uncashed checks or otherwise), after at least six (6) months from the date of initial distribution, the Claims Administrator will, if feasible and economical after payment of Notice and Administration Expenses, Taxes, and attorneys' fees and expenses, if any, re-distribute the balance among eligible claimants who have cashed their checks. These re-distributions will be repeated until the balance in the Net Settlement Fund is no longer feasible to distribute. *See* Stipulation at ¶26. Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not feasible or economical to reallocate, after payment of any outstanding Notice and Administration Expenses or Taxes, if any, will be contributed to a non-sectarian, not for profit charitable organization serving the public interest designated by Lead Plaintiff and approved by the Court.

The terms of the proposed award of attorneys' fees (Rule 23(e)(2)(C)(iii)), are discussed in Lead Counsel's accompanying Fee and Expense Application. Lead Counsel seeks an award of attorneys' fees and expenses pursuant to the common fund doctrine and the request is fully within the discretion of the Court, was not negotiated with Defendants, and is separate from the Settlement. Any fees and expenses that are awarded by the Court are payable upon award.

Finally, Rule 23(e)(2)(C)(iv) asks the Court to consider the fairness of the proposed Settlement in light of any agreement required to be identified under Rule 23(e)(3). Here, the only agreements made by the Parties in connection with the Settlement are the term sheet, the

Stipulation, and the Supplemental Agreement concerning the circumstances under which Defendants may terminate the Settlement based upon the number of exclusion requests. *See* Stipulation at ¶40. It is standard to keep such agreements confidential so that a large investor, or a group of investors, cannot intentionally try to leverage a better recovery for themselves by threatening to opt out, at the expense of the class.[4] The Supplemental Agreement will be submitted to the Court *in camera*, if requested.

In sum, each of the relevant factors for considering approval of a class action settlement fully supports a finding that the Settlement here is fair, reasonable, and adequate.

## II.    THE PLAN OF ALLOCATION IS FAIR, ADEQUATE, AND REASONABLE AND SHOULD BE APPROVED

The objective of a plan of allocation is to provide an equitable method for distributing a settlement fund among eligible class members. Like the standard governing approval of the settlement itself, a plan for allocating settlement proceeds warrants approval if the distribution of funds is "fair, reasonable and adequate." *Crocs*, 306 F.R.D. at 692. Where, as here, an allocation plan is endorsed by competent and experienced counsel, it "need only have a reasonable, rational basis." *Lucas*, 234 F.R.D. at 695. Additionally, in determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel. *See, e.g., Law v. NCAA*, 108 F. Supp. 2d 1193, 1196 (D. Kan. 2000).

Here, Lead Plaintiff's consulting damages expert prepared the Plan of Allocation after careful consideration of Lead Plaintiff's theories of liability and alleged damages under the Exchange Act. ¶¶52-53. The Plan provides for distribution of the Net Settlement Fund among

---

[4]    Rule 23(e)(2)(D), whether the proposal treats class members equitably with respect to each other, has been discussed and is addressed in Section II below.

22

Authorized Claimants on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and alleged damages. These formulas consider the amount of alleged artificial inflation in the prices of QVC Stock, as quantified by the consulting damages expert. ¶53. This analysis entailed studying the price declines on the dates of the alleged corrective disclosures, adjusted to eliminate the effects attributable to general market or industry conditions. In this respect, an inflation table was created as part of the Plan of Allocation and is reported in the Notice.

The Plan of Allocation was fully described in the Notice and, to date, there has been no objection to the proposed plan. *See* Ex. 3-A at 11-16. Accordingly, for all of the reasons set forth herein and in the Gardner Declaration, it is respectfully submitted that the Plan of Allocation is fair, reasonable, and adequate and should be approved, and that the Settlement satisfies the approval criteria set forth in Rule 23(e)(2)(C)(ii).

## III.    THE COURT SHOULD GRANT FINAL CERTIFICATION OF THE SETTLEMENT CLASS

The Court previously granted preliminary certification to the Settlement Class under Rules 23(a) and (b)(3). *See* ECF No. 46. Because nothing has occurred since then to cast doubt on the propriety of class certification for settlement purposes, and no objections have been received to date, the Court should grant final class certification.

## **CONCLUSION**

For all the foregoing reasons, Lead Plaintiff respectfully requests that the Court:  (i) grant

final approval of the Settlement; (ii) finally certify the Settlement Class, for settlement purposes

only; and (iii) approve the Plan of Allocation as fair, reasonable, and adequate.

Dated: August 19, 2019                              By: */s/ Jonathan Gardner*

**LABATON SUCHAROW LLP**
Jonathan Gardner
Christine M. Fox
Theodore J. Hawkins
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  jgardner@labaton.com
cfox@labaton.com
thawkins@labaton.com

*Lead Counsel for Lead Plaintiff and the
Proposed Class*

**THE SHUMAN LAW FIRM**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: rusty@shumanlawfirm.com

*Local Counsel for Lead Plaintiff and the
Proposed Class*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Malcolm T. Brown
270 Madison Avenue

New York, NY 10016
Telephone: (212) 545-4714
Facsimile: (212) 686-0114
Email: brown@whafh.com

*Additional Counsel for Lead Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that on August 19, 2019, I electronically filed the above Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Memorandum of Law in Support, using the Court's CM/ECF system, which will be sent electronically to the registered participants as identified on the attached Electronic Mail Notice List.


*/s/ Jonathan Gardner*
Jonathan Gardner

## I.      Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Guillaume Buell**
  gbuell@tenlaw.com,gbradley@tenlaw.com,jmurphy@tenlaw.com,8927635420@filings.docketbird.com
- **Matthew W. Close**
  mclose@omm.com,rely@omm.com,samanthamiller@omm.com,nymao.cwl@gmail.com,mleu@omm.com,brogers@omm.com
- **Karen Jean Cody-Hopkins**
  karen@codyhopkinslaw.com
- **Nicholas Martin DeWeese**
  ndeweese@shermanhoward.com,prendoff@shermanhoward.com,efiling@sah.com
- **Christine Marie Fox**
  cfox@labaton.com,kgutierrez@labaton.com,6312349420@filings.docketbird.com,electroniccasefiling@labaton.com
- **Jonathan Gardner**
  JGardner@labaton.com,kgutierrez@labaton.com,4027988420@filings.docketbird.com,fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com
- **Rusty Evan Glenn**
  rusty@shumanlawfirm.com,kip@shumanlawfirm.com
- **Theodore J. Hawkins**
  THawkins@labaton.com,kgutierrez@labaton.com,5957819420@filings.docketbird.com,electroniccasefiling@labaton.com
- **Francis Paul McConville**
  FMcConville@labaton.com,drogers@labaton.com,9849246420@filings.docketbird.com,ElectronicCaseFiling@labaton.com
- **Ivy Tran Ngo**
  ngoi@fdazar.com,chateauneufs@fdazar.com,footec@fdazar.com
- **Abby Faith Rudzin**
  arudzin@omm.com
- **Stefan D. Stein**
  sstein@shermanhoward.com,madams@shermanhoward.com,efiling@shermanhoward.com

## II.      Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`