**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:18-cv-02300-MEH

BRISTOL COUNTY RETIREMENT SYSTEM,
Individually and on Behalf of All Others Similarly Situated,

      Plaintiffs,

v.

QURATE RETAIL, INC.,
MICHAEL A. GEORGE,
GREGORY B. MAFFEI, AND
THADDEUS JASTRZEBSKI,

      Defendants.

---

**LEAD COUNSEL'S MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND PAYMENT OF LITIGATION EXPENSES
AND MEMORANDUM OF LAW IN SUPPORT**

---

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................... iii

MOTION.................................................................................................................................1

PRELIMINARY STATEMENT .............................................................................................1

ARGUMENT ..........................................................................................................................3

I.      PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF
        ATTORNEYS' FEES FROM THE COMMON FUND....................................................3

II.     THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER THE
        PERCENTAGE-OF-THE-FUND METHOD...................................................................5

        A.      The Percentage of the Fund Method Is the Preferred Method for Awarding
                Attorneys' Fees from a Common Fund ................................................................5

        B.      The Requested Attorneys' Fees Are Reasonable Applying the Percentage-
                of-the-Fund Method............................................................................................6

III.    THE FACTORS CONSIDERED BY COURTS WITHIN THE TENTH CIRCUIT
        SUPPORT THE REASONABLENESS OF THE REQUESTED FEE..............................7

        A.      The *Johnson* Factors Support the Fairness and Reasonableness of the
                Requested Fee .....................................................................................................9

                1.      The Amount Involved and the Results Achieved ......................................9

                2.      The Time and Labor Required...............................................................10

                3.      The Novelty and Difficulty of the Issues................................................11

                4.      The Skill Required to Perform the Legal Services Properly, and the
                        Experience, Reputation and Ability of the Attorneys..............................15

                5.      The Preclusion of Other Employment and Whether the Fee Is
                        Fixed or Contingent .............................................................................16

                6.      The Undesirability of the Case ..............................................................18

        B.      The Requested Fees are Reasonable Under the Lodestar Method........................18

C.     Other Factors Considered by Courts Further Support the Requested Fee as Fair and Reasonable ............................................................................................... 20

     1.     The Requested Fee Is Entitled to a Presumption of Reasonableness as it Is Based on a Fee Agreement .............................................................. 20

     2.     The Reaction of the Settlement Class to Date Supports the Requested Fee .............................................................................................. 22

IV.     THE REQUESTED EXPENSES ARE REASONABLE AND WERE NECESSARY TO ACHIEVE THE BENEFIT OBTAINED ........................................... 22

V.     LEAD PLAINTIFF'S REQUEST FOR REASONABLE COSTS AND EXPENSES PURSUANT TO THE PSLRA ................................................................. 23

CONCLUSION ............................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Anderson v. Merit Energy Co.*,
  No. 07-cv-00916-LTB-BNB, 2009 U.S. Dist. LEXIS 100681
  (D. Colo. Oct. 20, 2009) ................................................................................6

*Bateman Eichler, Hill Richards, Inc. v. Berner*,
  472 U.S. 299 (1985)........................................................................................4

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980)........................................................................................3

*In re Bos. Chicken, Inc. Sec. Litig.*,
  No. 97-1308, 2006 U.S. Dist. LEXIS 56267 (D. Colo. Aug. 10, 2006) ..................7

*Brown v. Phillips Petroleum Co.*,
  838 F.2d 451 (10th Cir. 1988) ...........................................................4, 6, 8

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001)..........................................................................21

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
  No. 12 Civ. 1609, 2015 WL 965693 (W.D. La. Mar. 3, 2015) .............................10

*In re Crocs, Inc. Sec. Litig.*,
  No. 07-cv-02351, 2014 WL 4670886 (D. Colo. Sept. 18, 2014).................... *passim*

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  No. 02-CV-3400 CM PED, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............19

*Gottlieb v. Barry*,
  43 F.3d 474 (10th Cir. 1994) ...........................................................3, 5, 8

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)........................................................................................9

*Hicks v. Morgan Stanley*,
  No. 01 Civ. 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005)................4

*Johnson v. Georgia Highway Express, Inc.*,
  488 F.2d 714 (5th Cir. 1974) ......................................................... *passim*

*In re King Res. Co. Sec. Litig.*,
   420 F. Supp. 610 (D. Colo. 1976) ............................................................................9

*Lane v. Page*,
   862 F. Supp. 2d 1182 (D.N.M. 2012) ....................................................8, 14, 16

*Law v. NCAA*,
   4 F. App'x. 749 (10th Cir. 2001) ............................................................................3

*Leroy v. City of Houston*,
   831 F.2d 576 (5th Cir. 1987) ................................................................................20

*Lucas v. Kmart Corp.*,
   No. 99-cv-01923, 2006 WL 2729260 (D. Colo. July 27, 2006) ............................20

*In re Lucent Techs., Inc. Sec. Litig.*,
   327 F. Supp. 2d 426 (D.N.J. 2004) ......................................................................21

*Lucken Family Ltd. P'ship, LLP v. Ultra Res., Inc.*,
   No. 09-cv-01543-REB-KMT, 2010 WL 5387559 (D. Colo. Dec. 22, 2010) ...........6

*In re Marsh & McLennan Cos. Sec. Litig.*,
   No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..................21

*Merck & Co. v. Reynolds*,
   559 U.S. 633 (2010) ..............................................................................................14

*Mishkin v. Zynex, Inc.*,
   No. 09-cv-00780, 2012 WL 4069295 (D. Colo. Sept. 14, 2012) .............................6

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ..............................................................................................20

*In re N.M. Indirect Purchasers Microsoft Corp., Antitrust Litig.*,
   149 P.3d 976 (N.M. Ct. App. Nov. 15, 2006) ........................................................5

*O'Dowd v. Anthem, Inc.*,
   No. 14-cv-02787, 2019 WL 2248548 (D. Colo. May 24, 2019) ............................16

*In re Omnivision Techs. Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................10

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
   No. 01-1451, 2006 WL 8429707 (D. Colo. Sept. 29, 2006) ...........................15, 19

iv

*In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*,
    625 F. Supp. 2d 1143 (D. Colo. 2009) ..................................................................11

*Schuler v. Medicines Co.*,
    No. CV 14-1149 (CCC), 2016 WL 3457218 (D.N.J. June 24, 2016) ......................9

*In re Sumitomo Copper Litig.*,
    189 F.R.D. 274 (S.D.N.Y. 1999) ...........................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) .................................................................................................4

*Tuten v. United Airlines, Inc.*,
    41 F. Supp. 3d 1003 (D. Colo. 2014) .....................................................................17

*Uselton v. Commercial Lovelace Motor Freight*,
    9 F.3d 849 (10th Cir. 1993) ..................................................................................5, 8

*Vaszlavik v. Storage Tech. Corp.*,
    No. 95-cv-2525, 2000 WL 1268824 (D. Colo. Mar. 9, 2000) ....................... *passim*

*In re Veeco Instruments Inc. Sec. Litig.*,
    No. 05 MDL 01695(CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ...............21

**Docketed Cases**

*Medina, et al. v. Clovis Oncology, Inc., et al.*,
    No. 1:15-cv-2546, slip op. (D. Colo. Oct. 26, 2017) ...............................................7

*In re Molycorp, Inc. Sec. Litig.*
    1:12-cv-00292-RM- KMT, slip op. (D. Colo. June 16, 2017) .................................6

*In re Novell, Inc. Sec. Litig.*,
    No. 99-995, slip op. (D. Utah May 26, 2005) .........................................................6

*In re Nu Skin Enters., Inc., Sec. Litig.*,
    Civ. No. 2:14-cv-00033, slip op. (D. Utah Oct. 13, 2016) .................................7, 24

*In re Oppenheimer Champion Income Fund Sec. Fraud Class Actions*,
    No. 09-cv-386, slip op. (D. Colo. Sept. 30, 2011) ................................................24

*In re Oppenheimer Rochester Funds Group Sec. Litig.*,
    No. 09-md-02063, slip op (D. Colo. Nov. 6, 2017) ...........................................7, 24

*Rasner v. FirstWorld Commc'ns, Inc.*,
    No. 00-cv-1376, slip op. (D. Colo. Jan. 19, 2005) ..................................................7

*In re Rhythms Sec. Litig.*,
    No. 02-35, slip op. (D. Colo. Apr. 3, 2009)........................................................................7

*In re Spectranetics Corp. Sec. Litig.*,
    No. 08-cv-02048, slip op. (D. Colo. Apr. 4, 2011).....................................................6, 18, 19

*In re Sun Healthcare Grp, Inc. Sec. Litig.*,
    No. 99-00269, slip op. (D.N.M. Dec. 13, 2004)....................................................................7

**Statutes**

 15 U.S.C. § 78u-4(a)(4) ..............................................................................................................23

 15 U.S.C. §78u-4(a)(6) ................................................................................................................5

**Other Authorities**

H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 (1995)....................21

## MOTION

Court-appointed Lead Counsel, Labaton Sucharow LLP ("Labaton Sucharow"), respectfully moves for an award of attorneys' fees on behalf of Plaintiffs' Counsel,[1] as well as payment of litigation expenses incurred by Plaintiffs' Counsel and the costs and expenses incurred by Lead Plaintiff in connection with litigating the claims in the above-captioned Action on behalf of the Settlement Class, pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[2]  Pursuant to Local Rule 7.1(a), Lead Counsel has conferred with counsel for the Defendants and they take no position on the relief requested by this motion.

## PRELIMINARY STATEMENT

The proposed Settlement, if approved by the Court, will resolve this case in its entirety in exchange for a $5.75 million cash payment pursuant to the Stipulation.  The Settlement will provide valuable compensation to the Settlement Class while avoiding delay and the significant risks of continued litigation, including challenges with respect to satisfying the statute of

---

[1] Plaintiffs' Counsel are Labaton Sucharow, The Shuman Law Firm, Wolf Haldenstein Adler Freeman & Herz LLP, and the Thornton Law Firm.  Any fee allocations among Plaintiffs' Counsel will in no way increase the fees that are deducted from the Settlement Fund, and no other attorneys will share the awarded attorneys' fees.

[2] Unless otherwise noted, capitalized terms have the meanings ascribed to them in the Stipulation and Agreement of Settlement, dated May 31, 2019 (the "Stipulation," ECF No. 44-1) (the "Stipulation") or in the Declaration of Jonathan Gardner in Support of (I) Lead Plaintiff's Motion for Approval of Class Action Settlement and Plan of Allocation and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Litigation Expenses (the "Gardner Declaration" or "Gardner Decl."), filed herewith.  Citations to "¶" in this memorandum refer to paragraphs in the Gardner Declaration.  All exhibits herein are annexed to the Gardner Declaration.  For clarity, citations to exhibits that themselves have attached exhibits will be referenced as "Ex. ___ - ___." The first numerical reference is to the designation of the entire exhibit attached to the Gardner Declaration and the second reference is to the exhibit designation within the exhibit itself.

All internal quotations and citations are omitted unless otherwise noted.

limitations under the Exchange Act and establishing falsity, scienter, loss causation and damages.  In the face of these risks—as well as the fully contingent nature of the case—Lead Counsel devoted substantial resources to prosecuting this Action against highly skilled opposing counsel.  Among other work detailed in the Gardner Declaration, Lead Counsel: (i) conducted a robust investigation which involved interviews with 27 former employees of Qurate and other third parties with relevant knowledge, consulted with an economics expert regarding loss causation and damages and a forensic accounting expert regarding the Company's use of Easy Pay credit to allegedly boost sales and meet performance targets, analyzed publicly available information and data concerning the Company and its securities, and reviewing the public record; (ii) filed a detailed consolidated amended complaint (the "Complaint" or "Amended Complaint"); (iii) reviewed approximately 3,000 pages of core documents produced by Defendants in connection with the mediation, consisting of presentations, emails, and reports from Board meetings, Compensation Committee meetings, and internal financial reviews; (iv) exchanged mediation submissions; and (v) participated in a full-day mediation session under the auspices of an experienced and highly respected mediator.  ¶¶13-22, 37-42.

Against this backdrop, Lead Counsel requests a fee of 18% of the Settlement Fund, which represents a negative lodestar "multiplier" of 0.85, payment of litigation expenses in the amount of $85,790.40, and reimbursement for Lead Plaintiff, pursuant to the PSLRA, in the amount of $1,750.00.  As demonstrated below, the request is less than the range of attorneys' fees typically awarded in securities class actions of this size, and is well supported by both case law and the facts of this case.  For the foregoing reasons, Lead Counsel respectfully submits that the requested fees and expenses should be approved.

Lead Plaintiff, a sophisticated institutional investor, has endorsed the requested fees and expenses as fair and reasonable.  *See* Declaration of Jeffrey Gill on Behalf of Indiana Public Retirement System, attached to the Gardner Declaration as Exhibit 1, at ¶5.  Furthermore, the reaction of the Settlement Class to date supports the request.  Pursuant to the Court's Preliminary Approval Order (ECF No. 46), 89,675 copies of the Notice have been mailed to potential Settlement Class Members and their nominees, and the Summary Notice was published in the *Investor's Business Daily* and transmitted over the *PR Newswire*.  Ex. 3 at ¶¶3-10.  The Notice advised potential Settlement Class Members that Lead Counsel would seek fees up to 30% of the Settlement Fund and payment of litigation expenses in an amount not to exceed $200,000.  *See* Ex. 3-A.  While the September 3, 2019 deadline for Settlement Class Members to object to the requested attorneys' fees and expenses has not yet passed, to date, no objections have been received.

For all the reasons set forth below, Lead Counsel respectfully requests that the Court approve its application for an award of attorneys' fees and expenses.

## ARGUMENT

### I.    PLAINTIFFS' COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND

The Supreme Court has long recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). The Tenth Circuit agrees, and has repeatedly held that a court may award attorneys' fees from a common fund in situations where, as here, that fund is the result of the attorneys' successful prosecution of the action.  *See, e.g., Law v. NCAA*, 4 F. App'x. 749 (10th Cir. 2001); *Gottlieb v.*

*Barry*, 43 F.3d 474, 482 (10th Cir. 1994); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir. 1988) ("The common fund doctrine 'rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched at the successful litigant's expense.'").

Moreover, the Supreme Court has emphasized that private securities actions, like this Action, are "an essential supplement to criminal prosecutions and civil enforcement actions" brought by the U.S. Securities and Exchange Commission ("SEC"). *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007); *accord Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985) (private securities actions provide "a most effective weapon in the enforcement of the securities laws and are a necessary supplement to [SEC] action"). "Federal securities class actions require plaintiffs' counsel to expend substantial time and effort with no guarantee of success" and "[i]n light of these difficulties, public policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC." *In re Crocs, Inc. Sec. Litig.*, No. 07-cv-02351, 2014 WL 4670886, at *5 (D. Colo. Sept. 18, 2014). Compensating plaintiffs' counsel for bringing these actions is essential, because "[s]uch actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *Hicks v. Morgan Stanley*, No. 01 Civ. 10071 (RJH), 2005 WL 2757792, at *9 (S.D.N.Y. Oct. 24, 2005).

II.     **THE REQUESTED ATTORNEYS' FEES ARE REASONABLE
        UNDER THE PERCENTAGE-OF-THE-FUND METHOD**

    A.     **The Percentage of the Fund Method Is the Preferred Method for
               Awarding Attorneys' Fees from a Common Fund**

In the Tenth Circuit, the percentage of the fund method is the appropriate and preferable method for calculating and awarding fees in common fund cases. *See In re Crocs*, 2014 WL 4670886, at *1 ("the Tenth Circuit has 'recognized the propriety of awarding attorneys' fees . . . on a percentage of the fund, rather than lodestar, basis") (citing *Uselton v. Commercial Lovelace Motor Freight*, 9 F.3d 849, 853 (10th Cir. 1993)). Similarly, in *Gottlieb*, the Tenth Circuit stated that although either the percentage or the "lodestar" method can be used in appropriate cases, "*Uselton* implies a preference for the percentage of the fund method." 43 F.3d at 483 (citing *Uselton v. Commercial Lovelace Motor Freight*, 9 F.3d 849, 853 (10th Cir. 1993)); *see also Vaszlavik v. Storage Tech. Corp.*, No. 95-cv-2525, 2000 WL 1268824, at *1 (D. Colo. Mar. 9, 2000) ("the Tenth Circuit has expressed 'a preference for the percentage of the fund method'"…).[3]

---

[3] The text of the PSLRA also supports awarding attorneys' fees in securities cases using the percentage method, providing that "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount . . . actually paid to the class." 15 U.S.C. §78u-4(a)(6). Other courts have noted that using the percentage method for determining a fee "is less subjective than the lodestar plus multiplier approach," and provides a better incentive to counsel where class counsel "was initially retained on a contingent fee basis." *Gottlieb*, 43 F.3d at 484; *see also In re N.M. Indirect Purchasers Microsoft Corp., Antitrust Litig.*, 149 P.3d 976, 993 (N.M. Ct. App. Nov. 15, 2006) ("The percentage method is preferred in some jurisdictions, including the Tenth Circuit, because this method rewards efficient and prompt resolution of class actions...").

**B.**     **The Requested Attorneys' Fees Are Reasonable**
           **Applying the Percentage-of-the-Fund Method**

The requested fee of 18% is less than the range of percentage fees regularly awarded by district courts within the Tenth Circuit. *See, e.g., Brown*, 838 F.2d at 455 n.2 (recognizing that a typical percentage award in a common fund case is around 33% of the recovery); *Vaszlavik*, 2000 WL 1268824, at *2 ("[C]lass action fee awards are typically 30% of the fund created by the settlement."); *Lucken Family Ltd. P'ship, LLP v. Ultra Res., Inc.*, No. 09-cv-01543-REB-KMT, 2010 WL 5387559, at *5 (D. Colo. Dec. 22, 2010) ("The customary fee awarded to class counsel in a common fund settlement is approximately one third of the total economic benefit bestowed on the class."); *Anderson v. Merit Energy Co.*, No. 07-cv-00916-LTB-BNB, 2009 U.S. Dist. LEXIS 100681, at *10 (D. Colo. Oct. 20, 2009) (same).

A review of attorneys' fees awarded in class actions with comparably sized, and even larger, settlements within the Tenth Circuit strongly supports the reasonableness of the 18% fee request here. *See, e.g.*, *In re Crocs*, 2014 WL 4670886, at *5 (awarding fee of 30% of $10 million settlement); *Mishkin v. Zynex, Inc.*, No. 09-cv-00780, 2012 WL 4069295, at *1 (D. Colo. Sept. 14, 2012) (awarding 25% of $2.5 million settlement); *In re Spectranetics Corp. Sec. Litig.*, No. 08-cv-02048, slip op. at 3 (D. Colo. Apr. 4, 2011) (awarding 28% of $8.5 million settlement) (Ex. 9);[4] *In re Novell, Inc. Sec. Litig.*, No. 99-995, slip op. at 1 (D. Utah May 26, 2005) (awarding 30% of $13.9 million settlement) (Ex. 9); *In re Molycorp, Inc. Sec. Litig.* 1:12-cv-00292-RM- KMT, slip op. at 1 (D. Colo. June 16, 2017) (awarding 30% of $20.5 million

---

[4] All unreported slip opinions are submitted herewith in a compendium of cases attached as Exhibit 9 to the Gardner Declaration.

settlement) (Ex. 9); *In re Rhythms Sec. Litig.*, No. 02-35, slip op. at 7 (D. Colo. Apr. 3, 2009) (awarding fee of 30% of $17.5 million settlement) (Ex. 9); *Rasner v. FirstWorld Commc'ns, Inc.*, No. 00-cv-1376, slip op. at 2 (D. Colo. Jan. 19, 2005) (awarding 33% of $25.925 million settlement) (Ex. 9); *In re Bos. Chicken, Inc. Sec. Litig.*, No. 97-1308, 2006 U.S. Dist. LEXIS 56267, at *12 (D. Colo. Aug. 10, 2006) (awarding 29% of $23,586,408 settlement); *In re Sun Healthcare Grp, Inc. Sec. Litig.*, No. 99-00269, slip op. at 2 (D.N.M. Dec. 13, 2004) (awarding 30% of $5 million settlement) (Ex. 9).[5]

Additionally, a recent analysis by NERA Economic Consulting of securities class action settlements found that during 2014-2018, the median attorneys' fee award was 30% for settlements of between $5 million and $10 million.  *See* S. Starykh and S. Boettrich, *Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review*, at 41 (NERA Jan. 29, 2019), Ex. 2.

In sum, the percentage fee requested here is reasonable and less than percentage fee awards made within the Tenth Circuit and in connection with similar settlements.

## III.   THE FACTORS CONSIDERED BY COURTS WITHIN THE TENTH CIRCUIT SUPPORT THE REASONABLENESS OF THE REQUESTED FEE

The Tenth Circuit has stated that in determining the appropriate percentage of attorneys' fees in common fund cases, the Court should consider the factors set forth in the Fifth Circuit's

---

[5] Fee awards of 18% or more have been awarded by district courts within the Tenth Circuit in larger settlements as well.  *See, e.g.*, *In re Oppenheimer Rochester Funds Group Sec. Litig.*, No. 09-md-02063, slip op at 4 (D. Colo. Nov. 6, 2017) (awarding 30% of $89.5 million settlement); *Medina, et al. v. Clovis Oncology, Inc., et al.*, No. 1:15-cv-2546, slip op. at 2 (D. Colo. Oct. 26, 2017) (awarding 22.5% of $142 million settlement) (Ex. 9); *In re Nu Skin Enters., Inc., Sec. Litig.*, Civ. No. 2:14-cv-00033, slip op. at 2 (D. Utah Oct. 13, 2016) (awarding 29% to $47 million settlement (Ex. 9).

decision in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974).

*See Gottlieb*, 43 F.3d at 483 ("the court must consider the twelve *Johnson* factors" to determine the reasonableness of a common fund fee award); *see also Brown*, 838 F.2d at 454-55; *Uselton*, 9 F.3d at 853; *Lane v. Page*, 862 F. Supp. 2d 1182, 1251 (D.N.M. 2012) (the Tenth Circuit "has adopted" the Fifth Circuit Test in *Johnson*).  The *Johnson* factors include the following:

> (1) The time and labor required…[;] (2) The novelty and difficulty of the questions involved…[;] (3) The skill requisite to perform the legal service properly…[;] (4) The preclusion of other employment by the attorney due to acceptance of the case…[;] (5) The customary fee…[;] (6) Whether the fee is fixed or contingent…[;] (7) Time limitations imposed by the client or the circumstances…[;] (8) The amount involved and the results obtained…[;] (9) The experience, reputation, and ability of the attorneys…[;] (10) The "undesirability" of the case…[;] (11) The nature and length of the professional relationship with the client…[; and] (12) Awards in similar cases.

*Johnson*, 488 F.2d at 717-19.  "[R]arely are all of the *Johnson* factors applicable" in a common fund case.  *Brown*, 838 F.2d at 456; *see also Uselton*, 9 F.3d at 853.  Given that the relevance of each of the *Johnson* factors will vary according to the particulars of each case, lower courts have discretion to apply the factors in view of the circumstances of the case.  *Brown*, 838 F.2d at 456.  As set forth below, application of the relevant *Johnson* factors supports Lead Counsel's fee request.[6]

---

[6] The customary fee (*Johnson* factor 5) and awards in similar cases (*Johnson* factor 12) are two factors that are often assessed in tandem (*see Crocs*, 2014 WL 4670886, at *3) and are addressed *supra* in §II.B.  In addition, the following *Johnson* factors are not relevant to this Action, and, therefore, are not addressed herein: time limitations imposed by the client or the circumstances (*Johnson* factor 7), and the nature and length of the professional relationship with the client (*Johnson* factor 11).

A.    The *Johnson* Factors Support the Fairness and
      <u>Reasonableness of the Requested Fee</u>

1.    The Amount Involved and the Results Achieved

The result achieved for the class (*Johnson* factor 5) is often cited as the most important factor when assessing an appropriate fee award.  *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("most critical factor is the degree of success obtained"); *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 630 (D. Colo. 1976) ("the amount of the recovery, and end result achieved are of primary importance, for these are the true benefit to the client").

Here, Lead Counsel has achieved a recovery of $5.75 million for the benefit of the Settlement Class, which represents a favorable portion of likely recoverable alleged damages. ¶¶32-35.   According to Lead Counsel's consulting damages expert, maximum aggregate damages in the Action would exceed several hundred million dollars.   However, given that Defendants would have likely pointed to confounding news that was released on the alleged corrective disclosure dates, Lead Counsel's expert performed a disaggregation analysis to remove the effects of potentially confounding information, which reduces estimated damages to between approximately $70 million and $100 million, if gains accrued during the Class Period on pre-Class Period holdings are removed or "netted."   Under these scenarios, the Settlement would recover approximately 6-8% of estimated disaggregated damages the class would seek — a favorable recovery, particularly in light of the attendant litigation risks.  *Id.*

Since the passage of the Private Securities Litigation Reform Act of 1995, courts have approved settlements that recovered a similar, or smaller, percentage of maximum damages. *See, e.g*., *Schuler v. Medicines Co*., No. CV 14-1149 (CCC), 2016 WL 3457218, at *8 (D.N.J. June 24, 2016) (approving $4,250,000 securities fraud settlement that reflects approximately

4.0% of the estimated recoverable damages and noting percentage "falls squarely within the range of previous settlement approvals"); *In re Omnivision Techs. Inc*., 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) ($13.75 million settlement yielding 6% of potential damages after deducting fees and costs was "higher than the median percentage of investor losses recovered in recent shareholder class action settlements"); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp*., No. 12 Civ. 1609, 2015 WL 965693, at *9 (W.D. La. Mar. 3, 2015) (finding reasonable a $7,850,000 settlement in securities fraud action providing 7.4% to 10.3% of class's potential recovery).

The result achieved, in light of the substantial risks, is significant and supports the requested fee.

### 2.  The Time and Labor Required

The time and effort expended by Plaintiffs' Counsel in prosecuting this Action and achieving the Settlement show that the requested fee is justified.  As set forth in greater detail in the Gardner Declaration, Plaintiffs' Counsel, among other things: (i) conducted a thorough investigation into the alleged misconduct, which included consulting with an economics expert regarding loss causation and damages and with a forensic accounting expert regarding Lead Plaintiff's claims about the Company's use of Easy Pay credit to allegedly boost sales and meet performance targets, analyzing publicly available information and data concerning the Company and its securities, conducting 27 interviews of former Qurate employees and other potential witnesses, and reviewing the public record; (ii) drafted and filed a detailed Amended Complaint; (iii) reviewed approximately 3,000 pages of core documents produced by Defendants in connection with efforts to reach a negotiated resolution of the Action; and (iv) exchanged

detailed mediation statements with Defendants and engaged in vigorous arm's-length settlement negotiations. *See generally* Gardner Declaration.

Plaintiffs' Counsel expended more than 2,077.2 hours investigating, prosecuting and resolving this Action with a total lodestar value of $1,219,583.75. The time and effort devoted to this case by Plaintiffs' Counsel, and their efficient and effective management of the litigation, were critical to obtaining the result achieved by the Settlement, and this factor supports the fee request.

### 3.   The Novelty and Difficulty of the Issues

The novelty and difficulty of the issues in a case (*Johnson* factor 2) is a significant factor in determining a fee award. Securities class actions are inherently difficult. *See, e.g., In re Crocs*, 2014 WL 4670886, at *3 ("[l]itigating an action under the PSLRA is not a simple undertaking…"); *Qwest Commc'ns*, 625 F. Supp. 2d 1143, 1149 (D. Colo. 2009) ("There are few simple class action cases involving securities law. This area of law may not be novel, but it generally is complex and difficult"); *In re Sumitomo Copper Litig.*, 189 F.R.D. 274, 281 (S.D.N.Y. 1999) ("'[C]lass action suits' in general 'have a well-deserved reputation as being most complex.'… [F]ederal courts, including this Court, 'have long recognized that [securities class actions are] notably difficult and notoriously uncertain.'"). Here, as set forth in detail in the Gardner Declaration, there were many difficult questions presented in the litigation, including establishing the falsity of Defendants' statements and proving scienter, overcoming a nuanced statute of limitations defense, and maneuvering through complex issues concerning loss causation and damages. ¶¶23-36.

Regarding falsity, Defendants would have contended that QVC's use of the Easy Pay program and its risks were well known to the market. Defendants would have further argued that even if Easy Pay credit was used as an important sales driver, as Lead Plaintiff alleges, that did not render misleading the Company's discussion of other aspects of its business that it also considered significant. ¶¶18, 20, 25.

Defendants also had numerous strong defenses to scienter, including that: (i) the Amended Complaint did not plead how stock sales by the Individual Defendants were out of line with their past practices, or suspiciously timed; (ii) any inference of scienter that might exist from stock sales was undermined by public filings demonstrating that the Company engaged in a substantial stock repurchase program throughout the Class Period; and (iii) incentive-based compensation is common among executives at publicly traded companies and does not ordinarily indicate scienter. ¶¶19, 26. Even if Lead Plaintiff prevailed on Defendants' motion to dismiss, Defendants would likely move for summary judgment following discovery, arguing, among other things, that Lead Plaintiff would not be able to prove that anyone in 2015, or the first quarter in 2016, believed the bad debt expense estimated for the fourth quarter of 2015 would later prove insufficient. ¶27.

To address such arguments, Lead Counsel worked closely with Lead Plaintiff's forensic accounting expert concerning the Company's use of Easy Pay credit to allegedly boost sales and meet performance targets. Lead Counsel thoroughly investigated the Company's historical financial statements in consultation with the forensic accounting expert and reviewed the Company's financial statements, including its debt reserves and accounts receivables, during the Class Period. This review was complicated by the fact that the entity now known as Qurate

changed its name and encompassed different subsidiaries before and during the Class Period. For example, during the Class Period, Qurate Retail Inc. was known as "QVC Group" and the assets that made up QVC Group were all wholly-owned subsidiaries of Liberty Interactive Corporation.  In March 2018, QVC Group was rebranded as Qurate Retail Inc., and in April 2018 Liberty Interactive was renamed Qurate.  Lead Counsel, in consultation with the forensic accounting expert, analyzed the correlation between QVC's use of Easy Pay and Qurate's revenue.  Lead Counsel sought to quantify the extent to which Defendants offered Easy Pay credit during the Class Period, as well as recorded bad debt expenses and estimated write-offs. Lead Counsel further analyzed the interaction of Easy Pay with revenue by charting the Company's bad debt expense throughout the Class Period.  With the help of the expert, Lead Counsel also analyzed Qurate's bad debt expense, as reported, compared to Qurate's later-disclosed "normalized" bad debt expense rate.  ¶18.

Lead Counsel also conducted an extensive review of publicly available information regarding the Individual Defendants' employment and compensation agreements throughout their tenure at the Company.  Lead Counsel analyzed the Individual Defendants' compensation utilizing data provided by Bloomberg and engaged in a comparative analysis of compensation before and during the Class Period in order to support Lead Plaintiff's allegations that the Company's executive officers received bonuses for hitting certain earnings benchmarks for the year, which Lead Plaintiff alleges the Company could have only achieved by increasing the use of Easy Pay.  While Lead Counsel believes the work was fruitful, its review of these various sources of revenue and compensation information was difficult and time consuming and necessitated thorough consultation with the forensic accounting expert.  ¶19.

Lead Counsel also faced Defendants' significant argument that the claims are barred by the statute of limitations under the Exchange Act, because the first of the two alleged partial disclosures (August 5, 2016) is outside the two year statute of limitations, given that the initial complaint in the action was filed on September 6, 2018. *See Lane*, 862 F. Supp. 2d at 1253 (awarding attorneys' fees in a case involving "complex loss causation and statute-of-limitations questions"). The rebuttal to this argument involved nuanced issues particular to the alleged disclosures on August 5, 2016 and September 8, 2016 and intersected with complex loss causation and damages issues given the nature of the disclosures. More specifically, Defendants would have argued that, as of August 5, 2016, investors had all the information they needed about the allegedly omitted information, and that the truth allegedly disclosed on September 8, 2016 was repetitive of information disclosed on August 5, 2016. *See, e.g.,* ¶¶28-29; *see also Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) (the two year statute of limitations begins to run when "the plaintiff actually discovered or a reasonably diligent plaintiff would have discovered the facts constituting the violation – whichever comes first"). Lead Counsel worked closely with Lead Plaintiff's consulting damages expert to counter such arguments in an effort to preserve the claims.

Regarding loss causation and damages, as detailed in the Gardner Declaration, Defendants would have contended that: (i) no damages were recoverable for the two alleged corrective disclosures at issue in this case because the alleged disclosures were not corrective of any alleged misstatement; (ii) the stock price declines on August 5 and September 8, 2016 were due to the announcement of a sales slowdown caused by multiple factors (*i.e.*, challenges in QVC's apparel, accessories, jewelry, electronics, and beauty segments) and not the allegedly

corrective disclosures of the increased use of Easy Pay; and (iii) "disaggregating" the impact of "confounding," non-fraud related information from the price declines would substantially reduce damages.  ¶¶30-36.  These difficult issues required complex and sophisticated analysis by Lead Counsel and its expert.

Furthermore, even if Lead Plaintiff had prevailed in these challenges in connection with the motion to dismiss, at summary judgment and trial, success would have been challenged in post-trial motions and on appeal.  Accordingly, if not settled, the Settlement Class in this case faced the considerable risk of years of additional complicated litigation.  Lead Counsel worked diligently to achieve a significant result for the Settlement Class in the face of these very real risks.  Under these circumstances, the requested fee is fully appropriate.

> **4.**     **The Skill Required to Perform the Legal Services Properly, and the Experience, Reputation and Ability of the Attorneys**

Under these two *Johnson* factors, the Court should consider the skill required to litigate the Action and "the experience, reputation and ability of the attorneys" involved.  *Johnson*, 488 F.2d at 718-19.  *See also In re Qwest Commc'ns Int'l, Inc. Sec. Litig.*, No. 01-1451, 2006 WL 8429707, at *4 (D. Colo. Sept. 29, 2006) ("Particularly in a case as complex as this [securities class action]. . .[t]his factor carries significant weight because the plaintiff class likely would not have obtained any relief without the assistance of counsel with a high level of skill and expertise.").  Considerable litigation skills were required in order for Lead Counsel and Lead Plaintiff to achieve the Settlement in this Action.  As noted above, this is a complex case involving difficult factual and legal issues on the merits, and it would be subjected to an extremely rigorous defense.  Given the many contested issues, it took highly skilled counsel to represent the class and bring about the substantial recovery that has been obtained.

Labaton Sucharow is among the most experienced and skilled securities litigation law firms in the country.  Since the passage of the PSLRA, Labaton Sucharow has been approved by courts to serve as lead counsel in numerous securities class actions throughout the United States.  *See* Ex. 4-C.  Lead Counsel submits that the skill of the Firm's attorneys, the quality of its attorneys' efforts in the litigation, the Firm's substantial experience in securities class actions, and the Firm's commitment to the litigation were key elements in enabling Lead Counsel to negotiate this Settlement.

Courts have also recognized the quality of the opposition faced by plaintiffs' counsel when assessing the quality of counsel's performance.  *See In re Crocs,* 2014 WL 4670886, at *3 ("Moreover, defendants' counsel is equally skilled, which required Plaintiffs' Counsel to expend significant effort and skill defending plaintiffs' claims."); *Lane,* 862 F. Supp. 2d at 1254 ("Given the high quality of defense counsel, 'there was simply no way that this case could have been prosecuted successfully without a high level of skill exhibited on the part of Class Counsel.'").  Here, Defendants were represented by O'Melveny & Myers LLP and Sherman & Howard L.L.C., prestigious and experienced defense firms.  Notwithstanding this formidable opposition, Lead Counsel achieved a favorable settlement.

### 5.      The Preclusion of Other Employment and Whether the Fee Is Fixed or Contingent

The fourth and sixth *Johnson* factors, the extent to which counsel was precluded from other employment and whether the fee is fixed or contingent, also support approval of the requested attorneys' fees.  Lead Counsel dedicated considerable time and effort to the Action despite the very significant risks of no recovery and while deferring any payment of their fees and expenses until a settlement was reached.  *See, e.g., O'Dowd v. Anthem, Inc.,* No. 14-cv-

02787, 2019 WL 2248548, at *17 (D. Colo. May 24, 2019) ("given that Class Counsel spent a significant number of hours on this matter on a contingent fee basis, it is reasonable to expect that this case precluded other work").  Further, the fully contingent nature of the fee requested by Lead Counsel and the substantial risks posed by the litigation support the requested fee.  *See In re Crocs*, 2014 WL 4670886, at *4 ("A contingent fee arrangement often weighs in favor of a greater fee because '[s]uch a large investment of money [and time] place[s] incredible burden upon law practices."); *Tuten v. United Airlines, Inc.*, 41 F. Supp. 3d 1003, 1009 (D. Colo. 2014) ("Class Counsel took the case on a contingent basis, which permits a higher recovery to compensate for the risk of recovering nothing for their work."); *Vaszlavik,* 2000 WL 1268824, at *4 ("Class counsel pursued this case on a contingent fee, whereby they would receive no compensation for their labor if they did not obtain a successful outcome, either through settlement or judgment.  Given the risk of non-recovery, this factor weighs heavily in favor of the requested fee.").

Lead Counsel prosecuted this Action on a wholly contingent basis and bore all risks of litigating the case through trial and appeals.  From the outset of this case, Lead Counsel understood that they were embarking on a complex, risky, and potentially lengthy litigation, which could (and did) require the expenditure of many hours of attorney time and the investment of tens of thousands of dollars in litigation expenses, with no guarantee of ever being compensated for their investment of time or resources.  *See also* ¶¶70-77.  Counsel's assumption of this contingency fee risk, and the extensive litigation of the Action in the face of these risks, strongly supports the reasonableness of the requested fee.

**6.      The Undesirability of the Case**

While Lead Counsel did not consider this case to be "undesirable," there was no government investigation by the Department of Justice or the SEC, no Restatement by the Company, and no admission by Defendants, and therefore, there was no roadmap for Lead Plaintiff and Lead Counsel to follow.  Moreover, there were substantial risks in financing and prosecuting this case, and Lead Counsel knew that they would have to spend substantial time and money without any assurance of being compensated for their efforts.  Thus, the "undesirability" of the case also weighs in favor of the requested fee.  *See, e.g.*, *In re Crocs,* 2014 WL 4670886, at *5 (noting that "public policy supports granting attorneys' fees that are sufficient to encourage plaintiffs' counsel to bring securities class actions that supplement the efforts of the SEC" and finding the undesirability of the case weighed in favor of the requested fee award).

**B.      The Requested Fees are Reasonable Under the Lodestar Method**

Although the percentage method is the appropriate and preferable approach, some courts in the Tenth Circuit use the lodestar method as a cross-check measure to demonstrate the reasonableness of the fee request.  *See In re Crocs*, 2014 WL 4670886, at *4 ("Courts using the percentage method will often cross check the request award with the lodestar amount.").  Here, the lodestar method would actually result in a higher fee to Plaintiffs' Counsel.  Additionally, under the lodestar method, courts often award fees that are a multiple higher than counsel's lodestar in order to recognize and compensate counsel's having assumed the representation without an assured payment of any fees.  *See, e.g.*, *Vaszlavik*, 2000 WL 1268824, at *4 (the lodestar method "multiplies the reasonable hours expended by a reasonable hourly rate, and finally by an additional percentage to compensate for risk"); *In re Spectranetics Corp.*, No. 08-

cv-02048, slip op. at 3 ("Lead Counsel's total lodestar is $2,182,958 dollars. A twenty-eight percent (28%) fee represents a multiplier of 1.09. This further supports the Court's finding that the fee request is fair, adequate, and reasonable.") (Ex. 9).

The requested 18% fee, which would amount to $1,035,000 (before interest), would represent a negative multiplier of approximately 0.85 of Plaintiffs' Counsel's total lodestar. Stated differently, the requested fee would be 85% of the value of the time incurred by Plaintiffs' Counsel in the prosecution and resolution of this litigation. Given that lodestar multipliers between 2 and 5 are commonly awarded in complex class actions with substantial contingency risks, the negative multiplier of approximately 0.85 requested here strongly supports the reasonableness of the requested fee. *See, e.g.*, *In re Qwest*, 2006 WL 8429707, at *4 (stating that "lead counsel who create a common fund for the benefit of a class are rewarded with fees that often are at least two times the reasonable lodestar figure, and in some cases reach as high as five to ten times the lodestar figure"). Courts have noted that a percentage fee that falls below counsel's lodestar strongly supports the reasonableness of the award. *See, e.g., In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-CV-3400 CM PED, 2010 WL 4537550, at *26 (S.D.N.Y. Nov. 8, 2010) ("Lead Counsel's request for a percentage fee representing a significant discount from their lodestar provides additional support for the reasonableness of the fee request.").

Plaintiffs' Counsel collectively expended 2,077.2 hours in the prosecution of this case. ¶66; Exs. 4-A, 5-A, and 6-A and Ex. 7 (Summary Table). Based on Plaintiffs' Counsel's hourly

rates, the total lodestar is $1,219,583.75.[7]  *See id*.  The hourly rates of Plaintiffs' Counsel here range from $585 to $980 for partners, $635 to $675 for of-counsels, and $345 to $625 for associates.  *See* Exs. 4-A, 5-A, and 6-A.  The hourly rates used in Plaintiffs' Counsel's lodestar calculation are reasonable in light of prevailing market rates for lawyers with comparable levels of experience and expertise in securities litigation and other complex class action litigation.  *See Lucas v. Kmart Corp*., No. 99-cv-01923, 2006 WL 2729260, at *4 (D. Colo. July 27, 2006) ("[T]he relevant community for purposes of determining a reasonable billing rate for Class Counsel likely consists of attorneys who litigate nationwide, complex class actions.").  Further, Lead Counsel submits that Plaintiffs' Counsel's rates are less than, or comparable to, those used by peer defense-side law firms litigating matters of similar magnitude.  Sample defense firm rates in 2018, gathered by Labaton Sucharow from bankruptcy court filings nationwide, often exceed these rates.  ¶65; Ex. 8 (table aggregating hourly rates of more than a dozen defense firms).

### C.   Other Factors Considered by Courts Further Support the Requested Fee as Fair and Reasonable

#### 1.   The Requested Fee Is Entitled to a Presumption of Reasonableness as it Is Based on a Fee Agreement

The 18% request is based on a pre-settlement agreement with Indiana, given the stage of the litigation at the time of settlement and the amount of the Settlement.  ¶60.  A fee agreement between a properly selected PSLRA lead plaintiff and counsel should be afforded a presumption

---

[7] The Supreme Court and courts in this Circuit have approved the use of current hourly rates, rather than historical rates, to calculate base lodestar figures in order to compensate counsel for the delay in receiving payment.  *See Missouri v. Jenkins*, 491 U.S. 274, 284 (1989); *Leroy v. City of Houston*, 831 F.2d 576, 584 (5th Cir. 1987) ("current rates may be used to compensate for inflation and delays in payment").

of reasonableness.  *See In re Cendant Corp. Litig.*, 264 F.3d 201, 282 (3d Cir. 2001) (*ex ante* fee agreements in securities class actions enjoy "a presumption of reasonableness"); *In re Marsh & McLennan Cos. Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *15 (S.D.N.Y. Dec. 23, 2009) ("Since the passage of the PSLRA, courts have found such an agreement between fully informed lead plaintiffs and their counsel to be presumptively reasonable").  Additionally, Lead Plaintiff fully supports and approves the fee request.  Ex. 1 at ¶¶5-6, 8.

Indeed, the PSLRA was intended to encourage institutional investors like Lead Plaintiff to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and actions of plaintiff's counsel." H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 731 (1995). Congress believed that these institutions would be in the best position to monitor the prosecution and to assess the reasonableness of counsel's fee requests.  Accordingly, Lead Plaintiff's endorsement of the fee request in this PSLRA action supports its approval. *See, e.g., In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695(CM), 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request"); *In re Lucent Techs., Inc. Sec. Litig.*, 327 F. Supp. 2d 426, 442 (D.N.J. 2004) ("[s]ignificantly, the Lead Plaintiffs, both of whom are institutional investors with great financial stakes in the outcome of the litigation, have reviewed and approved Lead Counsel's fees and expenses request").

2.      **The Reaction of the Settlement Class to Date Supports the Requested Fee**

The reaction of the Settlement Class to date also supports the requested fee. As of August 19, 2019, 89,675 Notices have been disseminated by the Claims Administrator to potential Settlement Class Members and their nominees informing them of, among other things, Lead Counsel's intention to apply to the Court for an award of attorneys' fees not to exceed 30% of the Settlement Fund and payment of up to $200,000 in expenses. *See* Ex. 3-A at ¶¶4, 36. To date, no objections have been received. ¶88. Lead Counsel will address any future objections in their reply papers to be filed with the Court on September 16, 2019.

**IV.    THE REQUESTED EXPENSES ARE REASONABLE AND WERE NECESSARY TO ACHIEVE THE BENEFIT OBTAINED**

Lead Counsel's fee application includes a request for payment of Plaintiffs' Counsel's litigation expenses that were reasonably incurred and necessary to the prosecution of this Action. These expenses are properly recovered by counsel. *See Vaszlavik*, 2000 WL 1268824, at *4 ("As with attorneys' fees, an attorney who creates or preserves a common fund for the benefit of a class is entitled to receive reimbursement of all reasonable costs incurred."). As set forth in the Gardner Declaration, Plaintiffs' Counsel incurred $85,790.40 in litigation expenses on behalf of the class in the prosecution of the Action. ¶¶79-84; Exs. 4-B and 5-B; 7. This amount is well-below the $200,000 cap that the Notice informed potential Settlement Class Members that Lead Counsel may apply for, and which—to date—there has been no objection to.

Much of Plaintiffs' Counsel's expenses were for professional services rendered by Lead Plaintiff's experts and consultants ($51,190.50 or 60% of total expenses). Lead Counsel retained experts in the fields of damages, loss causation, and accounting to assist in the prosecution and

resolution of the Action.  These experts were valuable for the analysis and development of the claims and in connection with mediation.  Lead Counsel's loss causation and damages expert also assisted Lead Counsel with the development of the proposed Plan of Allocation for the proceeds of the Settlement.  Lead Counsel also consulted with a forensic accounting expert who conducted an accounting analysis regarding the financial elements of Lead Plaintiff's claim. Lead Counsel utilized these experts in order to efficiently frame the issues in the Action, gather relevant evidence and make a realistic assessment of provable damages.  *See In re Crocs*, 2014 WL 4670886, at *5 (awarding requested expenses related to "computer research, investigation, and experts/consultants" "which, given the nature of the case, is an appropriate use of resources").

Additionally, Plaintiffs' Counsel incurred expenses related to, among other things, the mediation, electronic research, travel, court fees, and duplicating.  A complete breakdown by category of the expenses incurred is set forth in Plaintiffs' Counsel's respective declarations.  *See* Exs. 4-B and 5-B.  These expenses are properly recoverable by counsel.

The Notice informed potential Settlement Class Members that Lead Counsel would apply for payment of litigation expenses in an amount not to exceed $200,000.  As noted above, the amount of litigation expenses requested, $85,790.40, is well below the amount listed in the Notice and, to date, there has been no objection to the request for expenses.

## V.   LEAD PLAINTIFF'S REQUEST FOR REASONABLE COSTS AND EXPENSES PURSUANT TO THE PSLRA

Lastly, in connection with their request for payment of litigation expenses, Lead Counsel also seeks an award of $1,750.00 for Lead Plaintiff in connection with its efforts to oversee and assist Lead Counsel with the litigation of the Action.  The PSLRA, 15 U.S.C. § 78u-4(a)(4),

limits a class representative's recovery to an amount "equal, on a per share basis, to the portion of the final judgment or settlement awarded to all other members of the class," but also provides that "[n]othing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class." Specifically, Indiana seeks reimbursement in the amount of $1,750.00 for the time it dedicated to the litigation efforts. *See* Ex. 1 at ¶¶7-8.

Indiana took an active role in the litigation and has been fully committed to pursuing the class's claims since it became involved in the litigation. *See* Ex. 1 at ¶3. Lead Plaintiff also attended the March 25, 2019 mediation in New York. *Id.* These efforts required Lead Plaintiff to dedicate time and resources to the Action that it would have otherwise devoted to its regular duties. The requested reimbursement is based on the hours that Lead Plaintiff committed to these activities. *Id.*

Numerous courts have approved reasonable awards to compensate plaintiffs for the time and effort they spent on behalf of a class. *See, e.g.*, *In re Nu Skin Enters, Inc., Sec. Litig.*, Civ. No. 2:14-cv-00033, slip op. at 3 (awarding $9,800.00 to lead plaintiff) (Ex. 9); *In re Oppenheimer Rochester Funds Group Sec. Litig.*, No. 09-md-02063, slip op. at 5 (D. Colo. Nov. 6, 2017) (awarding $74,000 in lost wages and expenses to Lead Plaintiff) (Ex. 9); *In re Oppenheimer Champion Income Fund Sec. Fraud Class Actions*, No. 09-cv-386, slip op. at 6 (D. Colo. Sept. 30, 2011) (awarding $9,000 and $7,500 to lead plaintiffs) (Ex. 9).

Accordingly, it is respectfully submitted that the amount sought by Lead Plaintiff is reasonable and should be granted.

## CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests that the Court award (i) attorneys' fees in the amount of 18% of the Settlement Fund, *i.e.*, $1,035,000, plus interest accrued at the same rate as the Settlement Fund; (ii) payment of litigation expenses totaling $85,790.40, plus interest accrued at the same rate as the Settlement Fund; and (iii) reimbursement of $1,750.00 to Lead Plaintiff, pursuant to the PSLRA.[8]

Dated: August 19, 2019                                  By: */s/ Jonathan Gardner*

**LABATON SUCHAROW LLP**
Jonathan Gardner
Christine M. Fox
Theodore J. Hawkins
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:  jgardner@labaton.com
cfox@labaton.com
thawkins@labaton.com

*Lead Counsel for Lead Plaintiff and the Proposed Class*

**THE SHUMAN LAW FIRM**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Facsimile: (303) 536-7849
Email: rusty@shumanlawfirm.com

---

[8] A proposed order will be submitted with Lead Counsel's reply papers, after the deadline for objecting has passed.

*Local Counsel for Lead Plaintiff and the
Proposed Class*

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Malcolm T. Brown
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4714
Facsimile: (212) 686-0114
Email: brown@whafh.com

*Additional Counsel for Lead Plaintiff*

## **CERTIFICATE OF SERVICE**

I certify that on this 19th day of August 2019, I caused the foregoing to be electronically filed with Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to the email addresses as identified on the attached Electronic Mail Notice List.

By: */s/ Jonathan Gardner*
      JONATHAN GARDNER

**I. Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

· **Guillaume Buell**
gbuell@tenlaw.com,gbradley@tenlaw.com,jmurphy@tenlaw.com,8927635420@filings.docketbird.com
· **Matthew W. Close**
mclose@omm.com,rely@omm.com,samanthamiller@omm.com,nymao.cwl@gmail.com,mleu@omm.com,brogers@omm.com
· **Karen Jean Cody-Hopkins**
karen@codyhopkinslaw.com
· **Nicholas Martin DeWeese**
ndeweese@shermanhoward.com,prendoff@shermanhoward.com,efiling@sah.com
· **Christine Marie Fox**
cfox@labaton.com,kgutierrez@labaton.com,6312349420@filings.docketbird.com,electroniccasefiling@labaton.com
· **Jonathan Gardner**
JGardner@labaton.com,kgutierrez@labaton.com,4027988420@filings.docketbird.com,fmalonzo@labaton.com,acarpio@labaton.com,electroniccasefiling@labaton.com
· **Rusty Evan Glenn**
rusty@shumanlawfirm.com,kip@shumanlawfirm.com
· **Theodore J. Hawkins**
THawkins@labaton.com,kgutierrez@labaton.com,5957819420@filings.docketbird.com,electroniccasefiling@labaton.com
· **Francis Paul McConville**
FMcConville@labaton.com,drogers@labaton.com,9849246420@filings.docketbird.com,ElectronicCaseFiling@labaton.com
· **Ivy Tran Ngo**
ngoi@fdazar.com,chateauneufs@fdazar.com,footec@fdazar.com
· **Abby Faith Rudzin**
arudzin@omm.com
· **Stefan D. Stein**
sstein@shermanhoward.com,madams@shermanhoward.com,efiling@shermanhoward.com

**II. Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

· (No manual recipients)

2